ABRAMS & WOFSY, et al.

v.

RENAISSANCE INVESTMENT CORPORATION, et al.

Kathy J. PIGNATELLI, et al.

v.

RENAISSANCE INVESTMENT CORPORATION, et al.

Fred A. ACHECAR, et al.

v.

RENAISSANCE INVESTMENT CORPORATION, et al.

Edmund S. PENDLETON, et al.

v.

RENAISSANCE INVESTMENT CORPORATION, et al.

Civ. Nos. 1:87–cv–1931–WCO, 1:87–cv–1962–WCO, 1:87–cv–2074–WCO and 1:87–cv–2454–WCO.

United States District Court, N.D. Georgia, Atlanta Division.

March 12, 1993.

---

F. Carroll, John R. Clarke, Calvin Corvaia, Fred M. Councill, Douglas Cummins, R.A. David, Robert A. Ericsson, Marshall Feaster, Robert H. Fier, David French, Victor Glazer, William H. Graf, Ruth Graf, Alvin T. Greenspan, Earl Hadlow, Carl Herndon, Robert S. Howard, J. Michael Hughes, Thomas H. Jacobsen, Thomas Judge, Walter Kaminski, Mary Beth King, Mitchell Leibovitz, Mark Oden Heimer, Thomas Petway, Pat Price, Billy Jo Raber, Charles E. Rice, Ronald Richey, William Saye, Michael Shigezane, Yakov Skarinsky, Wad A. Smith, Warren Soffian, Richard Steinberg, Benjamin Strauss, Parvesh Swani, John W. Turner, David C. Vaughter, Ronald Walker, Rick Wilber, Robert G. Wilder, J. Roy Wynne and Stanley Ziman, Fred A. Achecar, William M. Allen, Michael B. Arnold, Carolyn M. Cox, Robert W. Cox, John D. Cullen, Michael R. Deluca, John H. Drake, Robert A. Ericsson, Goodman B. Epsy, III, Grant D. Esterling, Marshall Feaster, Jane K. Feaster, Kenneth D. Frazier, William H. Gower, Michael E. Gribble, Anne Love Hall, David E. Handley, John P. Kelsey, Ronald D. Kettlehake, Wyvonne Kettlehake, Abraham Koch, Kenneth R.L. Lassiter, R. Thomas Lentz, Wolfgane E. Loescher, Teri A. Ohliger, John H. Mantas, David D. Mooberry, Charles D. Muvdi, Diane T. Bonaccorsi, Harriet M. Pastor, Raymond Pastor, David L. Pollack, Roslyn G. Pollack, Walter F. Putnam, Charles F. Richards, Ronald J. Ritchie, Jean Roberts, Larry J. Roth, Diane Roth, John W. Salisbury, Henry S. Sawin, Jr., William B. Saye, James W. Scott, Meyer Silver, Cynthia J. Silver, Donald M. Skinner, Barbara A. Skinner, Mark A. Suwyn, Perry L. Swanson, Barbara L. Swanson, Thomas Sweeney, Margaret T. Sweeney, Raju M. Vanapalli, E. Norman Veasey, Robert G. Wilder, Rea Bros., Inc., Rea Inv. Partners, Barry Berger and Jane Berger.

Charles David Hailey, Mozley Finlayson & Loggins, Michael Hilliard Schroder, Swift Currie McGhee & Hiers, Marion Smith, II, White Smith Howard & Ajax, Joseph John Burton, Jr., Burton & Anderson, Atlanta, GA, for plaintiffs Abrams & Wofsy, A.H. Adams, Eric Ansel, Halbert Ashworth, Richard Barlow, Betty Black, Allen Brill, Thomas

Marion Smith, II, White, Smith, Howard & Ajax, Joseph John Burton, Jr., Burton & Anderson, Atlanta, GA, for plaintiffs Smith W. Robertson, Goodman B. Espy, III, M.D. and Billy J. Raber, trustee.

Oliver Reid Dobbs, III, pro se.

Stephanie J. Chisholm, pro se.

Frank J. Beltran, Beltran & Coffey, Atlanta, GA, for defendant John T. Breedlove, MAI.

David Elliot Spalten, Lex Allen Watson, II, Merritt & Tenney, Atlanta, GA, for defendants Skillman E. Siewert, Skillman Siewert, Inc., a GA Corp.

Skillman E. Siewert, pro se.

Marion Smith, II, White Smith Howard & Ajax, Joseph John Burton, Jr., Burton & Anderson, Atlanta, GA, for Billy J. Raber, trustee.

Richard Riley Hays, Jay D. Bennett, Alston & Bird, Atlanta, GA, for Ake–Atlanta Venture No. 5, objector.

John A. Chandler, John L. North, Sutherland Asbill & Brennan, Atlanta, GA, Anthony J. Constantini, phv, KPMG Peat Marwick, New York City, for defendant Peat Marwick Main & Co.

Kirby Glenn Atkinson, Boyce Ekonomou & Atkinson, Atlanta, GA, Jack Jeffrey Helms, Jr., Helms & Helms, Homerville, GA, for cross-defendant Stephanie J. Chisholm.

Richard Byron Attridge, Richard Anthony Schneider, King & Spalding, Atlanta, GA, for Reed Smith Shaw & McClay, objector.

John David Jones, Greene Buckley Jones & McQueen, Carla Anne Ford, Office of U.S. Atty., N.D. Ga., John Douglas Hartness, Jr., F.D.I.C., Legal Div., Atlanta, GA, for plaintiffs Kathy J. Pignatelli, James M. Barr, David E. Boone, Frances Briamonte, Joseph W. Brown, Vickie A. Brown, John P. Clifford, M.I. Curtis, James H. Day, Edward I. Dobin, Paul F. Engstrom, Leonard H. Finkelstein, Gerard R. Frey, John D. Gavin, Carl A. Goldenberg, Edgar R. Goldenberg, Dennis M. Gray, Mary Jo Gray, John L. Gray, Judy E. Gray, Jose G. Guzman, Lourdes L. Guzman, James P. Halstead, James M. Hamlett, III, Edmund F. Hecklau, Eleanor S. Hecklau, William F. Heefner, Fred Lane, Mayling Y. Lane, Norman Levine, Helen O. Lieberman, Allan J. Nadeau, Judith A. Nadeau, Dewaine L. Osman, Nancy Ann Osman, Paul A. Parris, Edward A. Patrone, William R. Peterson, Jr., Lee S. Potter, Willard Potter, Robert W. Prichard, Vijaykumar M. Rao, Robert Scherr, Ann Scherr, William G. Smith, A. Reginald Tarleton, John W. Tarleton, Robert Turrentine, Jan M. Weinberg, Charles S. Wiworski, John S. Zettick and Elaine P. Zettick.

Margaret L. Milroy, Greene Buckley Jones & McQueen, Atlanta, GA, for plaintiff Eileen Gavin.

Jonathan Roger Levine, Levine & D'Alessio, Atlanta, GA, for defendant Charles M. Shirley.

Charles M. Shirley, pro se.

John J. Almond, C.B. Rogers, Rogers & Hardin, Atlanta, GA, John T. Coyne, phv, Jordan Coyne Savits & Lopata, Washington, DC, Thomas J. Hughes, Jr., Office of Thomas J. Hughes, Jr., Marietta, GA, for defendant Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey, a partnership.

John J. Almond, C.B. Rogers, Rogers & Hardin, Atlanta, GA, for Philip Schwartz.

Emmet J. Bondurant, II, Jeffrey O. Bramlett, George W. Fryhofer, III, Bondurant Mixson & Elmore, John L. North, Sutherland Asbill & Brennan, Atlanta, GA, for defendants Hurt, Richardson, Garner, Todd & Cadenhead, a GA Partnership, E. Lewis Hansen, Michael A. Hoover.

John A. Chandler, John L. North, Sutherland, Asbill & Brennan, Atlanta, GA, for defendant Jerry Humphries.

Brian Nathan Smiley, Page & Bacek, William L. Bost, Jr., Greenfield Bost & Kliros, Atlanta, GA, for defendant Robert Bretschneider.

Robert Bretschneider, pro se.

Dobbs Industries Const. Co., pro se.

Stephen J. Anderson, William E. Sumner, Sumner & Hewes, Atlanta, GA, for plaintiffs Edmund S. Pendleton and Diane M. Pendleton.

## ORDER

O'KELLEY, Chief Judge.

From January 21, 1992 to May 7, 1992, this court conducted the nonjury trial of the consolidated *Abrams & Wofsy, Pignatelli, Achecar,* and *Pendleton* cases ("the *Renaissance* cases"). At trial, the plaintiffs and defen-

dants KPMG Peat Marwick and Jerry F. Humphries (collectively "Peat Marwick") presented evidence relevant to the *Abrams & Wofsy, Pignatelli,* and *Pendleton* plaintiffs' claims of fraud and negligence brought pursuant to (1) section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (hereinafter "section 10(b)"); (2) the Georgia Securities Act; (3) common law fraud under Georgia law; and (4) the Georgia law of professional negligence. The court now sets forth its findings of fact and conclusions of law relating to these claims. Fed.R.Civ.P. 52(a). In doing so, the court makes the following conclusions: (1) assuming that plaintiffs' section 10(b) claims against Peat Marwick are not time-barred,[1] these claims fail because the evidence does not show that Peat Marwick possessed the requisite scienter; (2) plaintiffs' claims under the Georgia Securities Act fail because Peat Marwick did not act as a seller under the applicable version of section 10–5–12(a)(2) and no private cause of action is available under the applicable version of section 10–5–12(d); (3) plaintiffs' common law fraud claims fail because the evidence does not show that Peat Marwick possessed the requisite scienter; (4) the *Pignatelli* and *Pendleton* plaintiffs' federal and Georgia RICO claims fail because the requirement of two or more predicate acts has not been met; and (5) plaintiffs' claims of professional negligence fail because the evidence does not show that Peat Marwick breached any duty owed to plaintiffs.

## I. *The Rise and Fall of Renaissance Investment Corporation*

The evidence at trial showed that Renaissance Investment Corporation ("Renaissance") was a company masterminded and run by Oliver Reid Dobbs, III. With the help of his father's ample financial resources and his Renaissance staff, including such key figures as Stephanie Chisholm (vice-president of administration), Charles Shirley (vice-president of finance), and Tom Nelson (vice-president of construction), Dobbs acquired several residential properties in Atlanta, Georgia for the purpose of renovating them and selling them to investors. Judging from his educational background and his activities at Renaissance, as shown at trial, Dobbs appears to have been a relatively sophisticated businessman. He attended a well-regarded private high school in Atlanta, obtained bachelor's and master's degrees in business, and received the benefit of one year of law school. However, unfortunately for all those involved in the *Renaissance* litigation, he devoted his business acumen to pursuing any necessary means, including making fraudulent misrepresentations and involving other people in his scheme, to accomplish his burgeoning ambitions to develop and renovate these historic Atlanta properties.

As the evidence revealed, Dobbs was quite adept at dealing with bankers, accountants, and lawyers who assisted him in structuring the renovation projects to secure debt and equity financing through bank loans and, more significantly, through the "syndication" process. Each syndication involved (1) forming a limited partnership for a real estate project, (2) preparing an offering circular, known as a private placement memorandum ("PPM"), to induce investment in the project, (3) circulating the PPM to a limited number of prospective investors, who were generally quite wealthy and were interested in investments with significant tax benefits, and (4) admitting a limited number of investors as limited partners of the real estate limited partnership so that equity financing could be raised.

After completing a few small real estate renovation projects, Renaissance began its first syndication effort in 1984 with the Biltmore "Executive Wing," which was part of the historic Biltmore hotel. The Executive Wing project was acquired by a entity affili-

---

1. On July 21, 1992, the court ruled that all plaintiffs' claims against Peat Marwick brought pursuant to section 10(b) are governed by the one-year/three-year limitations scheme set forth in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (June 20, 1991). On September 11, 1992, in *Henderson v. Scientific–Atlanta, Inc.,* 971 F.2d 1567 (11th Cir.1992), the Eleventh Circuit held that Section 27A of the Securities Exchange Act of 1934 is constitutional and that, under Georgia law, a two-year statute of limitations applies to section 10(b) claims commenced on or before June 19, 1991.

ated with Renaissance known as Atlanta Biltmore Associates, Ltd., of which Renaissance was the general partner. Through the syndication process, Atlanta Biltmore Associates, Ltd. sold the project to an entity known as Biltmore Towers Associates, Ltd.; limited partnership interests were offered in an entity known as Executive Wing Partners, Ltd., which acquired a sixty-one percent general partnership interest in Biltmore Towers Associates, Ltd. As general partner of Executive Wing Partners, Ltd. and Atlanta Biltmore Associates, Ltd., Renaissance was actively involved with the development of the Executive Wing project and the marketing of limited partnership interests in Executive Wing Partners, Ltd.

The Executive Wing Partners, Ltd. PPM, which was dated December 23, 1984, disclosed that Dobbs Industries Construction Company ("DICC"), another affiliate of Renaissance, had undertaken the renovation work. Exh. 5012 at Bates P0018341. The PPM further disclosed that construction was anticipated to be completed by February 28, 1985. *Id.* In addition, the PPM disclosed that the project was encumbered by a $10,000,000 "wraparound deed to secure debt," which represents the purchase money financing of the project, executed by Atlanta Biltmore Associates, Ltd. in favor of O.P.D.I.–U.S. ("OPDI"). *Id.* at Bates P0018354. Last, the PPM disclosed that the proceeds of the syndication closing would be held in escrow until, among other things, DICC completed its construction work and the rehabilitation of the project was finished. *Id.* at Bates P0018355.

The evidence showed that substantial delays in construction occurred on the Executive Wing project, which in turn caused serious problems with OPDI and other creditors. When construction was complete and the escrow funds were released in late September, 1985, an enormous number of liens and lawsuits related to the project had accumulated. Claiming that Atlanta Biltmore Associates, Ltd. had defaulted on its obligation, OPDI brought two lawsuits against Atlanta Bilt-

more Associates, Ltd. and Renaissance. By the time escrow broke, the financial condition of Renaissance and DICC had become seriously troubled because of the desperate need for fees and profits due from the Executive Wing syndication.

Despite these dire problems resulting from delays in the release of the Executive Wing escrow, Renaissance forged ahead with plans for additional real estate syndications. In the summer and fall of 1985, Dobbs and Renaissance engineered syndications for two properties known as the St. Andrews and the Granada; in each syndication, Renaissance acted as general partner. In the fall of 1985, the syndication of a property known as 696 Peachtree Street was completed, again with Renaissance as general partner. Last, Renaissance tried to syndicate the Georgian Terrace property in early 1986. For each syndication, Dobbs secured the professional services of well-respected accounting firms and law firms.[2] All of these projects eventually failed.

At trial, evidence was submitted showing that closing proceeds from the Granada syndication were improperly diverted by Renaissance. Instead of applying the funds as contemplated and disclosed in the Granada PPM, Renaissance used a substantial portion of the proceeds to satisfy obligations arising in connection with other Renaissance projects. The evidence further demonstrated that Renaissance (i.e., Dobbs) intended to divert similarly some proceeds of the 696 Peachtree syndication closing. These activities, as well as numerous misrepresentations made by Renaissance in connection with the St. Andrews and 696 Peachtree offerings to prospective investors and professionals involved in the offerings, constitute the fraud in which Renaissance was engaged.

As set forth herein, Peat Marwick performed accounting services in connection with the offering of limited partnership interests in the St. Andrews and 696 Peachtree limited partnerships. First, Peat Marwick

---

**2.** Reid Dobbs and Renaissance were assisted by two attorneys, Michael Hoover and E. Lewis Hansen, from the law firm of Hurt, Richardson, Garner, Todd & Cadenhead. Hansen and the law firm were sued by all plaintiffs in the *Renaissance* litigation; their liability will be addressed in a separate order.

carried out a "compilation" service for St. Andrews Associates, Ltd. ("St. Andrews"), which was subsequently upgraded to a "review" service. Second, Peat Marwick performed a "review" service for 696 Peachtree Street, Ltd. ("696 Peachtree"). Peat Marwick's work on the St. Andrews and 696 Peachtree projects entailed investigating the prospective financial information contained in financial projections that were prepared by Renaissance and included in the PPMs. For each service performed, Peat Marwick issued reports that were distributed to prospective investors.

The *Abrams & Wofsy* plaintiffs are all investors who purchased limited partnership interests in the St. Andrews Associates, Ltd. The *Pignatelli* and *Pendleton* plaintiffs are all investors who purchased limited partnership interests in the 696 Peachtree Street, Ltd. The *Achecar* plaintiffs purchased limited partnership interests in The Granada, Ltd., for which Peat Marwick did not perform any accounting services.

## II. Plaintiffs' Claims Under Section 10(b)

### A. Primary Liability

■ Scienter is a required element of section 10(b) claims in which primary liability is alleged. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1380, 47 L.Ed.2d 668 (1976); *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir.1989).[3] In the landmark case of *Hochfelder*, the United States Supreme Court defined scienter as "a mental state embracing intent to defraud, reckless disregard for the truth, or knowing use of some practice to defraud." 425 U.S. 185, 193–94 n. 12, 96 S.Ct. 1375, 1380–82 n. 12. The Court declined to address the issue of whether recklessness could satisfy the scienter requirement, thereby leaving the issue open for resolution by the lower federal courts. *Id.* Subsequently, the Eleventh Circuit ruled that the scienter requirement may be satisfied by proof of "severe recklessness." *Magna Inv. Corp. v. John Does One Through Two Hundred*, 931

F.2d 38, 39 (11th Cir.1991); *Broad v. Rockwell Intern. Corp.*, 642 F.2d 929, 961–62 (5th Cir.) (en banc), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981).

■ To hold Peat Marwick primarily liable for violations of section 10(b), assuming that at least one plaintiff's section 10(b) claim is not time-barred, the court must first find that Peat Marwick had knowledge of the fraud or acted with reckless disregard of the falsity of the information that was furnished to the potential investors regarding the offerings. If the court were to find that Peat Marwick had actual knowledge of the fraud or was severely reckless, the court would next need to determine whether Peat Marwick had a duty to disclose the information, which it knew or should have known, to the *Abrams & Wofsy*, *Pignatelli*, and *Pendleton* plaintiffs. Under section 10(b), "a defendant's omission to state a material fact is proscribed only when the defendant has a duty to disclose." *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1043 (11th Cir. 1986), *cert. denied*, 480 U.S. 946, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987). Because the court finds that the evidence does not support a finding that Peat Marwick had actual knowledge or was severely reckless, however, consideration of this issue is unnecessary.

### B. Aider and Abettor Liability

■ To succeed on their claims of aider and abettor liability, again assuming that at least one plaintiff's section 10(b) claim is not time-barred, the plaintiffs must prove: (1) the existence of a primary violation of section 10(b); (2) that Peat Marwick had a general awareness that its role was part of an overall activity that was improper; and (3) that Peat Marwick "knowingly and substantially assisted" the section 10(b) violation. *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 94–95 (5th Cir.1975); *Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d 1004, 1009, *reh'g denied*, 772 F.2d 918 (11th Cir.1985). During the *Renaissance* trial, the court held orally that a primary violation had been proved,

---

3. The elements of a primary section 10(b) claim are: "(1) a misstatement or omission (2) of a material fact (3) made with scienter (4) upon which the plaintiff relied (5) that proximately

caused the plaintiff's loss." *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir.1989) (citing *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1046 (11th Cir.1987)).

that is, the plaintiffs had shown that corporate officers of Renaissance had committed securities fraud in connection with the St. Andrews and 696 Peachtree offerings. Accordingly, the court may now focus on whether plaintiffs have proved the second and third elements of their aider and abettor claims.

In *Woodward*, the former Fifth Circuit required that to satisfy the second element of "general awareness," a plaintiff must prove that the alleged aider and abettor had "knowledge" of the fraud. "Knowledge may be shown by circumstantial evidence, or by reckless conduct, but the proof must demonstrate actual awareness of the party's role in the fraudulent scheme." 522 F.2d at 96. Subsequently, in *Woods*, the Eleventh Circuit held that this scienter requirement is satisfied by the same "severe recklessness" standard as required for primary 10(b) claims, "at least where the alleged aider and abettor owes a duty to the defrauded party." 765 F.2d at 1010.

As set forth more fully herein, the court finds that the evidence does not support a finding that Peat Marwick had any knowledge of the fraud under either an "actual awareness" or a "severe recklessness" standard. Accordingly, it is not necessary to determine whether Peat Marwick owed any duty to plaintiffs, the defrauded parties. In addition, because the court finds that the evidence fails to support a finding that the second element is satisfied, consideration of the third element is unnecessary.

### III. Plaintiffs' Claims Under the Georgia Securities Act

■ In their original complaints, the *Abrams & Wofsy, Pignatelli,* and *Pendleton* plaintiffs alleged that Peat Marwick violated section 10–5–12(a)(2) of the Georgia Code in connection with the sale of limited partnership interests in the St. Andrews and 696 Peachtree Street limited partnerships. The applicable version of the Georgia Securities Act is that which existed when the underlying facts and circumstances surrounding the alleged securities fraud occurred. O.C.G.A. § 10–5–23 (1989). In this case, the evidence has shown that the facts and circumstances underlying the alleged fraud and professional negligence occurred in 1984, 1985, and arguably through the early part of 1986. The same version of the Georgia Securities Act was in effect in 1984, 1985, and 1986 until the Act was altered substantially by amendments enacted on April 11, 1986. Because nearly all, if not all, of the relevant underlying facts and circumstances occurred prior to April 11, 1986, the court finds that the 1985 version of the Georgia Securities Act applies to the *Renaissance* litigation.

■ The 1985 version of section 10–5–12(a)(2) [4] closely tracks the language of section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l (2) (1981),[5] which establishes seller liability for securities fraud. The court previously determined that Peat Marwick did not act as a "seller" of limited partnership interests in the St. Andrews and 696 Peachtree and accordingly granted Peat Marwick's motion for summary judgment with respect

---

**4.** The 1985 version of section 10–5–12(a)(2) provides:

    (a) It shall be unlawful for any person:

       .     .     .     .     .

      (2) to offer to sell or to sell a security by means of any oral or written untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission) if such person shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission....
Ga.Code Ann. § ⸮ ⸱⸱112(a)(2) (1981).

**5.** Section 12(2) provides:

Any person who—

    .     .     .     .     .

    (2) offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and in the exercise of reasonable care could not have known, of such untruth or omission,
shall be liable to the person purchasing such security from him....
15 U.S.C. § 77l (2) (1981).

to plaintiffs' section 12(2) claims. *See* Order dated Sept. 27, 1991 at 12–16, 19–20. Based on this finding, the court holds similarly that Peat Marwick did not act as a seller under the 1985 version of section 10–5–12(a)(2) of the Georgia Code.

Alternatively, plaintiffs seek to hold Peat Marwick liable under the 1985 version of section 10–5–12(d), which provides:

(d) It shall be unlawful for any person in connection with the offer, sale, or purchase of any security, directly or indirectly,

(1) to employ any device, scheme, or artifice to defraud, or

(2) to engage in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser or seller.

Ga.Code Ann. § 97–112(d) (1981). In count six of their original complaint, the *Pignatelli* plaintiffs alleged that Peat Marwick violated both sections 10–5–12(a)(2) and 10–5–12(d) of the Georgia Securities Act. More recently, the plaintiffs in the other three cases have argued that their section 10–5–12(a)(2) claims were intended to be claims made pursuant to the 1985 version of section 10–5–12(d). *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 75 n. 10 ("It is obvious that Plaintiffs' reference to § 12(a)2 in the complaints was to the Georgia Securities Act as it existed in 1987 and, hence, to § 12(d) as it existed in 1987."). The allegations in the *Abrams & Wofsy* and *Achecar* complaints track Rule 10b–5, 17 C.F.R. § 240.10b–5; subsections (a) and (c) of Rule 10b–5 are substantially identical to former section 10–5–12(d).[6] The allegations in the *Pendleton* complaint track former section 10–5–12(a)(2).[7]

▮ Even if the court were to permit any of the plaintiffs to pursue claims under former section 10–5–12(d), this provision would not afford them any right to relief because it does not provide a private cause of action. *See* Order dated Sept. 23, 1988 at 22; *Diamond v. Lamotte,* 709 F.2d 1419, 1423, *reh'g denied,* 716 F.2d 914 (11th Cir.1983); *but see Friedlander v. Nims,* 571 F.Supp. 1188 (N.D.Ga.1983) (Shoob, J.), *aff'd on other grounds,* 755 F.2d 810 (11th Cir.1985) (sections 10–5–14(e) and 51–1–8 of the Georgia Code make a private cause of action available for violations of former section 10–5–12(d)).

Because the 1985 version of the Georgia Securities Act is applicable to plaintiffs' claims, the court finds that Peat Marwick is not liable under the current version of section 10–5–12(a)(2). The court further finds that Peat Marwick is not liable under former section 10–5–12(a)(2) because it did not act as a seller. In addition, the court finds that Peat Marwick is not liable under former section 10–5–12(d) because such provision does not afford a private cause of action.

*IV. Plaintiffs' Common Law Fraud Claims*

▮ To succeed on their claims of common law fraud under Georgia law, plaintiffs must prove that Peat Marwick made a false representation of fact with scienter and with the intention to induce the plaintiffs to invest in the St. Andrews and 696 Peachtree limited partnerships, on which plaintiffs relied and which caused damages to the plaintiffs. *DeLong Equip. Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499, 1519 (11th Cir.1989),

---

**6.** In count six of the *Abrams & Wofsy* complaint and count seven of the *Achecar* complaint, the plaintiffs allege:

In connection with the offer to sell and the sale of units in the Partnership, Defendants directly or indirectly:

(a) Employed devices, schemes and artifices to defraud each of the Plaintiffs;

(b) Made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to each of the Plaintiffs; and/or

(c) Engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon each of the Plaintiffs. *Abrams & Wofsy* Complaint at para. 72; *Achecar* Complaint at para. 80.

**7.** In count eight of the *Pendleton* complaint, the plaintiffs allege:

In offering to sell and selling Units of limited partnership interests in the Limited Partnership to Plaintiffs, Defendants made untrue statements and omitted to state material facts about the Limited Partnership and Defendants Renaissance and DICC, and their principals and affiliates....

*Pendleton* Complaint at para. 102.

cert. denied sub nom., *Washington Mills Electro Minerals Corp. v. DeLong Equip. Co.,* 494 U.S. 1081, 110 S.Ct. 1813, 108 L.Ed.2d 943 (1990); *Seale v. Miller,* 698 F.Supp. 883, 898 (N.D.Ga.1988) (Hall, J.); *Crawford v. Williams,* 258 Ga. 806, 806, 375 S.E.2d 223 (1989); *Ekstedt v. Charter Medical Corp.,* 192 Ga.App. 248, 248, 384 S.E.2d 276 (1989). Under Georgia law, the scienter requirement encompasses either actual knowledge or recklessness. *American Viking Contractors, Inc. v. Scribner Equip. Co., Inc.,* 745 F.2d 1365, 1372 (11th Cir.1984); *Grizzle v. Guarantee Ins. Co.,* 602 F.Supp. 465, 467 (N.D.Ga.1984) (O'Kelley, J.); *Irvin v. Lowe's of Gainesville, Inc.,* 165 Ga.App. 828, 830, 302 S.E.2d 734 (1983). Recklessness constitutes a deliberate "refusal to know" where one "blind[s] himself to the truth or falsity of a condition which he recklessly represents to his own advantage." *Bill Spreen Toyota, Inc. v. Jenquin,* 163 Ga.App. 855, 858, 294 S.E.2d 533 (1982). *See also Lively v. Garnick,* 160 Ga.App. 591, 592–93, 287 S.E.2d 553 (1981) (fraud is premised on "actual moral guilt" of the defrauding party).

■ Although the recklessness standards under section 10(b) and the Georgia law of common law fraud are not identical, the court finds that the scienter requirements are substantially similar. Accordingly, because plaintiffs' section 10(b) claims fail for lack of scienter (assuming that at least one plaintiff's section 10(b) claim is not time-barred), the court finds that plaintiffs' common law fraud claims fail.

## V. Plaintiffs' Federal and Georgia RICO Claims

■ The *Pignatelli* and *Pendleton* plaintiffs allege that Peat Marwick, in performing its work in connection with the St. Andrews and 696 Peachtree engagements, committed violations of federal RICO and Georgia RICO provisions. *See* 18 U.S.C. § 1962(c); O.C.G.A. § 16–14–4(b). To succeed on their RICO claims, these plaintiffs must prove that Peat Marwick participated in the conduct of an enterprise through a pattern of racketeering activity. *See Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479,

496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985); *Aldridge v. Lily–Tulip, Inc. Salary Retirement Plan Benefits,* 953 F.2d 587, 593 (11th Cir., Feb. 12, 1992); *see also Pelletier v. Zweifel,* 921 F.2d 1465, 1491 n. 57 (11th Cir.) (Georgia RICO provisions are "essentially identical" to federal RICO provisions), *cert. denied,* —— U.S. ——, 112 S.Ct. 167, 116 L.Ed.2d 131 (1991); *Chancey v. State,* 256 Ga. 415, 349 S.E.2d 717 (1986) (Despite some differences, federal RICO section 1962(c) and Georgia Code section 16–14–4(b) "are similar in that the foregoing core provisions both make it unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity."), *cert. denied* 481 U.S. 1029, 107 S.Ct. 1954, 95 L.Ed.2d 527 (1987); *Martin v. State,* 189 Ga.App. 483, 485, 376 S.E.2d 888, 892 (1988) (Georgia RICO provisions are "closely analogous" to federal RICO provisions), *cert. denied* (1989). To satisfy the "pattern of racketeering activity" requirement, plaintiffs must show that Peat Marwick engaged in at least two predicate acts of "racketeering activity." *See* 18 U.S.C. § 1961(5); *Bivens Gardens Office Bldg., Inc. v. Barnett Bank of Florida, Inc.,* 906 F.2d 1546, 1553 n. 10 (11th Cir.1990), *cert. denied sub nom., Barnett Banks, Inc. v. Konstand,* —— U.S. ——, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991); O.C.G.A. § 16–14–3(8); *Chancey,* 256 Ga. at 418, 349 S.E.2d 717.

■ The *Pignatelli* and *Pendleton* plaintiffs contend that they have satisfied the predicate act requirement by proving that Peat Marwick committed at least two acts of securities and wire fraud in the course of its work on the St. Andrews and 696 Peachtree engagements. *See* 18 U.S.C. §§ 1961(1)(B), (D); O.C.G.A. §§ 16–14–3(9)(A)(xxix). The court has found, however, that Peat Marwick lacked knowledge of the fraud perpetrated by Renaissance; consequently, the court now finds Peat Marwick did not commit any predicate acts of fraud as alleged by plaintiffs. Without the requisite predicate acts, the *Pignatelli* and *Pendleton* plaintiffs' claims of federal and Georgia RICO violations against

Peat Marwick must fail.[8]

### VI. Plaintiffs' Professional Negligence Claims

■ To succeed on their claims of professional negligence against Peat Marwick, the *Abrams & Wofsy, Pignatelli,* and *Pendleton* plaintiffs must prove by a preponderance of the evidence that the following elements are satisfied:

(1) a legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.

*Whitehead v. Cuffie,* 185 Ga.App. 351, 352, 364 S.E.2d 87 (1987) (citations omitted), *cert. denied* (1988). *See also Bradley Center, Inc. v. Wessner,* 250 Ga. 199, 200, 296 S.E.2d 693 (1982) (same elements); *Hill v. McClure,* 171 Ga.App. 588, 589, 320 S.E.2d 562 (1984) (same elements).[9]

### A. Peat Marwick Owed a Duty to Investors

■ With respect to the first element, professionals, including accountants, owe a duty under Georgia law to "those persons ... who the professional is actually aware will rely upon the information he prepared." *Badische Corp. v. Caylor,* 257 Ga. 131, 132–33, 356 S.E.2d 198 (1987). *See also Robert &*

*Co. Assocs. v. Rhodes–Haverty Partnership,* 250 Ga. 680, 680–81, 300 S.E.2d 503 (1983) (engineers; privity is not required); *Gulf Contracting v. Bibb County,* 795 F.2d 980, 982 n. 3 (11th Cir.1986) (following *Robert & Co.*); *Malta Constr. Co. v. Henningson, Durham & Richardson, Inc.,* 716 F.Supp. 1466, 1468 (N.D.Ga.1989) (Hall, J.) (following *Robert & Co.*), *aff'd,* reh'g denied, 927 F.2d 614, 932 F.2d 979 (1991); *Travelers Indemnity Co. v. A.M. Pullen & Co.,* 161 Ga.App. 784, 789, 289 S.E.2d 792 (1982) (accountants; duty owed depends on foreseeability of reliance).

■ As discussed more fully *infra,* Peat Marwick issued its reports to "The Partners" of the St. Andrews and 696 Peachtree limited partnerships. Peat Marwick was well aware that these reports were to be included and were in fact included in the St. Andrews and 696 Peachtree offering materials. Peat Marwick also knew that the offering materials were distributed to the *Abrams & Wofsy, Pignatelli,* and *Pendleton* plaintiffs, who were then potential St. Andrews and 696 Peachtree investors, for the purpose of assisting them in deciding whether to invest in the limited partnerships. Based on the foregoing, the court finds that Peat Marwick was aware that plaintiffs would rely on the information it provided in its reports and, therefore, owed a duty under Georgia law to the plaintiffs.

### B. Standards Under Which to Judge Peat Marwick's Work

■ Under Georgia law, professionals such as Peat Marwick owe a duty "to use

---

**8.** This order was written before the Supreme Court issued its ruling in *Reves v. Ernst & Young,* —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), that "one is not liable under [18 U.S.C. § 1962(c)] unless one has participated in the operation or management of the enterprise itself." In light of the court's ruling that the *Pignatelli* and *Pendleton* plaintiffs' RICO claims fail because Peat Marwick did not commit any predicate acts of fraud, however, it is not necessary for the court to address the Supreme Court ruling in *Reves.*

**9.** A cause of action for professional negligence is identical to a cause of action for professional malpractice. *Whitehead,* 185 Ga.App. at 352, 364 S.E.2d 87. In *Gillis v. Goodgame,* 199 Ga. App. 413, 404 S.E.2d 815 (1991), *rev'd on other grounds,* 262 Ga. 117, 414 S.E.2d 197 (1992), the

Georgia Court of Appeals defined "malpractice" as:

a dereliction from professional duty whether intentional, criminal, or merely negligent by one rendering professional services that results in injury, loss, or damage to the recipient of those services or those entitled to rely upon them or that affects the public interest adversely; the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services or to those entitled to rely upon them.

*Id.* 199 Ga.App. at 415 n. 1, 404 S.E.2d 815 (quoting Webster's Third International Dictionary).

such skill, prudence, and diligence as [professionals] of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake." *Hughes v. Malone*, 146 Ga.App. 341, 344, 247 S.E.2d 107 (1978). *See also Kellos v. Sawilowsky*, 254 Ga. 4, 5–6, 325 S.E.2d 757 (1985) (same language). In Georgia, a presumption exists that professional services were performed in an ordinarily skillful manner, and therefore the recipient of the professional services has the burden to show, through the use of expert testimony, the lack of due care, skill, and diligence. *Grindstaff v. Coleman*, 681 F.2d 740, 742 (11th Cir.1982); *Rogers v. Norvell*, 174 Ga.App. 453, 457, 330 S.E.2d 392 (1985); *Hughes*, 146 Ga.App. at 346, 247 S.E.2d 107. *See also Howard v. Walker*, 242 Ga. 406, 407, 249 S.E.2d 45 (1978) (requirement of expert opinion testimony); *Roberts v. Langdale*, 185 Ga.App. 122, 123, 363 S.E.2d 591 (1987) (presumption that professional services were performed in ordinarily skillful manner). In other words, the expert testimony must demonstrate that the professional's conduct was so unreasonable as to constitute a "significant deviation" from the applicable standards of care. *Hughes*, 146 Ga.App. at 345, 247 S.E.2d 107. Expert testimony showing a mere difference in views between techniques or judgments exercised is insufficient to show a breach of duty "where it is shown that the procedure preferred by each, or the judgment exercised, is an acceptable and customary method of performing the [professional services]." *Hayes v. Brown*, 108 Ga.App. 360, 366, 133 S.E.2d 102 (1963).[10]

Peat Marwick's work on the St. Andrews and 696 Peachtree entailed reporting on financial projections. At trial, plaintiffs and Peat Marwick submitted expert testimony regarding the standards applicable to accountants as found in publications issued by the American Institute of Certified Public Accountants ("AICPA"). In addition, evidence was admitted regarding Peat Marwick's internal standards as found in Peat Marwick's "Prospective Reporting Practice Guide," ("Guide"). *See* Exh. 924.

Peat Marwick's expert witness, Don Pallais, testified that the AICPA standards for prospective financial reporting, the type of work performed by Peat Marwick in the St. Andrews and 696 Peachtree engagements, have undergone an evolutionary process of development. Plaintiffs' expert, Robert J. Taylor, IV, similarly testified that various AICPA publications represent a "moving body of knowledge" such that certain publications that are not specifically applicable to certain types of accounting work may be applicable "in pertinent part." Both experts testified that in 1985, with the exception of an "exposure draft" discussed *infra*, no AICPA publications had been issued that directly addressed the standards under which accountants operated in reporting on financial projections. Accordingly, in 1985, AICPA literature that addressed other types of prospective financial reporting could be followed by accountants in reporting on financial projections.

In 1975, the AICPA published the "Management Advisory Services Guideline Series Number 3: Guidelines for Systems for the Preparation of Financial Forecasts." ("MAS # 3"), the objective of which was to "define guidelines for a system for the preparation of financial forecasts." *See* Exh. 45,584 at 39, 42.[11] In MAS # 3, the term "forecast" is

---

10. In *Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F.Supp. 531 (S.D.N.Y.1990), the court ruled that accountants owe a duty to their clients and the limited class of persons whose reliance is foreseeable to comply with applicable standards and guidelines and to use reasonable judgment. The court cautioned, however:

> Reasonable adherence to the standards is a matter calling for application of experience, skill, and exercise of independent judgment. The standards concern themselves not only with the auditor's professional qualities but also provide that judgment may be exercised by him in the performance of his examination

and in his report. Deviation from standards does not perforce thereof spell negligence in an audit, nor are innocent blunders culpable fault.

*Id.* at 538.

11. The reason for issuing MAS # 3 is explained in the introduction:

> Persons concerned with economic matters and especially with economic decisions are usually interested in predictions of the future. Recently great interest has been shown in the possible preparation, by company management, of earnings forecasts which would subse-

defined as "an estimate of the most probable financial position, results of operations, and changes in financial position for one or more future periods." *Id.* at 43. MAS # 3 explains the accountant's role:

> The preparation of a financial forecast is the responsibility of the management of an enterprise. Management may require the assistance and counsel of outside professionals in meeting this responsibility. Nothing in this document precludes the CPA from assisting management in the preparation of financial forecasts and in the development of forecasting systems.

*Id.* at 46.

The AICPA issued another publication in 1975 entitled "Statement of Position 75–4: Presentation and Disclosure of Financial Forecasts" (SOP 75–4). *Id.* at 55. As explained in its introduction, SOP 75–4 was issued because of the great interest shown at the time in financial forecasts and projections, which were being used in connection with obtaining debt or equity financing as well as in offering circulars for limited partnership interests. *Id.* at 57. In SOP 75–4, "financial projection" is defined as "an estimate of financial results based on assumptions which are not necessarily the most likely. Financial projections are often developed as a response to such questions as 'What would happen if?'" *Id.* at 58.

In 1980, the Financial Forecasts and Projections Task Force of the AICPA issued the "Guide for a Review of a Financial Forecast," ("'80 Guide") which "represent[ed] another of the AICPA's efforts to provide information and guidance to those interested in prospective financial information." *Id.* at v. As the '80 Guide explained in its preface:

> Prospective financial information may take a number of different forms, such as forecasts, projections, feasibility studies, and budgets. Accountants may be engaged to provide a variety of services relating to prospective financial information, such as providing assistance in developing forecasting systems, identifying factors to be considered, and compiling or preparing the prospective information and carrying out independent reviews of such information. This guide deals with only one form of prospective information—financial forecasts—and only one type of accountant's service—independent review and reporting.

> With a view toward providing guidance in additional areas, the AICPA is studying other forms of prospective financial information and other types of related services that accountants are engaged to perform.

*Id.* The '80 Guide includes the MAS # 3 and SOP 75–2 in its appendices. *See id.* at 39, 55.

In 1983, the Financial Forecasts and Projections Task Force of the AICPA issued an "Exposure Draft: Proposed Guide for Prospective Financial Statements" ("'83 Exposure Draft"). *See* Exh. 45,587. Peat Marwick's expert, Pallais, was a member of this task force and the principal author of the '83 Exposure Draft. As he explained at trial, the '83 Exposure Draft was prepared for circulation to accountants all over the United States and for responses and comments from them. The '83 Exposure Draft ultimately resulted in the 1986 AICPA publication entitled the "Guide for Prospective Financial Statements" ("'86 Guide"), which addressed all types of prospective financial statements including, for the first time, financial projections. *See* Exh. 45,585 at § 110.01–.02. Although the '86 Guide is not binding on Peat Marwick's work on the St. Andrews and the 696 Peachtree engagement, it is relevant because it illustrates another step in the devel-

quently be made available to security holders, potential investors, and the public.

The Securities and Exchange Commission, which historically has prohibited the inclusion of financial forecasts in prospectuses and reports filed with it, has now indicated that it will propose changes in its policies to permit the publication of forecast data under certain conditions....

In spite of the widespread preparation of financial forecasts, no authoritative statement of guidelines or standards exists for their preparation. Such guidelines are necessary if published forecasts are to be useful to the public. Although the Securities and Exchange Commission has stated its intent to issue forecasting guidelines, it is desirable and is consistent with Commission policy that these guidelines be developed in the private sector and be based on experience with financial forecasting. Exh. 45,584 at 41–42.

opment of AICPA standards for reporting on financial projections.

Despite the fact that no AICPA standards that explicitly governed reporting on financial projections existed when Peat Marwick carried out its work on the St. Andrews and 696 Peachtree projections, the court finds that the AICPA literature that was issued prior to such time is relevant to the judicial determination of whether Peat Marwick was negligent in carrying out its St. Andrews and 696 Peachtree work. In addition, because the evidence shows that the Peat Marwick accountants utilized and followed their own internal guide in conducting their work on the St. Andrews and 696 Peachtree engagements, the court finds that Peat Marwick's Guide is also relevant to this determination.

After careful review of the evidence as set forth *infra*, the court finds that Peat Marwick did not breach its legal duty owed to the St. Andrews and 696 Peachtree investors. The evidence shows that plaintiffs have not met their burden to prove that Peat Marwick lacked due care, skill, and diligence in carrying out its work on the St. Andrews and 696 Peachtree projects. Accordingly, the consideration of the third and fourth elements of plaintiffs' negligence claims, causation and damages, is not necessary. The court therefore holds that the *Abrams & Wofsy, Pignatelli*, and *Pendleton* plaintiffs' claims of professional negligence against Peat Marwick fail.

## VII. Peat Marwick's Work

### A. The Pre–Engagement Client Evaluation

▮ Peat Marwick's professional relationship with Renaissance began in July of 1985 when Jerry F. Humphries, a partner in the Atlanta Peat Marwick office since 1983, undertook a pre-engagement evaluation of Renaissance for purposes of determining whether to accept a compilation engagement for the syndication, that is, the offering of limited partnership interests in the St. Andrews.

### 1. Standards Governing the Pre–Engagement Client Evaluation

At trial, Humphries testified that Peat Marwick undertook the St. Andrews compilation engagement on July 23, 1985, after he assessed Renaissance's integrity through the client evaluation process. Humphries testified that he followed the procedures prescribed in a Peat Marwick internal guideline entitled "Real Estate Practice Bulletin," dated May 3, 1982 ("Bulletin"), which was admitted into evidence at trial as Exhibits 1776A and 1776B.

The Peat Marwick Bulletin contains several prerequisites for accepting a new client. First, it requires that someone act as "engagement partner." The engagement partner, who must have substantial experience in real estate limited partnership offerings, is "responsible for determining that the integrity, reputation, and financial condition of the client and other involved parties are satisfactory." Exh. 1776A at Bates P0014004. In the case of a new client, the engagement partner must conduct a pre-engagement client evaluation. *Id.* In all of Peat Marwick's work on the St. Andrews and 696 Peachtree projects, Humphries acted as engagement partner. Second, "second partner review of the engagement by a real estate designated industry specialist (DIS) is required." "[T]he DIS must concur with the engagement partner's determination that the engagement satisfies the conditions of this *Practice Bulletin* and that the project does not entail high risk/uncertainty, in contemplation of providing the proposed compilation-type service." *Id.* at Bates P0014002. Third, the Bulletin provides that "the Firm's independence requirements must be satisfied." Last, the Bulletin requires that "[t]he client must have a successful track record in the type of project contemplated" and "[t]he contractor, if any, must have completed at least one project similar in nature to the one proposed." *Id.* at Bates P0014004.

Peat Marwick's Guide provides similar instructions on deciding whether to accept an engagement. First, it prescribes that the prospective client be evaluated. Second, the Guide requires that the Firm possess suffi-

client expertise to carry out the proposed engagement. Quoting from the AICPA Executive Committee on Management Advisory Services Statement No. 2, the Guide sets forth the following standards:

1. Management advisory services are to be performed by persons having adequate training and experience in both the application of the analytical approach and process, *and in the subject matter under consideration* (emphasis added).

2. In all matters relating to a management advisory services assignment, an independence in mental attitude is to be maintained by the member and his staff.

3. Due professional care is to be exercised in the performance of management advisory services.

Exh. 924 at Bates P0007611. As part of Peat Marwick's competence requirements, the Guide provides for the appointment of "designated industry specialists," who are responsible for undertaking second partner review. *Id.* at Bates P0007612 and n. 1. Last, the Guide requires that an evaluation be made of the risk or uncertainty underlying the proposed prospective reporting engagement. *Id.* at Bates P0007616. Examples of high-risk situations that Peat Marwick should not undertake are where (1) "[s]ignificant uncertainty exists relative to the Firm's legal position and exposure" and (2) "[i]t might be impossible to satisfy ourselves that all key assumptions are reasonable, or to conclude that there is no reason to suspect that assumptions are unreasonable, depending on the nature of the engagement." *Id.* An example of a situation that might suggest high risk is when a "new venture" is involved, "where no demonstrated 'track record' exists for the management and/or the substance of the proposed venture." *Id.* The Guide further instructs: "The judgment as to whether the risk/uncertainty associated with a potential prospective reporting engagement is acceptable to the Firm follows a careful consideration of the specific circumstances and is made by the engagement part-

ner and concurred with by the designated industry specialist...." *Id.* at Bates P0007617.

### 2. Nadeau's Client Evaluation Work

In his role as engagement partner, Humphries instructed David Nadeau, a Peat Marwick accountant, to gather information for the client evaluation. In gathering this information about Renaissance, Nadeau made several phone calls and then made handwritten notes reflecting what he thought was significant.

First, Nadeau talked to Michael Hoover, a Hurt Richardson attorney who had done a substantial amount of real estate work on behalf of Renaissance on various projects. As reflected in Nadeau's notes, Hoover made both positive and negative comments:

On July 23, 1985 I contacted Mike Hoover of Hurt, Richardson who represented Renaissance. Mike said he has been involved with the client for a couple of years on and off. He feels the clients have some good ideas and have been reasonably successful in carrying out those ideas.

He indicated however that the client was slow in paying. Apparently no one has been paid yet for the Executive deal as the funds are still tied up in escrow. In addition he said the company tends to spread itself thin by acquiring property beyond its means, however, he feels this is due more to "seizing the moment" to—grab good deals.

He feels the principals have a high degree of integrity.

Exh. 1701 at Bates P0000998. At trial, Nadeau testified that he had no specific recollection of this telephone call with Hoover.

On the same day, Nadeau called Skillman Siewert, a former Peat Marwick partner who had referred Renaissance to Peat Marwick. According to Nadeau's notes,[12] Siewert said he "believes that the principals involved are reputable and have a high degree of integrity." *Id.* at Bates P0000999.[13] At trial, Nadeau testified that after this conversation

---

**12.** Nadeau erroneously wrote the word "June" in his notes. *See* Exh. 1701 at Bates P0000999.

**13.** Nadeau also wrote: "Jack [Siewert] opined that the client's product was only fair...." At trial, Nadeau testified that "product" referred to the partnership units sold by Siewert.

with Siewert, he had no questions regarding Renaissance's integrity.

Nadeau also talked to a broker dealer named Bob Kovan that day. Although Nadeau's notes indicate, as a positive sign, that Kovan had made a proposal to act as a manager of the underwriting effort on the St. Andrews offering, they also reflect a somewhat negative tone in Kovan's comments:

> Bob [Kovan] said the Renaissance people were "straight" but felt they had limited background in development/syndication. He feels the St. Andrews property is overvalued and this deal is a "pure tax" deal with little economic reality. His review of the Executive deal led him to the conclusion that the rehab costs did not justify the amount of work done. He also told me that AA [Arthur Andersen] & Co had not been paid as yet for the Executive deal (fees were $83,000).

*Id.* at Bates P0001000. At trial, Nadeau testified that he had the impression that Kovan thought Renaissance had a high degree of integrity and that the project had "economic reality." Nadeau further testified that Renaissance's limited development background would not prevent it from becoming a client of Peat Marwick's. Humphries testified that Nadeau's notes of his talk with Kovan did not raise any "red flags"; rather, Kovan's comments were only his opinion.

Last, Nadeau talked to Marlene Crotts, a commercial real estate lending officer at C & S Bank (now NationsBank). Her comments, as reflected in Nadeau's notes, were generally positive:

> On July 23 I contacted Marlene Krotts [sic] of C & S who is the Renaissance account representative. She said the bank has been involved with [the] client for 2 years and has 2 loans currently outstanding, one to the company and one for construction of the Executive Wing Project. She indicated that the loans have a good [payment] history never going [more than] 30 days past due.
>
> She said that in her opinion they had a quality product and possessed an unusual capability for renovation type work.
>
> The slow pay of AA & Co. on Executive Wing was due to a restrict clause in the

loan agreement which will not allow funds to be disbursed until the certificate of occupancy is obtained. She said this would occur in late July.

*Id.* at Bates P0001001. Nadeau testified at trial that he was not disturbed by the "slow pay" to Arthur Andersen; rather, he was satisfied with Crotts' explanation that Arthur Andersen's fees would be paid when the Executive Wing escrow broke. Nadeau was further encouraged by Crotts' apparent satisfaction with Renaissance's payment history.

Nadeau then drafted a file memorandum dated July 25, 1985, summarizing the client evaluation of Renaissance, which Humphries reviewed, revised, and issued in his own name. This memorandum sets forth conclusions regarding Nadeau's various phone calls:

> As a summary the third party inquiries indicate that the principals of Renaissance ... have a high degree of integrity and character, but concern was expressed over the client[']s slow pay experience with the law firm of Hurt, Richardson and the accounting firm of Arthur, Anderson [sic]. Mike Hoover of Hurt, Richardson, who first expressed this concern to me, felt the company had somewhat spread themselves too thin in acquiring numerous properties within the Midtown area to renovate. He indicated they had always paid their bills, but they were paid several months late. However Marlene Krotts [sic] of C & S expressed satisfaction of the payment history of Renaissance.

*Id.* at Bates P0000996. Humphries then concludes that Renaissance would make a good client for Peat Marwick despite some risks relating to fee collection:

> Based upon the responses received from the third parties contacted and my reaction to visiting with the Company, I am satisfied that Renaissance ... has a good potential to become a strong client of the Atlanta office in both audit and tax. Accordingly, I deemed that no further investigation is required. The client has the ordinary business risk associated with prospective reporting engagements, however these engagements are for compilation of prospective financial information and not

reviews or audits thereon which mitigates the potential business risks. We do have exposure for the timely collection of our bills. However, due to the magnitude of the fees involved, and the potential to perform additional like services to this client, this risk seems appropriate for the firm to assume.

*Id.* at Bates P0000997.

In carrying out his client evaluation of Renaissance, Nadeau also completed a "Prospective Client Evaluation Background Questionnaire." In response to the question of why the prospective client was changing accountants, Nadeau wrote: "Prospective client wishes to diversify its relationship with the leading accounting firm. They expressed no dissatisfaction with AA & Co." *Id.* at Bates P0001004. The questionnaire directs that inquiries with "key third parties" be made and documented for the file. These inquiries should cover, among other things, an assessment of the integrity of the principals, awareness of any current or possible litigation against the entity or its principals, and the lending history with bankers. *Id.* at Bates P0001004–P0001005. Although Nadeau's memoranda of conversation with third parties address the issues of integrity and lending history, there is no documentation of inquiries made concerning current or possible litigation. Attached to the questionnaire is a December 1, 1984 balance sheet of Renaissance, as well as the following statement:

The unaudited financial statement of the General Partner at December 1, 1984, reflects a net book value in excess of $1,000,-000 computed on the basis of estimated current fair market values. Such net worth consists almost entirely of interests in other real estate projects, and notes receivable secured by real estate. Consequently, such net worth is substantially illiquid and may not be readily salable to meet any obligations of the General Partner to the Partnership.

*Id.* at P0001008–09.

### 3. Humphries's Client Evaluation Work

At trial, Humphries testified as to several aspects of Nadeau's investigative work. First, Humphries found it significant that

well-respected accounting and law firms had agreed to perform professional services for Renaissance. Second, although he acknowledged that Renaissance's ability to pay its bills to Peat Marwick was a risk of the engagement, Humphries testified that he thought that this exposure was due mainly to the fact that Renaissance was a new client. Third, Humphries testified that Peat Marwick's fees were not intended to be contingent on the completion of the St. Andrews project, although Renaissance was free to choose the source of funds from which to pay Peat Marwick. Humphries further testified that he followed the "engagement checklist" set forth in the Bulletin.

In this checklist, Humphries checked "yes" to the following question: "Has the engagement partner determined, and has the designated industry specialist concurred, that the project does not entail high risk/uncertainty, in contemplation of providing the proposed compilation-type service?" Exh. 1776B at P0010974. At trial, Humphries testified that the St. Andrews project entailed "risk" but not "high risk"; a new client was involved, but Peat Marwick's market study showed a growing demand for buildings such as the St. Andrews.

Humphries also checked "yes" in response to the question of whether the client has a "successful track record in the type of project contemplated." *Id.* At trial, Humphries testified that Renaissance had demonstrated its "successful track record" by its completion of the Executive Wing project. Humphries also checked "yes" in response to the question of whether the contractor, DICC, had completed "at least one similar project." *Id.* At trial, Humphries testified that he was thinking of the Executive Wing project as being the "similar project."

As discussed *supra*, the evidence at trial showed that, in late July, construction on the Executive Wing had not been completed and the syndication closing proceeds had been tied up in escrow since the closing in December of 1984. The Executive Wing project involved another real estate limited partnership syndication in which Renaissance acted as general partner. In the Executive Wing PPM, the representation was made that Re-

naissance "anticipates that the renovations will be completed by February 28, 1985." Exh. 5012 at P0018341. The evidence at trial showed that completion of the Executive Wing construction was delayed considerably beyond this date. The evidence further showed that completion of construction was a condition for the release of the escrow. When escrow finally broke in late September, a significant amount of debts and creditor disputes had accumulated; Renaissance did not receive the profits that it had anticipated would accrue from the Executive Wing project.

At trial, Humphries admitted that he read the Executive Wing PPM, including the portion in which construction was projected to be completed by February 28, 1985, and that he did not check why escrow had not broken by July of 1985. Humphries also testified that he took a tour of the Executive Wing with Charles Shirley on August 30, 1985 and was very impressed.

### 4. Expert Opinions Regarding the Client Evaluation Work

At trial, Taylor, plaintiffs' accounting expert witness, testified that many "danger signs" were contained in Peat Marwick's pre-engagement client evaluation. For example, Renaissance's track record, a significant consideration in the client evaluation process, was nearly nonexistent. The only project similar to the St. Andrews and 696 Peachtree projects was the Executive Wing; however, at the time that the client evaluation was being performed by Peat Marwick, escrow had not yet broken due to construction delays. In addition, Taylor testified, the client evaluation showed that Renaissance was unable to pay its bills in July of 1985, the time when the evaluation was carried out. Taylor also concluded that the requisite independence was lacking because Peat Marwick's fees were dependent on the respective syndication closings.

Peat Marwick's accounting expert witness, Pallais, testified in response to Taylor's testimony. With respect to Renaissance's ability to pay its bills, he found, upon review of Peat Marwick's pre-engagement client evaluation, no suggestion that Renaissance was insol-

vent. He also noted that no AICPA guideline existed in 1985 that specifically addressed the topic of pre-engagement client investigation.

### 5. Adequacy of Pre–Engagement Client Evaluation

Contrary to plaintiffs' arguments at trial, the evidence regarding Peat Marwick's pre-engagement client evaluation fails to show that Peat Marwick had actual knowledge of or was severely reckless as to any fraud being perpetrated by Renaissance. In fact, the evidence fails to show that Renaissance was pursuing any fraudulent scheme at the time when Peat Marwick was deciding whether to accept Renaissance as a client. In addition, the evidence fails to show that Peat Marwick was negligent in carrying out its pre-engagement investigation of Renaissance.

Peat Marwick's pre-engagement client evaluation of Renaissance revealed several items of concern. First, it showed that Renaissance and DICC had very little experience with real estate limited partnership syndications but had completed other real estate projects. Second, it showed that construction had not yet been completed on the Executive Wing, which in turn was causing delays in payments and some financial difficulties for Renaissance. Third, it demonstrated some risk that Peat Marwick would not collect its fees from Renaissance. On the positive side, the evaluation showed that Renaissance was actively involved in promising renovation projects. Information revealed by Nadeau's conversations with one of Renaissance's attorneys, one of Renaissance's bankers, and others associated with Renaissance indicated that Renaissance had integrity and the ability to complete the proposed projects.

In weighing the client evaluation information, it must be remembered that Peat Marwick's decision to accept Renaissance as a client was a matter of judgment; accordingly, the court cannot draw strict lines to define what was or was not acceptable. As Humphries testified at trial, he recognized that some negative information had been brought to light. However, as engagement partner, he made the decision that such in-

formation was overcome by the positive information similarly gained through the evaluation process. For example, although it was probably clear that Renaissance intended to pay Peat Marwick out of its syndication proceeds, that intention does not dictate the conclusion that Peat Marwick lacked independence. In its written representations to Renaissance, Peat Marwick expressly stated that its fees were not contingent on the syndication closings; the possibility that the closings would not occur and Renaissance would not be able to pay Peat Marwick was a risk that Humphries, on behalf of Peat Marwick, was willing to assume.[14] In addition, it appears questionable that Renaissance had a "successful track record in the type of project contemplated" or that DICC had "completed at least one project similar in nature to the one proposed." *See* Exh. 1776A at Bates P0014004; *see also* Exh. 924 at Bates P0007616–17. In July of 1985, Renaissance and DICC had completed several other real estate projects, but the Executive Wing project was their first real estate syndication. Although some investigation of the Executive Wing project might have been warranted, it appears that Peat Marwick was operating with the understanding that the project was almost completed. Accordingly, the "track record" requirement, for Peat Marwick's own purposes, was probably satisfied. Finally, it

is somewhat troubling, especially with the benefit of hindsight, that Peat Marwick failed to investigate the possibility of litigation as directed in the Peat Marwick questionnaire.[15] However, the failure to adhere to one procedure recommended in Peat Marwick's own internal guidelines does not amount to a showing of negligence.

After careful consideration of the foregoing, the court finds that Peat Marwick generally followed its internal guidelines for conducting a pre-engagement client investigation. The decision to accept the engagement was made by Humphries after an informed evaluation of the risks associated with Renaissance. Although in retrospect it certainly was not a wise decision to accept the engagement, insufficient evidence exists to find by a preponderance of the evidence that Peat Marwick was negligent in doing so or that Peat Marwick should have been alerted to any fraud contemplated or being perpetrated by Renaissance from information revealed during the client evaluation process.

### B. Peat Marwick's Engagements

#### 1. The St. Andrews Compilation Engagement

After completing their client evaluation of Renaissance, Peat Marwick accepted the engagement to perform a "compilation" service,

---

**14.** Bernard L. Greer, an attorney whom Peat Marwick presented at trial as an expert witness in real estate limited partnership offerings, testified as to his experience with general partners of real estate limited partnerships. In his opinion, most general partners had significant net worth but were illiquid because their assets were composed primarily of interests in real estate. Greer had experienced delays in payments from general partners; however, he explained that developers in the real estate business do not have any regular cash flow because their income is derived from the various projects in which they are involved. Accordingly, Greer did not disclose slow payment information in PPMs because it was not material. Greer's testimony that general partners are typically illiquid and slow in paying their bills supports the finding that Renaissance's apparent illiquidity in 1985 and history of "slow pay," as revealed during Peat Marwick's pre-engagement client evaluation, were not the "red flags" that plaintiffs have so vehemently asserted should have warned Peat Marwick of Renaissance's more severe problems.

**15.** Greer further clarified the respective roles of accountants and attorneys in investigating the

existence of liens and lawsuits against general partners of limited partnership. According to Greer, whom the court found to be a generally credible witness, attorneys who were involved in limited partnership securities offerings in the mid–1980s had due diligence responsibilities to investigate whether any liens and lawsuits existed against the general partner and its affiliates and to decide whether such information was sufficiently material to make it a disclosure item. Materiality, in Greer's opinion, was determined by examining the amount sought by the plaintiffs and whether the financial viability of the general partner would be affected if the plaintiffs were successful. Unless the litigation pending against the general partner or affiliates impaired the general partner's ability to act as a general partner in the limited partnership, Greer opined, such litigation would not be material to the offering. In his experience, Greer never sought information regarding litigation from accountants; rather, this information was revealed from questioning the general partner and performing title searches.

**1540**

with the understanding that its compilation report would be included in the St. Andrews PPM used to solicit sales of limited partnership interests in the St. Andrews limited partnership. In a formal engagement letter, Peat Marwick wrote to Renaissance:

> This letter is to confirm our understanding of the terms and objectives of our engagement and the nature and limitations of the services we will provide.

> We will compile, from information management provides, certain prospective financial information relating to the Saint Andrews Associates, Ltd. for the period September 1, 1985 to December 31, 1985, and the years ending 1986 to 1995. We will not express any form of assurance on the achievability of the projections or reasonableness of the underlying assumptions.

> .     .     .     .     .

> We have no responsibility to update our report [with] events and circumstances occurring after the date of such report.

> .     .     .     .     .

> It is ... understood that in accepting this proposal, the fees and the payment thereof are not contingent upon either the results of the work performed or syndication closing.

Exh. 80,243 at Bates P0010939–40. On July 24, 1985, Shirley accepted the terms of this engagement letter. *See id.*

The Peat Marwick Bulletin describes the compilation service as follows:

> This compilation-type service entails a limited-scope engagement requiring that we satisfy ourselves that the client's projection assumptions are not unreasonable, and results in a report (which may be included in a private placement memorandum of a limited partnership) that disclaims an opinion on the reasonableness of such assumptions.

Exh. 1776A at Bates P0014002. In satisfying themselves that the assumptions are not unreasonable, the accountants must base their conclusion on "available information, client-supplied documentation, [their] knowledge of the industry, operating practices and financial structure for the type of project proposed, income tax matters, and the specific market in which the proposed project is to compete." *Id.* at Bates P0014003. In addition, if circumstances so require, the accountants should (1) assist the client in assembling the projected financial statement based upon the client's assumptions; (2) assist the client in formulating assumptions disclosure language; and (3) advise the client on taxation matters. *Id.* at Bates P001400.

At trial, Humphries testified regarding the work performed on the St. Andrews compilation engagement. In accordance with the engagement checklist, *see* Exh. 1776B at Bates P0010973, Humphries testified, Peat Marwick assisted the client in formulating disclosure language, formulating assumptions disclosure, and revising the projections and assumptions disclosure. Michael Plummer, a real estate management consultant, visited the construction site and reported on construction-related matters. On September 5, 1985, Humphries and Philip Cook, a Peat Marwick audit manager who worked on the St. Andrews engagement, signed off on the engagement checklist. Theodore Wierbowksi, another Peat Marwick accountant, performed "second partner review" for the St. Andrews project.

### 2. The St. Andrews Review Engagement

After completing its work on the St. Andrews engagement, Peat Marwick issued a compilation report dated August 22, 1985 for inclusion in the St. Andrews PPM, which was dated August 28, 1985. Subsequently, on or about September 10, 1985, Humphries learned that the St. Andrews engagement needed to be upgraded to a review because of certain requirements under the laws of Pennsylvania, a state in which St. Andrews limited partnership interests were to be offered. *See* Exh. 901 (Humphries's notes of Sept. 10, 1985 telephone call with securities attorney Alan Rabinowitz; "Need a 'Review Type' letter"); Exh. 902 (Humphries's notes of Sept. 10, 1985 telephone call with Shirley; "Penn. law requires a minimum of a 'review'"). Accordingly, Peat Marwick expanded the scope of its work so that it could issue a "review" report.

In doing so, Peat Marwick issued a formal engagement letter dated September 10, 1985, in which Humphries represented to Shirley:

We are writing this letter to confirm the scope of our review of certain prospective financial information prepared by your staff relating to St. Andrews Associates, Ltd., a limited partnership formed to purchase, rehabilitate, hold for investment and resale a corporate rental apartment facility in Midtown Atlanta, Georgia. Our review and our report thereon will supplement our compilation report previously issued and dated August 22, 1985. The objective of our review will be to issue our report as to whether, based on our review, we believe that the prospective data was prepared using assumptions which were reasonable.

... Generally, we will consider whether the assumptions appear to be reasonable in light of the Company's past experience and of information obtained during the review, and whether individual assumptions are consistent with other related assumptions.

.     .     .     .     .

We understand that our final report may be included in an offering circular for the sale of partnership units.

.     .     .     .     .

Our report will also indicate that we have no obligation to update the report or to review the prospective financial results because of events and transactions occuring [sic] subsequent to the date of the report.

... It is understood that in accepting this proposal, the fees and the payment thereof are not contingent upon either the results of the work performed or syndication closing.

Exh. 80,242 at Bates P0010931, 32, 33. Humphries then asked Plummer to perform additional work on the St. Andrews engagement. In Humphries's opinion, as he testified at trial, this was all that was necessary to upgrade the engagement to a review; no changes were made in the financial projections or assumptions.

Peat Marwick then issued its review report dated September 13, 1985, which was sent to previous recipients of the St. Andrews PPM as a supplement to the PPM. In this review report addressed to "The Partners" of St. Andrews Associates, Ltd., Peat Marwick represented:

We have completed our review of the accompanying financial projections of St. Andrews Associates, Ltd. (Partnership) for the period September 1, 1985 to December 31, 1985 and the years 1986 to 1995....

The accompanying financial projections set forth the projected results of the Partnership and are based on the information and assumptions set forth in the Notes to the Financial Projections. These projections are based on the assumptions of the general partner, being Renaissance Investment Corporation, concerning future events and circumstances. The assumptions are those which the general partner believes are significant to the projections or are key factors on which the financial results of the Partnership depend.

.     .     .     .     .

Although *we believe the information and assumptions used constitute reasonable bases for preparation of the projections,* the achievement of any financial projection may be affected by fluctuating economic conditions and is dependent upon the occurrence of other future events which cannot be assured. Therefore, the actual results achieved may vary from the projections, and such variations could be material.

Exh. 925 at Bates SC50630 (emphasis added).

*3. The 696 Peachtree Review Engagement*

On November 26, 1985, Peat Marwick, with Humphries acting as engagement partner, formally accepted an engagement to review the financial projections contained in the PPM for the 696 Peachtree limited partnership. *See* Exh. 283. In doing so, Peat Marwick made no additional pre-engagement evaluation of Renaissance, with one exception. After Shirley told Humphries that Touche Ross had been involved previously with the 696 Peachtree PPM, Humphries called Al Beerman, a Touche Ross accoun-

tant who had worked on the 696 Peachtree engagement. According to Humphries, Beerman told him that Renaissance was highly illiquid; this information did not concern Humphries. Beerman also told Humphries that Touche Ross was willing to perform accounting services again for Renaissance if it would get paid. Shirley's explanation to Humphries for the change in accounting firms was that Touche Ross did not have sufficient expertise to handle the facade easement issue involved with the 696 Peachtree offering.

On December 18, 1985, Peat Marwick issued its review report, which contained substantially similar representations as the review report for the St. Andrews, for inclusion in the 696 Peachtree PPM. Peat Marwick's 696 Peachtree review report was dated December 6, 1985, which represents the date that all the field work (i.e., the gathering of documentation and other information regarding the 696 Peachtree) was completed for the 696 Peachtree engagement.

### C. Standards Governing Peat Marwick's Engagements

#### 1. AICPA Publications

As discussed *supra,* although there is no AICPA literature addressing an accountant's review of financial projections that was binding and effective in 1985, several AICPA publications provide much instruction in determining the standards by which Peat Marwick's work on the St. Andrews and 696 Peachtree engagements should be judged. These publications, also discussed *supra* but set forth more fully *infra,* include: (1) MAS # 3; (2) SOP 75–4; (3) '80 Guide; and (4) '83 Exposure Draft.

#### a. MAS # 3

Although MAS # 3 "establishes the broad principles and requirements which should govern the preparation of financial forecasts," it also notes that many of the principles involved with the preparation of financial forecasts apply to the development of financial projections. Exh. 45,584 at 44, 46. For example, the inherent impossibility of accurately predicting the future applies to both forecasts and projections:

No one can know the future. Predictions are based on information about the past and present. Of necessity, judgment must be applied to estimate when and how conditions are likely to change. These judgments may subsequently prove to be inaccurate; thus, the accuracy and reliability of a forecast can never be guaranteed. Forecasts by their very nature are subject to error....

Forecast information is substantially less subject to objective verification than historical data. Expected results are often not achieved because of unforeseen occurrences. When working with or using forecast information, it is essential to understand the inherent exposure to inaccuracy involved in any forecast.

*Id.* at 46. In addition, MAS # 3 emphasizes that the "preparation of a financial forecast is the responsibility of the management of an enterprise," although accountants may assist in their preparation. *Id.* This proviso presumably applies as well to the preparation of projections.

Of the several guidelines for the preparation of forecasts provided in MAS # 3, the most relevant, for purposes of the *Renaissance* litigation, is that "[t]he assumptions utilized in preparing a financial forecast should be reasonable and appropriate and should be suitably supported." *Id.* at 47. As MAS # 3 explains: "Assumptions are the essence of forecasting and are the single most important ingredient of a financial forecast. The quality of the underlying assumptions largely determines the reliability of a forecast." *Id.* at 50–51. MAS # 3 further instructs that the time spent on the appropriateness of each particular assumption should be commensurate with its "likely relative impact." *Id.* at 51. MAS # 3 continues by distinguishing between implicit and explicit assumptions:

By nature, a financial forecast always contains a large number of assumptions, some of which may be obvious and explicit but many of which are implicit and obscure. Frequently, the most basic assumptions with enormous potential impact, such as those relating to war or peace conditions, are not addressed explicitly in

the preparation of a forecast. However, those assumptions deemed to be most significant at the time of preparation should be made explicit to focus attention on them and to facilitate review by management.

> .    .    .    .    .

Although it is ordinarily not feasible to exhaustively list and otherwise document and support all the assumptions underlying a forecast, nevertheless it is necessary to seek out and explicitly state support for the most crucial or significant assumptions. Despite these precautions, hindsight will often reveal basic assumptions that have been overlooked or that, in the light of later circumstances, received inadequate treatment. Furthermore, the nature of forecasting is such that some assumptions will turn out to be erroneous no matter what effort, analysis, or support may be applied.

*Id.* Last, MAS # 3 notes that alternative assumptions should be analyzed objectively:

> Relating an assumption to past or present conditions often is a useful approach to check on reasonableness: however, trends are not necessarily reliable indicators of the future. Particular attention should be given to the possibility of changes in conditions and these must rest mainly on theory and an understanding of the basic causal factors.

*Id.* Because both forecasts and projections involve the preparation of assumptions, the instructions provided by MAS # 3 regarding forecast assumptions presumably would apply in the case of projections.

### b. SOP 75–4

SOP 75–4 provides further instructions, again for forecasting purposes only, regarding assumptions. Like MAS # 3, SOP 75–4 provides:

> A financial forecast is based on assumptions representing management's judgment of the most likely circumstances and events and its most likely course of action. Assumptions are the single most important ingredient of a financial forecast. However, regardless of the amount of study or

analysis, some assumptions inevitably will not materialize.

*Id.* at 61. SOP 75–4 also provides direction as to the disclosure of assumptions:

> Those assumptions should be disclosed which management thinks are most significant to the forecast or are key factors upon which the financial results of the enterprise depend. There ordinarily should be some indication of the basis or rationale for these assumptions. . . .
>
> Frequently, basic assumptions that have enormous potential impact are considered to be implicit in the forecast. Examples might be conditions of peace, absence of natural disasters, etc. Such assumptions need be disclosed only when there is a reasonable possibility that the current conditions will not prevail. In such circumstances, to the extent practicable, the possible impact of a change in the assumptions should be disclosed.

*Id.* SOP 75–4 further counsels that it should be made clear that the assumptions disclosed are only those that the management believes to be significant to the forecast and that they were based on circumstances and conditions existing when the forecast was prepared. *Id.* at 62. SOP 75–4 additionally cautions:

> Identifying those assumptions which, at the time of preparation, appear to be most significant to the forecast or which are key factors upon which the financial results of the business depend requires the careful exercise of good faith judgment by management.

*Id.*

Significantly, SOP 75–4 provides instructions for updating a forecast issued on a "one-time" basis, such as in connection with obtaining equity financing, where no intention exists to issue updated forecasts:

> In such cases, emphasis should be given to the date of issuance of the forecast. . . . In addition, management's intention not to update the forecast should be specifically disclosed.

*Id.* at 65.

### c. '80 Guide

The '80 Guide provides extensive instruction for an accountant's review of a financial

forecast, much of which may be applied to an accountant's review of financial projections. Topics discussed include: (1) defining management's and the accountant's responsibilities; (2) the general requirements for a review engagement; (3) procedures for evaluating assumptions; and (4) instructions regarding the accountant's review report. Each of these topics, as relevant to the *Renaissance* litigation, are discussed below.

First the '80 Guide distinguishes the role of management from the accountant's role in preparing the forecast. As set forth in the '80 Guide, the responsibility for identifying key assumptions and determining the reasonableness of each assumption lies primarily with management:

> The forecast including the underlying assumptions is the responsibility of an entity's management. Management cannot guarantee that forecasted results will be attained, because achievability depends on many factors that are outside management's control; however, management controls operations by planning, organizing, and directing activities. Management, therefore, is in the best position to develop reasonable assumptions with respect to the key factors upon which financial results depend.

> Management may enlist the assistance of outside parties in preparing the forecast. For example, an accountant who is engaged to review and report on the forecast may provide such assistance by helping management identify assumptions, participating in information gathering, or performing the mechanical aspects of preparation. Such activities ordinarily would not affect the accountant's objectivity in reviewing and reporting on the forecast. Regardless of the extent of the accountant's participation, the forecast assumptions remain management's responsibility. The accountant may assist management in the formulation of assumptions, but management must evaluate the assumptions, make key decisions, and present the assumptions as their own.

*Id.* at 3 (footnote omitted).

Second, the '80 Guide provides guidance for conducting a review of a forecast. The objective of a review, according to the '80 Guide, is to provide an accountant with a basis for reporting (1) whether the forecast was prepared properly based on the stated assumptions and in conformity with the recommendations set forth in SOP 75–4, and (2) whether the underlying assumptions provide a reasonable basis for the forecast. *Id.* at 5. Specific objectives and an understanding of the services to be provided should be confirmed in an engagement letter. *Id.*

The '80 Guide then sets forth guidelines for conducting a review, including the following directives:

> 1. The review should be performed by a person or persons with adequate technical training and proficiency to review a financial forecast.

> 2. In all matters relating to the engagement, the accountant should maintain an independence in mental attitude.

> 3. Due professional care should be exercised in the performance of the review and the preparation of the report.

> 4. The work should be adequately planned and assistants, if any, should be properly supervised.

> .    .    .    .    .

> 6. Suitable support should be obtained to provide a reasonable basis for the accountant's report on the financial forecast.

*Id.* at 5–6 (footnote omitted).

In addition, the '80 Guide instructs that the accountant should perform procedures that provide reasonable assurance of, among other things, adequate disclosure of assumptions based on the guidelines contained in SOP 75–4. *Id.* at 11. "The accountant should consider whether the forecast, including related disclosures, should be revised because of (a) mathematical errors, (b) unreasonable assumptions, (c) inappropriate or incomplete presentation, or (d) inadequate disclosure." *Id.* at 12.

The '80 Guide further provides that the use of working papers "should be appropriate to the circumstances and the accountant's needs on the engagement to which they apply." *Id.* at 13. Working papers should indicate, among other things, that (1) "the

engagement had been planned and that the work of the assistants had been supervised and reviewed" and (2) "[w]hat sources of information were used and the major assumptions that were made in the preparation of the forecast." *Id.*

Third, the '80 Guide sets forth guidelines regarding identification of key factors contained in assumptions and support for assumptions. The '80 Guide instructs:

> The accountant should perform those procedures he considers necessary in the circumstances to enable him to report on whether he believes the assumptions provide a reasonable basis for management's forecast. Based on his review, the accountant can conclude that the assumptions provide a reasonable basis for the forecast, if he concludes (1) that management has explicitly identified the factors expected to materially affect the operations of the entity during the forecast period and has developed appropriate assumptions with respect to such factors and (2) that the assumptions are suitably supported.

*Id.* at 8. In a footnote to (1), the '80 Guide provides, as in MAS # 3 and SOP 75–4: "An attempt to list all assumptions is inherently not feasible. Frequently, basic assumptions that have enormous potential impact are considered to be implicit, such as conditions of peace and absence of natural disasters." *Id.*

With respect to the identification of key factors, the '80 Guide directs accountants as follows:

> Using his knowledge of the business, the accountant should evaluate whether management's assumptions relate to all key factors upon which the entity's financial results depend. In evaluating the assumptions, the accountant should consider the relevance and overall completeness of the factors identified as well as risks inherent in the business, the sensitivity of the forecast to variations in particular factors, and the pervasiveness of the particular factors in the various assumptions. These matters may significantly affect the forecast because of their importance in one or more significant assumptions.

*Id.* at 8–9.

The '80 Guide further provides that after "satisfying himself that the key factors have been identified and included in the assumptions, the accountant should evaluate whether the assumptions are suitably supported." *Id.* at 9. The accountant should consider assumptions in the aggregate, significant assumptions individually, and the aggregate impact of individually insignificant assumptions. *Id.* In addition, the '80 Guide directs accountants to consider, among other things: (1) "[w]hether sufficient pertinent sources of information about the assumptions have been considered"; (2) "[w]hether the assumptions are consistent with the sources from which they are derived"; (3) "[w]hether the assumptions are consistent with each other"; and (4) "[w]hether the historical financial information and other data used in developing the assumptions are sufficiently reliable for that purpose." *Id.* at 10. The '80 Guide also counsels that "the accountant should consider using alternative approaches to the development of assumptions in evaluating the forecasted amounts." *Id.* at 11.

Paralleling its guidelines for conducting a review, the '80 Guide presents an outline that illustrates appropriate review procedures. Among other things, it advises the accountant to look for answers to questions such as "What procedures provide reasonable assurance that all significant factors are identified and included in the assumptions?" *Id.* at 16. The outline further provides for the consideration of "the competence of management personnel involved in the forecasting process...." *Id.* at 17. In addition, the outline provides for the determination of whether key factors have sufficiently been identified, as well as the consideration of alternative assumptions. *Id.* at 17–18. Last, the suggestion is made that the accountant "consider obtaining a letter from the client's legal counsel, as of the report date, covering ... [l]itigation, claims, and assessments...." *Id.* at 19.

Fourth, the '80 Guide provides instructions regarding an accountant's report on a review of a forecast. As an initial matter, it specifies that "[t]he date of completion of the accountant's review procedures should be used as the date of the report." *Id.* at 22.

Next, the '80 Guide provides that "when a departure from the guidelines, an unreasonable assumption, or a limitation on the scope of the accountant's review has led him to conclude that he cannot issue an unqualified report," the accountant should issue an adverse report stating that he or she believes the forecast has not been prepared in conformity with AICPA guidelines and specifying the paragraph that discloses the basis for the adverse report. *Id.* at 23. If limitations are imposed on the scope of the review, then the accountant may need to issue an adverse report:

> The accountant can issue an unqualified report only if the review has been conducted in accordance with this guide and he has been able to apply all the procedures he considers necessary in the circumstances. The scope of the accountant's review may be limited either (a) by client-imposed conditions that preclude the application of one or more procedures that the accountant considers necessary in the circumstances to comply with the guidelines set forth in this guide or (b) by circumstances, such as the accountant's inability to evaluate significant assumption(s) because they are not suitably supported. Limitations on the scope of the review, whether imposed by the client or by other circumstances, may require the accountant to state in his report that he cannot evaluate the presentation of the forecast or assess whether the assumptions provide a reasonable basis for management's forecast.

*Id.* at 24–25. Last, the '80 Guide provides that the question of an accountant's independence in his or her reporting must be decided by him or her "as a matter of professional judgment." *Id.* at 26.

#### d. '83 Exposure Draft

As stated previously, the '83 Exposure Draft expands the AICPA guidelines for reporting forecasts to include reporting on projections. Exh. 45,587 at iii. The '83 Exposure Draft is instructive in several respects: (1) it defines pertinent terms; (2) it provides that the preparation procedures for a forecast should be applied to a review of projections, with some modification; and (3) it provides that the review procedures for a forecast should be applied to a review of projections, with some modification as well. Each of these categories will be discussed seriatim.

First, the '83 Exposure Draft sets forth the definitions of certain terms, some of which should be noted. The term "financial projection" is defined as:

> prospective information that presents, to the best of the responsible party's knowledge and belief, given one or more hypothetical assumptions, an entity's expected financial position, results of operations, and changes in financial position. A financial projection is sometimes prepared to present one or more hypothetical courses of action for evaluation, as in response to a question such as "What would happen if ...?" A financial projection is based on the responsible party's assumptions reflecting conditions it expects would exist and the course of action it expects would be taken, given one or more hypothetical assumptions.

*Id.* at 8. The term "hypothetical assumption" is then defined as "an assumption used in a financial projection to present a condition or course of action that is not necessarily expected to occur, but is consistent with the purpose of the projection." *Id.* In contrast with the definition of financial projection, the term "financial forecast" is defined as "prospective financial information that presents, to the best of the responsible party's knowledge and belief, an entity's expected financial position, results of operations, and changes in financial position." *Id.* Thus, the difference between a forecast and a projection is that a forecast, as stated *supra*, presents what is most likely to occur and a projection presents what may be expected to occur given certain assumptions. The '83 Exposure Draft also defines the term "review" as "a professional service that involves evaluation of" (1) "[t]he preparation of the prospective financial statements"; (2) "[t]he support underlying the assumptions"; and (3) "[t]he presentation of the prospective financial statements for conformity with AICPA presentation guidelines." *Id.* at 9. Last, the term "key factors" is defined as:

the significant matters on which an entity's future results are expected to depend. Such factors are basic to the entity's operations and thus encompass matters that affect, among other things, the entity's sales, production, services, and financing activities. Key factors serve as a foundation for prospective financial statements and are the bases for the assumptions.

*Id.* at 9.

Second, the '83 Exposure Draft states that the guidelines for the preparation of forecasts are applicable, as modified therein, to projections. *Id.* at 93. Accordingly, as stated in previous AICPA literature, the preparation of financial projections are the responsibility of management, who may be assisted by accountants. *Id.* at 12. In the section entitled "Guidance for Entities that Issue Financial Forecasts," the '83 Exposure Draft further provides for the identification and disclosure of significant assumptions. *Id.* at 24–25. Like other AICPA literature previously discussed, the '83 Exposure Draft mentions the existence of implicit assumptions:

> Frequently, a basic assumption is made that current conditions having enormous potential impact will continue to prevail and is considered to be implicit in the financial forecast. Examples are conditions of peace, absence of natural disasters, etc. Such assumptions need be disclosed only when there is a reasonable possibility that the current conditions will not prevail.

*Id.* at 24. Last, the '83 Exposure Draft echoes previously issued instructions on the development of and support for assumptions. *Id.* at 62. However, it modifies the forecast guidelines regarding assumptions as follows:

> Hypothetical assumptions need not be reasonable *but should be appropriate in* light of the purpose for which the financial projection is prepared. All other assumptions should be reasonable given the hypothetical assumptions. That is, the other assumptions should be developed to depict conditions based on the hypothetical assumptions. For example, if a financial projection is prepared to show the effect of the construction of a new production facility that is partially financed, the presenta-

tion should include the effect of the related debt service.

> Hypothetical assumptions need not be supported as they relate to the special purpose of the presentation. The other assumptions, however, should be suitably supported given the hypothetical assumption.

*Id.* at 94.

Third, the '83 Exposure Draft states that the guidelines for the review of forecasts are applicable, as modified therein, to projections. *Id.* at 110. Distinguishing between a review of a forecast and a review of projections, it states: "The accountant's procedures and reporting on reviews of financial projections differ primarily because they are concerned with the support for assumptions *given the occurrence of the hypothetical assumptions* and the presentation of the prospective financial statements. . . ." *Id.* at 110 (emphasis in original). The '83 Exposure Draft additionally provides:

> As a result of his review the accountant has a basis for reporting on whether a financial projection is presented in conformity with AICPA guidelines and whether the assumptions provide a reasonable basis for the responsible party's presentation given the hypothetical assumptions.

*Id.* In evaluating the assumptions:

> The accountant should perform those procedures he considers necessary in the circumstances to report on whether the assumptions provide a reasonable basis for the financial projection given the hypothetical assumptions. The accountant can conclude that the assumptions provide a reasonable basis for the financial projection given the hypothetical assumptions if the responsible party represents that the presentation reflects, to the best of its knowledge and belief, expected financial position, results of operations, and changes in financial position for the prospective period given the hypothetical assumptions and he concludes based on his review (1) that the responsible party has explicitly identified all factors that would materially affect the operations of the entity during the prospective period if the hypothetical assumptions were to materialize and has devel-

oped appropriate assumptions with respect to such factors and (2) that the other assumptions are suitably supported given the hypothetical assumptions.

*Id.* The '83 Exposure Draft further provides: "In evaluating support for assumptions other than hypothetical assumptions, the accountant can conclude that they are suitably supported if the preponderance of information supports each significant assumption given the hypothetical assumptions." *Id.* At trial, Peat Marwick's accounting expert, Pallais, testified that no assumptions in the St. Andrews or 696 Peachtree PPMs were identified as hypothetical assumptions. TR at 88 (Apr. 6, 1992).

### 2. Peat Marwick's Guide

To better understand Peat Marwick's standards for reporting on financial projections, a few terms must first be defined. According to Peat Marwick's Guide, a "financial projection" is "an estimate of financial results based on assumptions which are not necessarily the most likely." Financial projections are often developed as a response to such questions as "What would happen if?" Exh. 924 at Bates P0007592. A review report is categorized as an "unrestricted report," which is a "[p]rospective report[ ] that contain[s] financial projections ... which can be used by third-parties in connection with a public or private offering of securities." *Id.* at Bates P0007594. In the captioned litigation, Peat Marwick's compilation and subsequent review reports on Renaissance's financial projections were used, with Peat Marwick's knowledge, to induce investment in the St. Andrews and 696 Peachtree limited partnerships and thus constituted unrestricted reports.

The Guide sets forth the proper scope of an unrestricted reporting engagement: "Firm policy requires that we *undertake* to satisfy ourselves that the underlying assumptions, as well as the prospective financial results, are reasonable, and therefore precludes engagements where client-imposed scope limitations will restrict our ability to so evaluate assumptions." *Id.* at Bates P0007595 (footnote omitted). The Guide pro-

hibits allowing clients to limit the scope of an engagement:

> Client-imposed scope limitations are not permitted for unrestricted reporting engagements. Scope limitations imposed by circumstances (e.g., a lack of information supporting an assumption) should be carefully evaluated to determine whether such limitations prevent our reporting that assumptions are reasonable.

*Id.* at Bates P0007620.

In conducting a review of projections and assumptions, the Guide contemplates: "(1) understanding the 'projection process' and management's experience with its use; (2) gathering sufficient information to suitably support the assumptions used; (3) determining the mathematical accuracy of the projections; and (4) satisfying ourselves that presentation and disclosure are adequate." *Id.* at Bates P0007619. With respect to finding support for assumptions, the Guide instructs the accountants, among other things, to "[d]etermine that the sources of information are reputable, reliable, and appropriate" and to "[d]etermine the appropriateness of the logic and completeness of the assumptions." *Id.* at Bates P0007619. With respect to adequacy of presentation and disclosure, the Guide makes reference to SOP 75–4, discussed *supra.*

The Guide echoes the language of SOP 75–4 in addressing the identification and disclosure of assumptions:

> The prospective financial information including the underlying assumptions is the responsibility of management of the entity.

> . . . . .

> Management may enlist the assistance of outside parties in preparing the prospective results. When engaged to review and report on projections, we may provide such assistance. For example, helping management identify assumptions, participating in the gathering of information or performing the mechanical aspects of preparation ordinarily would not affect the accountant's objectivity in reviewing and reporting on the projections. Regardless of the extent of our participation, the assumptions remain management's responsibility.

We may assist management in the formulation of assumptions, but management must evaluate the assumptions, make key decisions, and accept the assumptions as their own.

*Id.* at Bates P0007598 (footnote omitted). The Guide further provides that "[t]he client *may* not 'assume away' any major uncertainties." *Id.* at Bates P0007622.

The Guide provides: "The amount of work necessary to satisfy ourselves as to the reasonableness of underlying assumptions is obviously a judgmental matter." *Id.* at Bates P0007596. If the review reveals that the assumptions are unreasonable, then a report should not be issued unless such matters are cured by client modification of the information. *Id.* at Bates P0007595. The Guide distinguishes between reasonable and unreasonable assumptions:

*Reasonable assumptions.* Assumptions that are (a) supported by sufficient relevant data and information, (b) supported by logic, (c) internally consistent, and (d) within a range of alternative assumptions that are likely to occur.

*Unreasonable assumptions.* Assumptions that (a) appear inconsistent with past results and cannot be logically supported, (b) appear inconsistent with our understanding of the client's business and its environment and have little or no supporting information, (c) are contradicted by the preponderance of information gathered, or (d) are not within a range of assumptions that are likely to occur.

*Id.* at Bates P0007596.

Under the Guide, "[a]dequate disclosure is paramount." *Id.* at Bates P0007600. Accordingly, in examining the reasonableness of assumptions, a determination of adequacy of report disclosure must be made. *Id.* at Bates P0007596. When Peat Marwick issues a report on the reasonableness of assumptions, the Guide provides:

This type of report includes a statement to the effect that we believe the assumptions constitute a reasonable basis for preparation of the projections. That statement reflects a professional judgment based on supporting information gathered and tests performed. The nature and amount of supporting information gathered and the type and extent of tests performed are also judgmental matters.

This places a burden on Firm personnel to consider alternative assumptions which would change materially the projected results. Also, it implies that the preponderance of evidence supports the stated assumptions.

*Id.* at Bates P0007609.

In carrying out a prospective financial review reporting engagement, the "engagement partner" has certain specified responsibilities:

The engagement partner is required to make such a review of engagement working papers as the engagement partner deems necessary to be satisfied as to the appropriateness and comprehensiveness of the work performed and conclusions reached. The engagement partner also is responsible for ascertaining that each working paper has been reviewed by someone other than its preparer.

The engagement partner must also be satisfied as to clarity and adequacy of disclosure in the Firm's report....

*Id.* at Bates P0007621.[16] In addition, the engagement partner is responsible for "[r]eading the entire offering circular and considering whether the information contained therein, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the prospective report." *Id.* at Bates P0007627.

The scope of "second partner review," according to the Guide, "includes a review of the report and such working papers as the *second partner deems necessary* to satisfy the objectives stated below." *Id.* (emphasis added). These objectives include (1) "giv[ing] additional assurance that there has

---

16. Under the Guide, working papers should document adequately: "engagement planning and supervision; [Peat Marwick's] understanding of the projection process; [and] the work performed (procedures used to evaluate assumptions as well as projection preparation and presentation) and the conclusions reached...." Exh. 924 at Bates P0007598.

been compliance with Firm policy regarding the disclosure, format, terminology, etc., in the prospective report (including prospective schedules and any financial statements, assumption disclosure, caveats, and any supplementary data that might be required)" and (2) "ascertain[ing] that appropriate consideration has been given to . . . the key assumptions." *Id.*

### D. The Accountants' Work on the St. Andrews

#### 1. Assumption that Construction Would Be Completed by December 31, 1985

In the St. Andrews PPM, the projections on which Peat Marwick reported included assumptions regarding rental revenue during 1985. In Note 6 to the financial projections, which was issued as part of the St. Andrews PPM, Peat Marwick states: "Rental revenues in the projections are . . . computed assuming one-half of one month's rent is earned during December 1985 and an apartment vacancy rate of 35% in 1985 and 1986 and 10% in 1987 and each year thereafter . . . ." Exh. 5006 at Bates P0011951. In the course of performing its engagement, Peat Marwick investigated the reasonableness of the assumption that the St. Andrews project would be completed by December of 1985.

In a file memorandum dated September 3, 1985, Peat Marwick accountants Brad Dickson and Ray Moody documented Renaissance's assumptions in determining rental projections for the St. Andrews, based on a May 1985 market study by Dale Henson Associates. *See* Exh. 873 at Bates P0011421. In discussing absorption rates for rental occupancy, Dickson and Moody noted that "[t]he general partner projects an average occupancy rate in St. Andrews to be 65% in 1985 . . . ." They next conclude:

> This assumption is not unreasonable particularly in light of the fact that the St. Andrews project is not to be place[d] in service on a "phase in" basis, rather all units and service facilities are to be placed in service on December 1985 when construction is projected to be 100% complete.

*Id.* at Bates P0011422. Finally, they concluded that "[t]he general partner's assump-

tions when taken as a whole are not unreasonable as used to project rental revenues for the St. Andrews Executive Residences." *Id.* at Bates P0011423. At trial, Dickson, who acted as "senior staff accountant in charge" on the St. Andrews engagement, testified that he visited the St. Andrews construction site and talked to Shirley about construction. He testified further, however, that he did not try to ascertain whether the assumption regarding the date of completion was reasonable because it was Michael Plummer's responsibility to examine this assumption.

Plummer testified at trial that he was asked to conduct a tour of the St. Andrews property in order to examine the facilities from construction cost, operations, and timing standpoints and to evaluate the appraisal methodology used for a facade easement donation. As reflected in his September 12, 1985 memorandum to Humphries, he determined that the methodology used in appraising the economic value of the St. Andrews project, which involved a uniquely valued facade easement donation that would result in substantial tax benefits for the investors, was reasonable. Exh. 34 at Bates P0005487. He also reviewed certain assumptions underlying the revenue projections. Specifically, he used the Dale Hensen market study, *see* Exh. 35, which was prepared for Renaissance in May of 1985 for another project in a similar geographic location. The Hensen study supplied information regarding rental rates, absorption rates, and expected levels of occupancy. At trial, Plummer testified that it is common to have pre-leasing; however, he did not recall any plan to pre-lease units in the St. Andrews. Plummer did not read the St. Andrews PPM.

When Plummer came to Atlanta the second time, after the St. Andrews engagement was upgraded to a review engagement, he made another on-site inspection of the St. Andrews construction site, talked with Shirley and the contractor (although he did not recall the contractor's identity), and reviewed the construction contract. The construction contract, which was between DICC and St. Andrews Associates, Ltd., provided:

13. Time is of the essence of this Contract. Severe adverse tax consequences will result if construction, renovation and rehabilitation is not completed on/or before December 31, 1985. In the event of a delay in completion after that date, DICC shall be liable to SAAL for penalty payments as set forth in Paragraph 14.

14. If DICC shall fail to secure A Temporary Certificate of Occupancy as to the building only by December 31, 1985, then and in that event DICC shall tender the sum of $100,000.00 as a late fee. In addition to the payment of the late fee, as set forth herein, SAAL shall have the right to require specific performance from DICC in completion of the work.

Exh. 45,337 at Bates P0012498. According to Plummer, his job was not to determine the percentage of completion of construction; rather, he was asked to look at the probability of completion of construction. Although the construction was ongoing when he visited the site, he was of the opinion that construction would be completed, based on his own visual inspection, talks with Shirley, and talks with the unidentified contractor. Plummer's time records reflect that he spent 16 hours on October 18, 1985 on the St. Andrews engagement. Exh. 1725 at Bates P0000329. At trial, Plummer was unsure whether this time period included travel time. In a memorandum to Humphries dated October 9, 1985, he reported that "the work can be completed by year-end and there are no foreseeable problems." Exh. 80,245 at P0010948. At trial, when Humphries was questioned about the assumption of rental income in December of 1985 that was contained in the St. Andrews PPM, *see* Exh. 5006 at Bates P0011951, he testified that he depended on Plummer's expertise in this area. Humphries further testified that he had discussed this assumption with Plummer and relied on Plummer's conclusion that such an assumption was reasonable. He also testified that he knew that Plummer was not aware of the purpose of his work on the St. Andrews and that there was no reason for Plummer to have read the St. Andrews PPM.

Taylor, plaintiffs' expert, testified that the assumption that construction on the St. An-

drews would be completed by December 31, 1985 was unreasonable. According to Taylor, Plummer's work on the St. Andrews, as reflected in Exhibit 873 (Sept. 3, 1985 Plummer memorandum to file), was inconsistent with construction draw documents then available, which Plummer had not examined. Specifically, the construction draw documents did not support the conclusion that construction would be completed by the end of 1985. Taylor further concluded that Plummer performed insufficient work on the St. Andrews because he spent little time on the construction site and on the construction draw documents. On cross-examination by counsel for Peat Marwick, Taylor admitted that the St. Andrews had received a temporary certificate of occupancy on December 13, 1985, although it was for common areas only.

Pallais, Peat Marwick's expert, testified that the assumption that the St. Andrews would be finished by the end of 1985 was suitably supported. According to Pallais, Plummer's work provided a sufficient basis for concluding, as of the date of the reports, that this assumption was reasonable. In Pallais's opinion, Plummer utilized the best and most direct form of evidence by personally visiting the St. Andrews construction site.

The court concludes that Peat Marwick was not negligent in reviewing the assumption as to the projected date of construction completion on the St. Andrews. Accordingly, the court concludes further that Peat Marwick's work on this assumption in no way showed any actual awareness of fraud or severe recklessness as to the existence of any fraud. Through Plummer's work, Peat Marwick adequately investigated the reasonableness of this assumption. In making this conclusion, the court accepts the testimony of Pallais, Peat Marwick's expert witness, as credible and rejects Taylor's testimony to the extent it is contrary. In doing so, the court agrees with Pallais's testimony that Plummer's on-site inspection constituted a sufficient investigation of the construction progress; thus, contrary to Taylor's opinion, inspection of construction draw documents was not necessary. Moreover, as reflected in Peat Marwick's written representations in its

engagement letters and reports, Peat Marwick had no obligation to update its reports for events that occurred after the dates of their reports. Although the actual results may not have occurred as projected, the projection that construction would be completed by the end of 1985 was reasonable as of September 13, 1985, the date of Peat Marwick's latter report for the St. Andrews project.

### 2. The Construction Loan

■ At trial, plaintiffs presented evidence to demonstrate that Peat Marwick was negligent in reporting on the projections regarding sources of funds. In the fall of 1985, complications arose in connection with the construction loan on the St. Andrews project, which were not disclosed to the investors or investigated by Peat Marwick. After consideration of the evidence at trial, as set forth below, the court concludes that Peat Marwick was not negligent in this respect.

The St. Andrews PPM disclosed that "[t]o finance the acquisition of the Property and a portion of the costs of renovation and rehabilitation of the Property, the Partnership obtained a construction loan in the principal amount of $4,700,000 ... from TCF National Properties, Inc." ("TCF"). Exh. 5006 at Bates P0011747. Under the construction loan agreement, the partnership was obligated to obtain a permanent loan commitment by August 26, 1985. *Id.* at Bates P0011748. In the notes accompanying the financial projections, certain assumptions were made regarding the acquisition of permanent financing:

[The construction] loan is due and payable upon completion of the project but not later than March 24, 1986 unless extended at the option of the General Partner until March 24, 1987. The General Partner intends to assist the Partnership in acquiring nonrecourse permanent loans in the amount of $6,400,000. These projections assume that the Partnership will acquire the nonrecourse financing in December, 1985.... The General Partner[']s assumptions with regard to such nonrecourse financing are based upon informal discussions with unrelated lenders and recent experience. As of the date of the projections, no commitment for such nonrecourse financing has been obtained and there is no assurance that nonrecourse financing can or will be obtained.

Should the General Partner be unable to obtain nonrecourse permanent loans in the amount of $6,400,000, [DICC] will continue to provide nonrecourse financing sufficient to bring the total mortgage up to $6,400,000 provided there is sufficient collateral in the property....

*Id.* at Bates P0011950.

At trial, Charles Shirley, one of the corporate officers of Renaissance, identified the construction loan agreement between TCF and the St. Andrews Associates, Ltd. This document was not admitted in evidence. Stephanie Chisholm, another corporate officer of Renaissance, identified Exhibit 813, which was admitted in evidence, as an August 10, 1985 letter from her to William Oliver, a loan officer at TCF. In this letter, Chisholm advised Oliver of Renaissance's plans regarding the St. Andrews and requested his attention to several items, including:

1) St. Andrews Associates, Ltd. needs the acknowledgement of TCF that we are syndicating the property and acknowledgement that we will be adding additional limited partners, since it is not provided for in the existing construction loan agreement....

.　　.　　.　　.　　.

4) It is the recommendation of the accountants and the attorneys that the donation of the facade of the building to a non-profit organization be done prior to the claiming of the rehabilitation tax credit. Therefore, this donation of the facade easement needs to be done as soon as possible. TCF will have to acknowledge the easement of the facade so that the partnership can make the donation and place the easement on the property which must be an easement in perpetuity. The donation really does not have any material effect on your collateral.

Exh. 813 at Bates RS002673–74. Based on this document, the court concludes that Re-

naissance needed TCF's consent to syndicate the St. Andrews project and donate the facade easement as contemplated in the projections contained in the St. Andrews PPM. *See* Exh. 5006 at Bates P0011939, P0011949. The need for TCF's consent, however, was not disclosed in the St. Andrews PPM.

At trial, Chisholm also identified TCF's written response to her August 10, 1985 letter. In this letter, which was dated September 25, 1985, TCF informed the St. Andrews Associates, Ltd.:

> Please be advised that the Loan documents prohibit the Transaction you have described and requested ˙our consent to.

> We shall not modify the Loan documents to permit the transactions requested and we hereby inform you we do not and shall not consent to the requested transactions.

Exh. 814. Chisholm testified that it was her understanding that TCF eventually would agree to the syndication. She further recalled that the St. Andrews syndication closed but that Renaissance's problems with TCF continued after the closing. Dobbs testified that he recalled many problems with TCF arising from TCF's reluctance to approve the St. Andrews syndication. Dobbs identified Exhibit 2021 as a December 23, 1985 letter from TCF to him regarding the $4,700,000 construction loan. In this letter, TCF consented to the St. Andrews syndication and the facade easement donation. Exh. 2021 at Bates SC53479, SC53483. However, among other things, TCF conditioned its consent on the following:

> The current outstanding balance under the Loan Documents shall be reduced in the amount of nine hundred thirteen thousand seven hundred seventy five dollars ($913,-775.00), which the Borrower [St. Andrews Associates, Ltd.] shall pay to the Lender [TCF] ("Paydown")....

*Id.* at Bates SC53479.

At trial, Chisholm did not remember having seen Exhibit 2021, but she recalled that TCF wanted a substantial reduction of $900,-000 in the construction loan amount. She did not recall whether Renaissance agreed to the $900,000 paydown. When counsel for Peat Marwick showed Exhibit 80,358 to Chisholm, which is a loan modification agreement between TCF and St. Andrews Associates, Ltd. dated March 3, 1986, she identified her signature located under "St. Andrews Associates, Ltd.... By: Renaissance Investment Corporation, General Partner." Exh. 80,358 at Bates RH 018343. This agreement reflects that TCF and St. Andrews. Associates, Ltd., as a result of settling "certain disputes," agreed to reduce the $4,700,000 construction loan to $3,500,000. *Id.* at Bates RH018336. Chisholm had no recollection of this loan reduction.

The circumstances regarding the TCF loan were clarified substantially by the testimony of Thomas B. Nelson, who had been vice-president of construction at Renaissance and president of DICC, a Renaissance-related entity, at all relevant times.· At trial, Nelson testified that he recalled signing the December 23, 1985 TCF consent letter, which was admitted in evidence as Exhibit 327.14.[17] In Nelson's opinion, although the provision for a $900,000 paydown constituted a significant reduction in the construction loan proceeds, he had assumed that the funds would be obtained elsewhere. He further testified that the $900,000 paydown was not made and that TCF did not consent to the syndication in 1985.

According to Nelson, no one from Peat Marwick asked him whether the approval of the construction lender, TCF, was necessary for the closing of the syndication. On cross-examination by counsel for Peat Marwick, Nelson admitted that he never read the whole St. Andrews PPM. In addition, he never talked to anyone from Peat Marwick regarding the proposed reduction in the TCF loan.

At trial, Peat Marwick put on videotaped excerpts from the deposition of Alan R. Rabinowitz, who acted as securities counsel on the

---

17. Only one apparent difference exists between Exhibit 2021 and Exhibit 327.41. In Exhibit 327.41, the last page contains Nelson's signature, as identified by Nelson at trial, along with the handwritten words "Thomas B. Nelson, V.P." *See* Exh. 327.41 at Bates SC0067713. In Exhibit 2021, the last page contains an identical signature but no handwritten words next to it. *See* Exh. 2021 at Bates SC53484.

St. Andrews offering. Rabinowitz testified that Chisholm asked him sometime after early December of 1985 to assist in getting TCF's approval for the St. Andrews syndication. At her request, he went to a meeting in New York with Nelson and Oliver, where he learned that Oliver was balking at giving TCF's consent to a subordination of the TCF loan to the facade easement, which was a required condition under federal tax regulations. As Rabinowitz recalled, on the night before the St. Andrews closing, Oliver consented, on behalf of TCF, to the subordination of the construction loan. Rabinowitz' time records indicate that the St. Andrews syndication closing took place in Atlanta on December 23 and 24, 1985. *See* Exh. 34,-699.99 at Bates RS018165–68.

The Peat Marwick accountants involved with the St. Andrews engagements also testified at trial regarding the construction loan from TCF. First, Humphries testified it was his understanding that a construction loan from TCF was in place and that the general partner, Renaissance, was going to help the partnership obtain permanent financing. He did not consider the possibility that financing might need to be obtained from DICC. Second, Nadeau testified that he worked on several tax issues regarding the St. Andrews, including the tax aspects of the facade easement donation. Third and last, Dickson testified that, to the best of his recollection, no one at Peat Marwick investigated DICC's financial ability to provide construction financing if permanent financing could not be obtained. In addition, he could not recall whether any Peat Marwick accountant investigated Renaissance's ability to assist the limited partnership to obtain permanent financing of $6,400,000.

At trial, plaintiffs' expert Taylor testified that assumptions regarding the facade easement for the St. Andrews were unreasonable. The St. Andrews project involved the donation of a facade easement, which would result in substantial tax benefits but would also reduce the value of the property since the donation would be in perpetuity. When Peat Marwick was working on the St. Andrews, the construction lender had not yet agreed to the donation. According to Taylor, the im-

plicit assumption that the lender would agree to the donation without changing the terms of the loan was unreasonable.

The notes accompanying the St. Andrews projections mention the $4,700,000 loan, but it is assumed that the partnership will acquire permanent loans in the amount of $6,400,000 in December of 1985. *See* Exh. 5006 at Bates P0011950. Correspondingly, the amount of $6,400,000, and not $4,700,000, is listed in the sources of funds portion of the cash flow projections. *Id.* at Bates P0011938. Thus, no assumption was made regarding the $4,700,000 loan. Instead, the assumption was made that permanent financing would be obtained by December of 1985, or, alternatively, that DICC would provide sufficient financing. Although Taylor did not testify as to the reasonableness of this assumption, he did testify that the solvency of DICC should have been investigated.

Pallais also testified regarding the TCF construction loan. According to Pallais, it was logical to assume that the construction lender would agree to the facade easement donation on the St. Andrews project. Under the AICPA standards, Pallais noted, Peat Marwick had no responsibility to update its report to reflect events occurring after the report was issued. Thus, when the construction lender balked at consenting to the facade easement donation and then declared the loan in default, this event affected the actual results but not the projections.

Peat Marwick's compilation report is dated August 22, 1985, and its review report is dated September 13, 1985. As of the latter date, the court finds that the assumption regarding the construction loan and permanent financing was accurate and reasonable under the then-present circumstances. As stated correctly by Pallais, Peat Marwick had no obligation to update its St. Andrews reports because of events occurring after the date of its reports. TCF's refusal to agree to the syndication and the facade donation, the proposal for the $900,000 paydown on the TCF loan, and the final reduction of the loan to $3,500,000 all occurred subsequent to the dates of Peat Marwick's reports on the St. Andrews. In addition, the court rejects plaintiffs' argument that it was not reason-

able for Peat Marwick to have assumed, as of the dates of its reports, that TCF would consent to the syndication and facade donation. It was in TCF's best interest to have consented so that the project could be completed, the permanent financing could be obtained, and the TCF loan could be paid. Furthermore, the evidence fails to show that there was any indication, prior to the dates of Peat Marwick's reports, that TCF would not give its consent. Accordingly, consideration of DICC's financial ability to provide financing was not necessary. Based on the foregoing evidence and analysis, the court finds that Peat Marwick was not negligent with respect to reporting on the reasonableness of the assumption regarding construction and permanent financing in the St. Andrews engagement.

### E. The Accountants' Work on the 696 Peachtree

At trial, Plummer testified that he was asked to perform work on the 696 Peachtree engagement similar to the work he performed on the St. Andrews engagement. As reflected in his memorandum to Humphries dated December 13, 1986, he made an on-site inspection of the 696 Peachtree construction site, met with the developer regarding projected construction costs and construction timing, and reviewed the appraisal methodology used in valuing the facade donation. Exh. 25 at Bates P0005499. After he inspected the site and talked with the developer, he concluded that it was reasonable to assume that "the rehabilitation of the first two floors of the building can be completed by year end, with the remainder being completed during the first few months of 1986." *Id.* at Bates P0005501. At trial, he testified that his conclusions regarding the 696 Peachtree project were based on what Shirley and someone else, whose identity he could not recall, told him. He further testified that he did not know the percentage of completion on the 696 Peachtree as of the date of his visit to the 696 Peachtree site. During his visit to the 696 Peachtree, Plummer testified, he did not ask for construction draws to determine the percentage of completion because he was not asked to do so.

According to Humphries's testimony at trial, he and Plummer discussed Plummer's work on the 696 Peachtree on several occasions. In fact, Humphries never visited the 696 Peachtree site, but instead he relied on Plummer's conclusions regarding the 696 Peachtree. Humphries testified that although Plummer told him that much of the construction work was completed, at least for the first floor, it was not Plummer's responsibility to check on whether the 696 Peachtree construction was on schedule. In December of 1985, Humphries testified, it did not come to his attention that the 696 Peachtree construction was only ten percent complete. Significantly, he relied on Shirley's representations regarding the completion of the 696 Peachtree. When Humphries saw an old certificate of occupancy, instead of a recently dated certificate of occupancy, he was not concerned because Shirley told him that the 696 Peachtree building had never been taken out of service. In addition, Humphries testified that it was his understanding that a certificate of occupancy is not always required; rather, it is simply the best evidence that a building is ready to be placed in service. Some time after the 696 Peachtree engagement was completed, Humphries learned that Shirley was relying on the old certificate of occupancy on the basis that the renovation was such that the building was never taken out of service. *See* Exh. 315 (Mar. 11, 1986 letter from Shirley to Humphries).

Another Peat Marwick accountant who worked on the 696 Peachtree project was Dickson, who had worked previously on the St. Andrews project. At trial, he testified that he did not recall many of the details of his work on the 696 Peachtree. However, he did recall that it was Plummer's responsibility to review the reasonableness of the assumption of forty percent construction completion by December 31, 1985, as well as the other construction aspects of Peat Marwick's work on the 696 Peachtree. He also recalled that he and Larsen were responsible for reviewing the tax aspects of the project.

Much of the work on the 696 Peachtree engagement was performed by Mary Larsen, a Peat Marwick staff accountant. According

to her testimony at trial, she assisted in the review of the 696 Peachtree projections and assumptions, participated in drafting notes to accompany the projections, and assembled the work papers file. In essence, her job was to document whether the assumptions were reasonable. In carrying out this job, she received a set of projections and a draft of the notes (the "rationale and assumptions") from Renaissance; Shirley was her primary contact. To build the file, she gathered documents, made notes of various conversations, traced the numbers received with the projections, and consulted with others. At trial, she testified that she was impressed with Shirley and found him to be quite credible. As to Humphries, she testified that he was "pretty demanding" and that she had almost constant contact with him during her work on the 696 Peachtree project. She further testified that Moody and Cook reviewed her work. Although she read only portions of the 696 Peachtree PPM, the description of Renaissance as "illiquid," *see* Exh. 5016 at Bates P0001408, was consistent with her understanding; in fact, she testified, she understood that it is not unusual for a general partner such as Renaissance to be illiquid.

In addition, Larsen testified about her work with construction timing estimates for the 696 Peachtree project. She recalled that she knew Caddell Construction was to perform the construction work on the 696 Peachtree. In fact, she included the construction contract between DICC, Caddell, and 696 Peachtree, Ltd., in the Peat Marwick work papers for the 696 Peachtree engagement. *See* Exh. 951. The 696 Peachtree PPM, however, does not disclose the existence of this construction contract; instead, it provides:

> Effective August 5, 1985, the Partnership entered into a turn-key construction contract ... with Dobbs Industries Construction Company ("DIC"), an affiliate of the General Partner, whereby DIC agreed to rehabilitate the Project for a total contract cost of $4,206,000 ..., and DIC anticipates that a portion of the Project will be "placed in service" by December 31, 1985. If 40% of the Project is not placed in service by December 31, 1985, the turnkey amount

payable to DIC will be reduced by $100,000, from $4,206,000 to $4,106,000.

Exh. 5016 at Bates P0001344. When questioned why this construction contract was not disclosed in the 696 Peachtree PPM, she testified that she vaguely recalled something about a "turnkey" contract. Plaintiffs' counsel then asked why the work paper for the Caddell construction contract was included, to which she responded that she assumed it was the "actual contract." Unlike the turnkey contract disclosed in the 696 Peachtree PPM, which provides for completion of the project at a specified cost, the Caddell construction contract does not provide for a fixed cost of completing construction. The draft of the Caddell construction contract dated September 10, 1985, which was admitted at trial, provides in pertinent part:

> Renovation work shall begin forthwith and shall proceed at a pace to meet the requirements of the Owner. Accordingly, the Contractor shall proceed immediately and shall be reimbursed for all legitimate costs incurred. Within sixty (60) days hereof, the parties agree to negotiate in good faith, and as set forth hereinafter, a guaranteed maximum cost for the work....

> Work shall begin immediately on a fully cost reimbursable basis.... After sixty (60) days, or as soon as practical thereafter, the Contractor shall have prepared a detailed estimate of the total cost of the work and upon agreement by the parties, a change order to this agreement shall be executed establishing a guaranteed maximum cost of the work.

Exh. 951 at Bates P0013052, P0013058.

Larsen also recalled at trial that the 696 Peachtree projections assumed that the construction would be forty percent complete by December 31, 1985, and that a temporary certificate of occupancy would be obtained by December 31, 1985 for that forty percent of the building. *See* Exh. 5016 at Bates P0001391, P0001518. The 696 Peachtree assumptions provide: "If a Temporary Certificate of Occupancy is not received for 40% of the usable space by December 31, 1985, then the tax benefits attributable to depreciation

and the rehabilitation credit would be deferred." *Id.* at Bates P0001518. At trial, Larsen testified that she recalled discussing this provision with Dickson. In addition, she recalled asking whether the contractor would be able to complete forty percent of the 696 Peachtree construction by December 31, 1985. At trial, plaintiffs' counsel questioned Larsen about several construction draw requests, which were included in the 696 Peachtree work papers, that reflected a less than forty percent degree of completion during 1985. In response, Larsen testified that she was not concerned about the requirement of forty percent completion because she had talked to the client about this matter. In fact, she prepared a work paper on December 18, 1985 in which she noted that, "per Tom Nelson," fifty-four percent of the construction was estimated to be completed by the end of 1985. *See* Exh. 944 at Bates P0014059. Larsen testified that she also talked to Shirley about the forty percent completion. She did not, however, discuss the issue of construction completion with Plummer or any third parties such as the construction lender. She did not ask Humphries about the degree of completion; rather, Humphries asked her for information regarding the degree of completion. On cross-examination by plaintiffs' counsel, she admitted that the only factual support she obtained for the assumption of forty percent completion by December 31, 1985 was Nelson's representations.

At trial, Taylor testified that Plummer's work regarding the 696 Peachtree construction constituted an insufficient basis for reporting on the reasonableness of the 696 Peachtree construction timing assumption. As with the St. Andrews, Taylor testified, Plummer did not spend enough time on-site and should have looked at construction draw requests in greater detail. Pallais, on the other hand, testified that the assumption that the 696 Peachtree would be forty percent complete by the end of 1985 was suitably supported. In Pallais's opinion, as with the St. Andrews, Plummer's work provided a sufficient basis for concluding that the assumption was reasonable because Plummer personally visited the site. Pallais additionally opined that the identity of the contractor

(e.g., DICC versus Caddell) was irrelevant because another contractor could easily be substituted.

As with the construction timing assumption on the St. Andrews, the court concludes that Peat Marwick was not negligent in reporting on the reasonableness of the assumption in the 696 Peachtree PPM that construction would be forty percent completed by the end of 1985. Larsen's and Plummer's work was sufficient to show that this assumption was reasonable. In making this conclusion, the court once again agrees with Pallais's expert opinion on this issue and consequently rejects Taylor's expert opinion to the extent that it is contrary.

The fact that the DICC–Caddell construction contract was not disclosed in the 696 Peachtree PPM causes some concern to the court. According to the 696 Peachtree PPM, the construction costs were fixed; however, under the DICC–Caddell contract, construction costs could have escalated. It may be concluded, however, that any amount in excess of DICC's fixed price would come from DICC's fixed profits and not from the partnership's funds. Accordingly, the DICC–Caddell construction contract did not affect the assumptions.

### F. Assumptions Concerning Solvency

#### 1. Operating Deficit Loans

Both the St. Andrews and 696 Peachtree PPMs state that Renaissance, as general partner, may make operating deficit loans ("ODL") to the limited partnerships. The St. Andrews PPM provides:

> As General Partner, Renaissance ... may, but is not obligated to make loans ... to the Partnership to meet Operating Deficits in the event such loans are required.

Exh. 5006 at Bates P0011730. *See also id.* at Bates P0011873 (defining ODL); *id.* at Bates P0011889 ("First Amended and Restated Limited Partnership Agreement"; "No Partner shall be required to lend any funds to the Partnership."); *id.* at Bates P0011896 (treatment of ODLs as loans). The notes that accompany the projections in the St. Andrews PPM provide:

The partnership agreement provides that the General Partner may make loans to the partnership to defray Operating Deficits.... These financial projections assume no Operating Deficit Loans will be incurred; however, there is no assurance that the partnership will generate sufficient cash flow and such loans would not be necessary.

*Id.* at Bates P001950. *See also id.* at Bates P0011938 (cash flow projections; no reference to ODLs from Renaissance listed in the sources of funds). The 696 Peachtree PPM similarly states:

The General Partner has agreed to make loans to the Partnership up to an aggregate amount of $1,000,000 to fund negative cash flow from operations ... for the five year period following the closing of this Offering....

Exh. 5016 at Bates P0001408. *See also id.* at Bates P0001506 (defining ODL guarantee as Renaissance's "obligation to fund negative cash flow from the operation of the project"). The notes that accompany the projections in the 696 Peachtree PPM provide:

It has been assumed that, at the General Partner's discretion, the Partnership would borrow funds, if necessary, on a short-term basis from the General Partner to meet any projected cash deficits during the Partnership's existence....

These financial projections assume no such borrowings will be incurred; however, there is no assurance that the Partnership will generate sufficient cash flow and such loans would not be necessary.

*Id.* at Bates P0001524. *See also id.* at Bates P0001532 (cash flow projections; no reference to ODLs from Renaissance listed in the sources of funds).

At trial, Taylor testified that the solvency of Renaissance was or should have been a material assumption. According to Taylor, the solvency of Renaissance was implicit in the assumption that it, as general partner, would provide working capital if any operating deficits occurred. Thus, according to Taylor, Peat Marwick should have investigated the financial condition of Renaissance. Based on his review of Peat Marwick's preengagement client evaluation, the work on the balance sheet, and sheer logic, Taylor testified, such assumptions of solvency could not have been supported.

In response to Taylor's testimony, Pallais testified that the financial condition of Renaissance was not and should not have been an assumption in the St. Andrews and 696 Peachtree projections. Although the general partner's financial condition may have been relevant to an investor, Pallais testified, it was not implicated in the projections. Even though the PPMs provided for ODLs from Renaissance, both projects were structured as stand-alone deals in which it was assumed in the projections that Renaissance would not serve as a source of funds. Pallais also rejected the theory that the solvency of Renaissance was an implicit assumption. According to Pallais's understanding of the AICPA guidelines, the term "implicit assumption" should be defined to mean generally unquestioned circumstances such as war and peace, but not something like the financial condition of a general partner. In all of the projections in the St. Andrews and 696 Peachtree PPMs, no implicit assumption of Renaissance's solvency existed.

The language regarding ODLs from Renaissance is somewhat stronger in the 696 Peachtree PPM than in the St. Andrews PPM. The language in the St. Andrews PPM is phrased in terms of loans "may" be made from Renaissance, whereas the language in the 696 Peachtree PPM is phrased in terms of Renaissance's "agreement" and "obligation" to make loans. Regardless of such language, the projections in both PPMs expressly assumed that no ODLs would be made; no financial contributions from Renaissance, as general partner, were contemplated. Taylor's conclusions that the projections assumed that Renaissance would provide working capital if any operating deficits occurred, thereby making relevant the question of Renaissance's solvency, is thus expressly refuted by the language of the assumptions.

Based on the foregoing, the court finds that the solvency of Renaissance should not have been a stated assumption. In addition, the court accepts Pallais's expert opinion that

Renaissance's solvency was not an implicit assumption. As defined in the AICPA literature and explained by Pallais, an author of the '83 Exposure Draft, "implicit assumptions" would not include the solvency of Renaissance. The projections assumed no infusion of money from Renaissance, and the offering materials provided for the possibility of a replacement general partner.

### 2. DICC's solvency

■ Taylor testified that the solvency of DICC should have been a material assumption. According to Taylor, it would be reasonable to expect shortfalls in funding between construction draws. Because DICC was obligated to complete the projects, the question of its solvency should have been considered. In Taylor's opinion, an assumption of DICC's solvency could not have been supported. In response to Taylor's testimony, Pallais testified that the solvency of DICC was not and should not have been an assumption. However, he offered no explanation for this opinion.

■ The court concludes that the solvency of DICC did not need to be a material assumption. It may or may not have been foreseeable that DICC would have to provide construction funding, under its contractual obligations, in the event of funding shortfalls between construction draws or between construction and permanent loans. In any event, the AICPA literature instructs that accountants, in reviewing the identification of assumptions, should assist management in identifying *significant* assumptions so that they may be disclosed. The decision by management and the accountants as to what constitutes a significant assumption is a matter of judgment. *See* Exh. 45,584 at 64 (SOP 75–4). With the benefit of hindsight and the examination of Peat Marwick under the scrutiny of the judicial microscope, it could be said that Peat Marwick should have investigated DICC's ability to fund construction costs as a possible key factor or assumption to disclose. Despite this, the court finds that Peat Marwick's failure to investigate DICC's solvency does not amount to negligence.

### 3. Alternative Assumptions

At trial, Taylor testified that Peat Marwick should have considered certain assumptions, such as Renaissance's solvency, that were not considered in the course of Peat Marwick's engagements on the St. Andrews and 696 Peachtree. On cross-examination by counsel for Peat Marwick, Taylor admitted that, in his evaluation of Peat Marwick's work, he chose assumptions based on his experience and his opinion of the key factors in the success or failure of a real estate project. He further admitted that, under the AICPA standards, the process of reviewing assumptions, determining key factors, and determining whether reasonable bases exist for the assumptions involves questions of judgment on which reasonable accountants could differ.

Pallais, on the other hand, testified that the AICPA literature, which was in effect in 1985, did not specifically address consideration of alternative assumptions. In Pallais's opinion, alternative assumptions should be considered only if the support for the assumptions is determined to be insufficient.

■ The court finds that plaintiffs have not shown that any failure by Peat Marwick to consider alternative assumptions amounted to negligence. Plaintiffs have not demonstrated, by a preponderance of the evidence, that any of the assumptions that they have attacked were insufficiently supported and therefore called for consideration of alternative assumptions. As plaintiffs' expert admitted, the evaluation of assumptions and key factors for a review engagement necessarily involves questions of judgment on which reasonable accountants could differ. In addition, although the AICPA literature contemplates that alternative assumptions, such as variances in numbers and amounts (e.g., rental rates, occupancy rates) be considered, loans from the general partner or the contractor are not such alternative assumptions. Thus, Peat Marwick's failure to consider whether ODLs from Renaissance would be necessary or whether DICC's financial resources would be necessary to fund construction costs does not amount to negligence.

### G. The Balance Sheet

#### 1. *Peat Marwick's Investigation of the Balance Sheet*

■ At some point in mid-December of 1985, Humphries decided to perform some work on an unaudited balance sheet of Renaissance, which was included in the St. Andrews and 696 Peachtree PPMs. *See* Exh. 5006 at Bates P0011984; Exh. 5016 at Bates P0001541. Plaintiffs have contended that Peat Marwick's work on the balance sheet supports a finding of scienter, which in turn supports their fraud-based claims, as well as a finding that Peat Marwick breached its duty, in support of plaintiffs' negligence claims. At trial, the testimony was conflicting concerning the circumstances surrounding the commencement of this work, the reasons for performing such work, and the adequacy of the amount of work done. A detailed analysis of the evidence regarding Peat Marwick's work on the balance sheet is necessary to determine whether such evidence supports findings of scienter and negligence.

#### a. Finley Kumble's Involvement

In 1985, Philip Schwartz was an attorney in the now-bankrupt law firm of Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey ("Finley Kumble") in its Miami, Florida office. With a legal background in real estate limited partnership syndication work, he and Finley Kumble began working on the Granada offering, which concerned a limited partnership of which Renaissance was general partner, and acted as securities and tax counsel. Subsequently, he and Finley Kumble agreed to act as securities and tax counsel for the 696 Peachtree offering.[18] In his deposition, which was admitted at trial, Schwartz testified that his role in both the Granada and 696 Peachtree syndications was to "quarterback" the transactions. Another Finley Kumble attorney named Josephine Cicchetti worked with him on the 696 Peachtree offering.

In her deposition, which was admitted into evidence at trial, Cicchetti testified that she began working on the 696 Peachtree offering

in November of 1985. According to Cicchetti, she acted as a "securities associate" on the 696 Peachtree, assisting Schwartz, who acted as the "securities partner." Exh. TR–10 at Discovery ZX Run 28:22–24. In the course of her work, she assisted in the preparation of the 696 Peachtree PPM. She did not, however, assist in the preparation of the tax section, tax opinion, balance sheet, or projections.

On December 3, 1985, Cicchetti testified, a meeting of Finley Kumble attorneys was held to coordinate the due diligence work on the 696 Peachtree. According to Cicchetti, the Finley Kumble attorneys decided to ask Renaissance, the client, "for more recent or more up to date financial information since the financial information contained in the prior offering materials was older." Exh. TR–10 at Discovery ZX Run 50:5–19. In response to the attorney for Peat Marwick's questions, Cicchetti recalls as follows:

Q: Do you know what response Finley, Kumble received from Renaissance?

A: The initial response was that updating the financial information would take time.

Q: Was there any other responses [sic] after that initial response?

A: I am sure—I shouldn't say I am sure. I believe there were subsequent conversations of which I wasn't a part having to do with the financial statements.

*Id.* at Discovery ZX Run 50:20–51:4. Cicchetti further testified:

A: ... What I recall ... is that document, the balance sheet on the ... Granada had a balance sheet of June and the questioning was whether that was current enough for the offering; but I don't recall being involved in any substantive conversations on the content of that. The only conversations I recall were the date of that document.

Q: Who was responsive to updating, if you will, that June 30, '85, balance sheet from the Finley, Kumble firm? Was that your responsibility to sort of update it to make

---

**18.** Finley, Kumble was sued by the *Pignatelli, Achecar,* and *Pendleton* plaintiffs in the captioned litigation. Prior to the time of trial, these plaintiffs and Finley Kumble reached a settlement agreement.

sure that updated information was in the Ppm? Or was that Phil Schwartz?

A: Well, it would not be a question of responsibility for updating. It would be more whether it would be reasonable to keep a document with that date in the file; and that determination was made by the firm, but I don't know.

*Id.* at Discovery ZX Run 203:7–204:1. Although Cicchetti recalled having conversations with various Peat Marwick accountants regarding the 696 Peachtree, she testified that she did not recall ever discussing the June 30, 1985 Renaissance balance sheet or the projections with Peat Marwick accountants.

b. Schwartz's request for "comfort"

In Schwartz's deposition testimony admitted at trial, although he could not recall how the calls were initiated, he recalled having more than one telephone conversation with Humphries regarding the Renaissance June 30, 1985 balance sheet. In one conversation with Humphries, Schwartz recalled as follows:

A: I was asking Mr. Humphries for information about that balance sheet. I am not an accountant. I knew it wasn't audited. At the same time it was somewhat dated and some of the descriptions of certain of the assets troubled me as not being as complete as they needed to be and I asked Mr. Humphries for some comfort with respect to that balance sheet.

Q: And what was the result of your request?

A: Mr. Humphries was unwilling to give me comfort on the balance sheet. Basically—I am paraphrasing, but what he told me was they couldn't give me comfort, it wasn't audited. At the same time they were putting their projections in the book and, of course, this balance sheet was included in the book and I should take some comfort in that.

.    .    .    .    .

A: He was adamant and firm in his position and I was seeking further information and he was unwilling to provide it. I certainly took comfort in the fact that Peat

left their projections in the book with the balance sheet.

Exh. TR–40 at Discovery ZX Run 223:8–23, 224:4–8. Schwartz also recalled that Shirley participated in this conversation. After he had finished talking with Humphries, Schwartz testified, he stayed on the phone with Shirley and discussed the accuracy of disclosure in the balance sheet. Schwartz further testified:

I had no reason to believe at that moment that they [Peat Marwick] had more information. . . . I certainly think that . . . I was looking for them to prepare the notes to the financials to update it to provide some—help Renaissance do that because, again, it's a question of materiality. It is a question of the disclosure being accurate.

It doesn't have to be audited, but it should be accurate. I thought they were in a better position to do that than I was. You know, at the same time they were leaving their projections in and that did say something.

*Id.* at Discovery ZX Run 225:15–226:3.

When Shirley testified at trial, he remembered many details of Schwartz's concern regarding the balance sheet. In mid-December of 1985, Shirley testified, he frequently talked to Schwartz about the 696 Peachtree. As Shirley explained, they were on a "short time track" to get the syndication completed in time so that the limited partners/investors would received their rehabilitation tax credits for 1985. Shirley recalled that on Friday, December 13, 1985, he and Schwartz discussed a "laundry list" of items over the telephone. One issue that came up was the balance sheet; Schwartz told Shirley that it was somewhat dated and stale and that something more current was needed. Shirley responded that it would be impractical to get something more current in light of the time pressures. Schwartz then suggested that Shirley ask Peat Marwick to look at the balance sheet and give Schwartz some "comfort" on it. To the best of his recollection, Shirley told Schwartz that he would call Humphries, which Shirley did that day. According to Shirley, Humphries spoke with him and then agreed to send some Peat

Marwick accountants out to Renaissance to gather supporting documentation for the balance sheet.

As Shirley recalled at trial, Dickson and Larsen came out to the Renaissance offices on Monday, December 16 and Tuesday, December 17, 1985 to compile information to support the balance sheet. In response to their requests for support for each line item entry on the balance sheet, he gave verbal explanations and supplied all pertinent documentation available to him.

On December 17 or 18, 1985, Shirley testified, he had another phone conversation with Schwartz in which they tried to tie up the "loose ends" of the 696 Peachtree deal. As Shirley recalled, Schwartz asked him how Peat Marwick was doing on its investigation of the balance sheet; Shirley responded that he did not know but that they could call Humphries. Shirley then set up a conference call between himself, Humphries, and Schwartz. When Schwartz asked Humphries about the balance sheet, however, Humphries would not give any answers. Instead, Humphries told Schwartz that he could not say anything positive or negative about the balance sheet and that Peat Marwick was not engaged to perform any work on the balance sheet. Humphries would not give an opinion on the balance sheet; in fact, Humphries stated that he had not done enough work on the balance sheet to offer any opinion. Humphries then hung up, and Shirley and Schwartz continued their conversation. Due to Schwartz's concerns regarding the balance sheet, Schwartz told Shirley that he would include some new footnotes to the balance sheet and then send them to Shirley for his review before the PPMs were issued. At trial, Shirley testified that his impression of Humphries's refusal to disclose anything regarding the balance sheet to Schwartz was that Humphries was "blessing" the transaction. Shirley was also of the opinion that if Humphries had found anything misleading on the balance sheet, Humphries would have said something to him.

In response to Peat Marwick's counsel's questioning, Shirley testified that he called Humphries on December 13, 1985 and told Humphries that some comfort was needed so that Finley Kumble could release the PPM. Shirley then admitted that his prior deposition testimony, in which he stated that he could not recall *when* he asked Humphries to perform the work on the balance sheet, was true when given.

Humphries's testimony regarding Schwartz's request for "comfort" is inconsistent with Shirley's testimony but generally consistent with Schwartz's testimony. On cross-examination by plaintiffs' counsel, Humphries testified that he recalled receiving telephone calls from Schwartz:

> Mr. Schwartz and I talked on several occasions. He asked me to give him—this is his word, quote, unquote, comfort on the balance sheet. He was hired as securities counsel. We weren't hired to do his investigation for him. I, of course, had done nothing on that balance sheet and as an accountant I couldn't express any type of opinion whatsoever to him on it and told him that. He called back on one or two occasions trying to get me to say something to him or opine to, quote, unquote, give him comfort. At the same time he actually called one of my managers at home one night trying to get a manager to give him comfort and when the manager called and told me that, the next day I got on the phone with Mr. Schwartz and told him in very impolite words probably not to call any of my people anymore, to keep his discussions with me.

Trial Transcript (hereinafter "TR") at 73–74 (Feb. 10, 1992). Humphries also explained why he refused to give "comfort" to Schwartz:

> Q: And it is your testimony that you told Mr. Schwartz that Peat Marwick was not engaged to do any work on the balance sheet and you were not going to give him any comfort?
>
> A: That is exactly right. As a C.P.A., people don't realize the work that goes behind making a statement in a review or an audit report or compilation report. And they don't know the timeliness, they don't know the amount of time that goes into it, they don't understand the work behind it. So if you make the statement to someone regarding a balance sheet like

that, they would think you had done the work that would be necessary to make a statement of that sort. We don't make statements like that. Our statement is made in the form of a report attached to the financial statements and we don't say, quote, unquote, offer words of comfort to anybody. Never have.

*Id.* at 74–75.

After this conversation with Schwartz, Humphries testified, he called Shirley and told Shirley that Peat Marwick needed to perform some work on the balance sheet. Humphries's curiosity had been piqued by the recent disclosure of an order of prohibition regarding Dobbs and information regarding numerous undisclosed liens and lawsuits, as well as the unusual call from Schwartz:

Q: Even though you had no intention of giving Mr. Schwartz any information on the balance sheet and even though you contend that Peat Marwick was never engaged to do any work on the balance sheet, you, in fact, did do work on the balance sheet, didn't you, Mr. Humphries?

A: Yes, we did.

Q: Indeed is it your testimony that you are the one that called Mr. Shirley up and told him that Peat Marwick was going to do some work on that balance sheet?

A: Yes. It had come to our attention in this same period of time a couple of items. One was the prohibition on Mr. Dobbs from the past saying he couldn't sell securities—illegally, they weren't registered anymore, that I wasn't aware of. At the same time some liens and lawsuits came to my attention. And then I had Phil Schwartz calling me wanting, quote, unquote, comfort on the balance sheet. So it stirred my curiosity and I started looking into those areas.

*Id.* at 75–76. Humphries testified further as to why Schwartz's request for comfort concerned him:

Q: Even though you didn't intend to give Mr. Schwartz comfort, is it your testimony that it raised questions in your mind as to why Mr. Schwartz wanted comfort in regard to that balance sheet?

A: Yes.

Q: Were you concerned that it was something on that balance sheet that might affect the projections and the underlying assumptions?

A: Yes, I was concerned that he would call me, securities counsel call me about a portion of the PPM that applied to him.... As I told you before, I had been on probably 20 to 25 syndications in the past and I dealt with a lot of different security counsels and a question like that was out of left field and I had never had one put to me.

*Id.* at 77–78. Humphries also testified that the following deposition testimony was true when given: "It raised questions in my mind as to why they [Finley Kumble] wanted comfort and, as I said, the balance sheet was getting stale. By stale, it was getting a little older and we had run into some lawsuits and liens we didn't know about." *Id.* at 78–79.

After considering the foregoing testimony of Schwartz, Humphries, and Shirley, the court concludes that the preponderance of evidence supports the following findings of fact. Schwartz and Humphries spoke some time prior to the Peat Marwick accountants' work on the balance sheet; it was probably Friday, December 13, 1985. During this conversation, Schwartz asked Humphries for "comfort" regarding the balance sheet, which Humphries refused to give. Shirley did not ask Humphries to perform the balance sheet work; rather, out of Humphries's own concerns, he directed that work be performed on the balance sheet. After this work was completed, Humphries talked to Schwartz once more and again refused to give any "comfort" to Schwartz.

Although the following evidence was not well-developed at trial, it provides the most logical explanation of *why* the balance sheet work was performed by Peat Marwick. Most significantly, it shows why Humphries and the other accountants did not investigate the faulty underpinnings of the balance sheet more thoroughly than is indicated by the documentary and testimonial evidence presented at trial, as discussed *infra*. During plaintiffs' counsel's cross-examination of Humphries, the following exchange occurred:

Q: What in the balance sheet could possibly affect your report, Mr. Humphries?
A: One of the things we do is we read the whole PPM to see if there is anything in that PPM that would go against the projections we were reviewing. One of the things that was a requirement and still is, to be a corporate general partner, certain net worths have to be met for this whole thing to be treated as a partnership. That net worth, I believe, at that point in time, was a million dollars. You would want to make sure that the general partner had the million dollar net worth to perform as a corporate general partner where the partnership would be treated as a partnership for I.R.S. purposes. Because if it weren't treated as a partnership, if it were treated as a corporation, none of the benefits would flow through and all the benefits the investors were getting for tax purposes in their investment would, of course, not flow through and would change everything.

.     .     .     .     .

Q: So the solvency and net worth of the general partner was a material assumption, was it not?
A: Of course. We want to make sure that the million dollars is there and, again, this is a fact. It is not an assumption, it is a fact. Either it is or it isn't; you look to see with the documents that you have and it was.

TR at 79–80 (Feb. 10, 1992). Humphries admitted that his deposition testimony, in which he stated that he did not recall what in the balance sheet could have affected Peat Marwick's report but did recall that he looked at what he thought he should and was satisfied with what he found, was true: "As I stated earlier, in reviewing the work papers, in talking with the people in the correspondence files, a lot of things have come back since my testimony." *Id.* at 80–81.

The basis for Humphries's concern about the financial condition of Renaissance, as general partner of a limited partnership, is found in section 301.7701–2 of the Treasury Regulations. *See* 26 C.F.R. § 301.7701–2(d)(2) (1991) (unrevised since Apr. 26, 1983). This Regulation provides that a limited partnership that has a corporation as a general partner will be taxed as a corporation, and not as a limited partnership, if the general partner (1) "is merely a 'dummy' acting as the agent of the limited partners" or (2) "has no substantial assets." *Id.* Under this regulation, if Renaissance did not have "substantial assets," then the St. Andrews and 696 Peachtree investors would have faced the possibility that the Internal Revenue Service would find that their respective limited partnerships should be taxed as corporations. Consequently, they would lose the substantial federal tax benefits projected in the PPMs. *See* Exh. 5006 at Bates P0011939; Exh. 5016 at Bates P0001535.

Both the St. Andrews and 696 Peachtree PPMs include multiple references to this requirement of the availability of tax benefits. First, in the "Federal Income Tax Consequences" section of the PPMs, the topic of the taxation of limited partnerships as partnerships and not as corporations is addressed. Exh. 5006 at Bates P0011788, P0011790–91; Exh. 5016 at Bates P0001426–27, P0001429. Second, each PPM contains a tax opinion issued by securities counsel who opine that the limited partnership will be classified as a limited partnership for federal income tax purposes and not as an association taxable as a corporation. Exh. 5006 at P0011927; Exh. 5016 at Bates P0001547. Third, each PPM contains an assumption, which Peat Marwick reported constituted a "reasonable bas[i]s for preparation of the projections," that the limited partnership will be classified as a limited partnership. Exh. 925 at Bates SC50630; Exh. 5006 at Bates P0011952; Exh. 5016 at Bates P0001512, P0001529. The assumption contained in the 696 Peachtree PPM further states that the limited partnership will rely on the tax opinion to this effect. Exh. 5016 at P0001529.

The evidence shows that when Peat Marwick carried out its compilation and subsequent review engagements for the St. Andrews, it had no reason to question the assumption that the St. Andrews partnership would be treated as a partnership for tax purposes and had no reason to question the accuracy of the balance sheet. Significantly, this assumption did not state that the limited partnership was relying on the tax opinion

contained in the St. Andrews PPM. With respect to Peat Marwick's work on the 696 Peachtree engagement, as events developed in mid–December of 1985, Humphries learned that he probably could not rely on the 696 Peachtree tax opinion issued by Finley Kumble because Schwartz had expressed concern to him personally regarding the balance sheet. Accordingly, Humphries conducted an investigation of the balance sheet to assuage his concern regarding the reasonableness of the assumption concerning the tax treatment of the partnership. Neither Schwartz's phone call nor Peat Marwick's investigation of the balance sheet, as discussed more fully *infra,* should have indicated to Peat Marwick that Renaissance was engaged in any fraudulent conduct. As a result of this investigation, Humphries was satisfied that the general partner, Renaissance, appeared to have "substantial assets." Thus, Peat Marwick could issue its 696 Peachtree review report for the 696 Peachtree PPM; no updating of the St. Andrews reports was required.

### c. Circular 230

In "IRS Regulations Regarding Tax Shelter Opinions," ("Circular 230"), which was included as Appendix D of the 1986 AICPA Guide for Prospective Financial Statements, the Internal Revenue Service set forth certain regulations governing the practice of attorneys as well as certified public accountants; these regulations were effective May 23, 1984. *See* Exh. 45,585. Circular 230 is helpful in examining Humphries's conduct in connection with the balance sheet work and Schwartz's request for "comfort."

Subsection (a) of section 10.33 provides that a practitioner, such as a securities lawyer, who provides a opinion that analyzes the federal tax effects of a tax shelter investment, must comply with the following:

(i) The practitioner must make inquiry as to all relevant facts, be satisfied that the material facts are accurately and completely described in the offering materials, and assure that any representations as to future activities are clearly identified, reasonable and complete.

(ii) A practitioner may not accept as true asserted facts pertaining to the tax shelter which he/she should not, based on his/her background and knowledge, reasonably believe to be true. However, a practitioner need not conduct an audit or independent verification of the asserted facts, or assume that a client's statement of the facts cannot be relied upon, unless he/she has reason to believe that any relevant facts asserted to him/her are untrue.

31 C.F.R. § 10.33(a)(1)(i)–(ii) (1991; not revised since 1984). Another practitioner, such as an accountant, may rely on that practitioner's opinion under the following circumstances:

A practitioner who is associated with forecasts or projections relating to or based upon the tax consequences of the tax shelter offering that are included in the offering materials, or are disseminated to potential investors other than the practitioner's clients, may rely on the opinion of another practitioner as to any or all material tax issues, provided that the practitioner who desires to rely on the other opinion has no reason to believe that the standards of paragraph (a) of this section have not been complied with by the practitioner rendering such other opinion....

*Id.* at § 10.33(b)(2). Violation of these regulations is punishable by disbarment or suspension from practice before the Internal Revenue Service. *Id.* at § 10.52(b).

In conducting its review, Peat Marwick reviewed an assumption in the 696 Peachtree PPM, which states:

The Partnership will be treated as a partnership rather than as an association taxable as a corporation for Federal income tax purposes. The Partnership plans to rely on an opinion of counsel to this effect.

Exh. 5016 at Bates P0001529. As a result of Schwartz's request for "comfort," Humphries knew that he could not rely on Finley Kumble's tax opinion because he was aware of Schwartz's concerns regarding the balance sheet and, implicitly, questions regarding Renaissance's financial condition. Thus, in reporting on the reasonableness of this assumption, Humphries would probably have violated Circular 230 if he had relied on Finley Kumble's tax opinion. The balance

sheet work carried out at Humphries's direction demonstrates that Humphries did not rely on Finley Kumble's tax opinion; instead, Humphries conducted his own investigation of the reasonableness of this assumption by examining the information contained in Renaissance's June 30, 1985 balance sheet.

In addition, Humphries's refusal to give "comfort" to Schwartz does not indicate that any duty owed by Peat Marwick was breached. In performing their respective work on the 696 Peachtree PPM, Finley Kumble and Peat Marwick each had independent obligations to verify the accuracy of the representations they made. Accordingly, Humphries's refusal to discuss Peat Marwick's investigation of Renaissance's financial condition did not relieve Schwartz of his duty to determine for himself whether Finley Kumble could opine that the 696 Peachtree would be classified as a limited partnership for federal income tax purposes.

### d. Performance of the Balance Sheet Work

According to Humphries, after telling Shirley that he needed to look at some of the items on the balance sheet, he sent Dickson and Larsen out to the Renaissance offices to review and obtain information that would support the numbers on the balance sheet. Humphries was under the impression that Shirley would supply all information requested by Peat Marwick:

> In dealing with Charlie Shirley, any time we had asked for information, no matter what it was, he had always supplied it. So I had no reason to doubt that what we would ask for he would give us, and in this instance the people were out there gathering the information seemed to be getting it with no problem. So there was no reason to question it.

TR at 82 (Feb. 10, 1992).

At trial, Dickson, who worked on the St. Andrews and 696 Peachtree offerings, testified that Humphries instructed him to get an explanation for the balance sheet items. Without telling Dickson why he was making this request, Humphries directed Dickson and Larsen to go out to the Renaissance offices and get information and documents from Shirley. According to Dickson, he did not know how the balance sheet work would affect the 696 Peachtree engagement or even whether the balance sheet work was connected with the 696 Peachtree engagement. Although he recognized that the phrase "696 General Partner Balance Sheet" at the top of the Peat Marwick work paper for the June 30, 1985 balance sheet was his handwriting, he could not recall at trial why he chose those words.

Dickson testified that he spent a couple of hours with Larsen at the Renaissance offices talking to Shirley, Chisholm, and Dobbs as well as assisting Larsen. At trial, Dickson identified much of the handwriting on the Peat Marwick work papers for the balance sheet as his. He could not recall, however, which documents he had read, nor could he recall giving the Peat Marwick work papers for the balance sheet to Humphries. In addition, Dickson could not say whether the work was normal procedure; he simply testified that he performed the work at Humphries's request. According to Dickson, he had no reason to believe in 1985 that the balance sheet was false or misleading because he received satisfactory answers during his investigation and was comfortable with Larsen's work. Moreover, he had no feelings regarding the accuracy of the numbers contained in the balance sheet. Although he was not asked to investigate such an issue, he testified, he would have told a supervisor if he had thought that the balance sheet was materially false or misleading. According to Dickson, he made a verbal report to Humphries regarding the balance sheet and then left the file with Larsen. Although Larsen performed her work under his supervision, Dickson knew that she would report to Humphries and that she operated under a duty to report any problems to her supervisors. He could not recall any time when Larsen told him that she was having problems getting any underlying documentation.

Larsen also testified at trial about her work on the balance sheet. According to Larsen, on December 16, 1985, three days after she thought she had completed her work on the 696 Peachtree engagement, Dickson came to her with the June 30, 1985

balance sheet and asked her to finish the work that he had started. Dickson told her to gather documents and write down the client's explanations regarding items on the balance sheet. The only reason given by Dickson, Larsen recalled, was that Humphries wanted them to perform some internal work. Larsen testified that she did not know that this balance sheet work was related to the 696 Peachtree engagement, nor was she ever told that the balance sheet had been called into question by securities counsel on the 696 Peachtree offering. She then recalled going to the Renaissance offices with Dickson, as well as with another Peat Marwick accountant named Brian Berlin, who did not testify at trial. At the Renaissance offices, she talked to Shirley and obtained verbal explanations for items on the balance sheet.

As Larsen recalled at trial, on Tuesday morning, December 17, 1985, Humphries was waiting for her when she arrived at her office. She told Humphries that she needed time to organize documents. Larsen and Humphries then held a meeting later that day to which Larsen brought documents and a list of "open items," regarding the balance sheet and 696 Peachtree, to go over with Humphries. In her deposition testimony, which plaintiffs' counsel used at trial to impeach Larsen, she testified that she told Humphries that she could not complete her work on the balance sheet because she needed more documentation from Shirley. At trial, she explained that after she told Humphries about the open items, Humphries called Shirley to set up a meeting; at this point, Larsen testified, she felt that she had completed her work on the balance sheet. During the meeting, she, Humphries, and Shirley went through her "open item" list. At trial, Larsen recalled that Humphries and Shirley discussed the topic of liens and lawsuits. They also discussed one lawsuit in particular—the OPDI versus Atlanta Biltmore Associates, Ltd. and Renaissance; she was told that a document regarding this lawsuit would be delivered later from an attorney. Larsen also recalled that Humphries became upset with Shirley, raised his voice at Shirley, and threatened to withhold release of the Peat Marwick review report until all requested information was supplied. In response to Humphries's heated requests for more documentation, Shirley told Humphries that Peat Marwick had everything he had and that there were no more undisclosed lawsuits.

On Wednesday, December 18, 1985, as Larsen recalled, Nelson came to Peat Marwick's offices and gave Humphries a letter concerning four outstanding lawsuits and two outstanding liens, which Humphries and Larsen read. This letter was a surprise to Larsen. Humphries then asked Nelson "is this all," to which Nelson replied "yes." According to Larsen, Humphries was satisfied with this response. At the end of the day, Humphries signed the review report.

Larsen testified that she spent eight to ten hours on the balance sheet work and, after she completed her work, was satisfied with the information received. As she explained at trial, she was not performing an audit, so there was no need to obtain verification of line items from third parties. She also testified that she did not have the impression that the client was withholding information from her and she did not think that the balance sheet contained material omissions or was misleading. When she had finished gathering information, Larsen catalogued her work and put it in the file room as part of the "catch-all" binder instead of in the 696 Peachtree review file or the master file index. At trial, this balance sheet work was submitted as Exhibit 1761.

Larsen further testified that she did not take the balance sheet work to Cook or Moody, who were performing second partner review on the 696 Peachtree engagement. However, Larsen did not have the impression, she testified, that Humphries was trying to conceal the balance sheet work. Instead, based on her knowledge of the 696 Peachtree engagement, Larsen did not think it was required to submit the balance sheet work for second partner review because she thought that the balance sheet work was not part of the 696 Peachtree engagement. Accordingly, Larsen did not ask Humphries or Dickson whether she should submit the bal-

ance sheet work for second partner review with the 696 Peachtree work.

Phil Cook testified at trial that he reviewed the St. Andrews and 696 Peachtree work papers, in his capacity as a senior manager in the audit department, to determine compliance with Peat Marwick standards. He further testified that he never saw what became Exhibit 1761, the balance sheet work papers, while he was working on the St. Andrews and 696 Peachtree engagements. Last, corroborating Larsen's testimony, Cook recalled that Larsen was the accountant who delivered the 696 Peachtree work papers for his review.

Ray Moody, an accounting partner in the audit department who offered second partner review on the 696 Peachtree engagement, testified that Humphries presented the 696 Peachtree work papers for his review. Like Cook, he testified that he did not see Exhibit 1761 while he was working on his second partner review of the 696 Peachtree engagement. He further testified that he had no opinion of why Humphries performed the balance sheet work. In addition, he testified that if he had known in 1985 that Renaissance was insolvent, he would have asked some questions. Although he had no knowledge in 1985 of whether the balance sheet was materially false or misleading, if he had known of such a situation, then he would have asked some questions and would have tried to correct the situation.

In response to Peat Marwick's counsel's questions regarding what he would have done had he known about Schwartz's request for "comfort" from Humphries, Moody testified that he would have told Humphries to tell Schwartz that Peat Marwick was not engaged to perform work on the balance sheet, as Humphries did. If Humphries had expressed concern to him regarding the balance sheet, Moody would have told him to investigate and satisfy himself on this matter, which Humphries did. Moody testified that he would not expect a report back from Humphries. Had he known of the work performed on the balance sheet, Moody testified, he would still have signed off on the review report because the numbers looked to be supported by documentation and because

there appeared to be no suggestion of insolvency. On cross-examination by plaintiffs' counsel, Moody testified that, had he seen Exhibit 1761 during second partner review, he would have done a "cursory" review with the expectation that someone else had already examined the underlying documents. He further testified that, in his opinion, any concern regarding the accuracy of the balance sheet was a matter for securities counsel, not Peat Marwick. However, if he had thought that the balance sheet was materially misleading, he would not have let his name go out on the report and would have discussed this matter with securities counsel.

### e. The Balance Sheet Work

At trial, a great deal of time was spent between plaintiffs' counsel and Larsen going over, line by line, her work on the balance sheet. This testimony is relevant to determining the scope and adequacy of Peat Marwick's work. When Larsen performed her work on the balance sheet, she knew that it was unaudited and that Renaissance was the general partner of the 696 Peachtree limited partnership. The work paper attached to the balance sheet, as well as several notes and documents gathered as work papers to accompany the balance sheet, reflect the explanations and documentation received by Larsen and Dickson from Renaissance in response to their inquiries. *See* Exh. 1761. The items listed on the balance sheet will be discussed seriatim.

The first item listed on the balance sheet in the "assets" category is "Cash and Equivalent" of $64,550. Exh. 1761 at Bates P0000463. As Larsen testified at trial, there is no supporting documentation or explanation for this number.

The next item is "Cash Deposits on Real Estate[,] Georgian Terrace Hotel" of $325,-000. *Id.* at Bates P0000463. At trial, Larsen explained that this figure is supported by her written explanation as well as a purchase money agreement that was made part of Peat Marwick's work papers. Her written explanation states: "Deposits put down on property purchase of Georgian Terrace ... made on their behalf by Renaissance ... However, no note agreement available at this time[.] In process of drawing up docu-

ments." *Id.* As the evidence showed at trial, Renaissance was actively involved in 1985, in addition to its other projects, with the rehabilitation and syndication of an historic property known as the Georgian Terrace. The $325,000 amount shown on the balance sheet apparently was an earnest money payment by Renaissance, on behalf of the entity affiliated with Renaissance that would purchase the Georgian Terrace. This conclusion is supported by the purchase money agreement, which shows that Georgian Terrace Associates, Ltd., as purchaser, would make an earnest money deposit of $325,000. *Id.* at Bates P0000514, P0000517. This agreement does not, however, reflect that such payment was made by Renaissance or, if so, that Renaissance was entitled to this money such that it could properly be characterized as an asset.

The next item listed as an asset is "Accounts Receivable—Biltmore Tower Associates, Ltd." of $1,161,500. As reflected in the "1985 Note" dated December 31, 1984, which was included in the balance sheet work papers, First Equities Investors–I, Ltd. (the maker) promised to pay $1,161,500 to Biltmore Tower Associates, Ltd. ("BTA") (the payee). *Id.* at Bates P0000472. This note matured on May 15, 1985. *Id.* Significantly, First Equities' obligation to make payments required under the note was conditioned on BTA's satisfaction of the conditions precedent to the release of escrow funds from the Executive Wing syndication. *Id.* At trial, Larsen explained that Atlanta Biltmore Associates, Ltd. ("ABA") sold the Executive Wing to BTA and then assigned the $1,161,500 note to Renaissance as payment for indebtedness. Larsen's written explanation of this item shows that ABA assigned this note, payable by First Equities to BTA, "in connection with the rehabilitation, ownership and management of Atlanta Biltmore Hotel prop[erty]." *Id.* at Bates P0000467. As reflected in the "Assignment of Investor Cash Escrow" dated January 5, 1985, which was also included in the balance sheet work papers, ABA assigned its interest in $1,161,500 held in escrow to Renaissance, to whom ABA had become indebted in connection with the rehabilitation of the Executive Wing. *Id.* at Bates P0000474. The Executive Wing PPM

set forth several requirements to be satisfied before escrow could break, including the completion of construction and the receipt of certificates of occupancy for each unit by February 28, 1985. *Id.* at Bates P0000632–33. In Larsen's handwritten explanation of this item, she wrote that the note was placed in escrow in May of 1985 and was paid off in September of 1985. *Id.* at Bates P0000467. No further documentation or explanation is found in the Peat Marwick balance sheet work papers; there is no documentation showing that the money was actually paid or that Renaissance received the money. At trial, in response to plaintiffs' counsel's questioning, Larsen testified that Shirley did not disclose whether the money was paid to Renaissance. She later testified, in response to Peat Marwick's counsel's questioning, that Shirley told her the accounts receivable had been collected as of September of 1985.

The next items listed in the "assets" category are "development fees receivable." These items reflect amounts totalling $1,712,189 for four properties with which Renaissance was involved. *Id.* at Bates P0000463. At trial, Larsen testified that no supporting documentation was gathered with respect to these figures; the only available support is Dickson's written explanations. On the balance sheet, the following notations were made: (1) next to the amount of $500,600, "not paid" is written; (2) next to the amount of $450,000, "paid" is written; (3) next to the amount of $286,589, "some paid" is written; and (4) next to the amount of $475,000, "not paid" is written. *Id.* The written explanation states that the development agreements for each property, between Renaissance and the respective entities, were examined by Peat Marwick. *Id.* However, no documentary verification of the amounts owed to Renaissance, such as the development agreements themselves, are contained in the balance sheet work papers.

The next item listed under "assets" is $1,756,000 for "Notes Receivable—Executive Wing Partners, Ltd. (Investor Notes)." *Id.* The written explanation states:

"Per Reid Dobbs III, this assignment of the investor notes of Executive Wings Partners, Ltd. to [Renaissance] is in satis-

faction of development fees and a partial return of capital. This was paid at closing."

*Id.* As reflected in "Assignment of Investor Notes" dated January 5, 1985, which was included in Peat Marwick's balance sheet work papers, ABA assigned its interest in this $1,756,000 to Renaissance. *Id.* at Bates P0000480. No other documentation or written explanation is included in the balance sheet work papers.

The next group of items listed under "assets" is for "Development Work in Progress (at cost)." *Id.* at Bates P0000463. First, the amount of $1,325,000 is listed for "817 W. Peachtree (Biltmore Hotel—Main Bldg.)." *Id.* Larsen's handwritten note reflects that these funds were advanced at the Biltmore closing on behalf of ABA. *Id.* at Bates P0000466. Although the closing statement for the sale of the Biltmore is included in the balance sheet work papers, *see id.* at Bates P0000485, it does not show that Renaissance advanced any money to ABA. Second, the amount of $451,650 is listed for "1302 West Peachtree," which is the Granada property. *Id.* at Bates P0000463. Larsen's handwritten note reflects that this amount was paid off at the Granada closing. *Id.* at Bates P0000467. A notation on the balance sheet work paper makes reference to a work paper "N." *Id.* at Bates P0000463. However, this work paper is not included in Exhibit 1761, nor was it discussed at trial. Third, the amount of $265,500 is listed for "Piedmont Partners, Ltd." *Id.* Larsen's handwritten note reflects that this amount was paid by Renaissance on behalf of Piedmont Properties. *Id.* at Bates P0000466. This amount is further supported by a billing statement included in the balance sheet work papers. *See id.* at Bates P0000486–89. Last, the amount of $155,325 is listed for "St. Andrews Associates, Ltd." *Id.* at Bates P0000463. Although reference is made to work paper "0," this work paper concerns the order of prohibition against Dobbs and not the St. Andrews. *See id.* at Bates P0000577–79. The following written explanation is provided: "A/R from St. Andrews Assoc. Ltd[;] Overall $155,325 is immaterial[;] Per C. Shirley—this will be paid at closing 12/18/85[.]"

The next item on the balance sheet, which follows the above-discussed current assets reportedly totalling $7,216,714, is the amount of $935,350 listed for "Notes Receivable—Biltmore Tower Associates, Ltd." *Id.* at Bates P0000463. The written explanation of this figure provides:

[E]xamined notes payable from First Equities Investors–I, Ltd. to Biltmore Towers Associates, Ltd., both dated 12–31–84. Per Reid Dobbs, III, these notes were assigned to [Renaissance] in satisfaction of development fees due [Renaissance] from Biltmore Towers Assoc., Ltd along with the [$1,756,000] note. . . . In addition, per Reid Dobbs III, these notes are a return of capital.

*Id.* The balance sheet work papers include (1) a $935,350 note dated December 31, 1984, made payable by BTA to ABA, which supports the original obligation and (2) an assignment from ABA to Renaissance, dated January 5, 1985, of $935,000 of the $935,350 note, which supports the assignment. *See id.* at Bates P0000477–79. The note, however, is not an unconditional promise to pay. It provides:

[I]f this Note is paid upon resale of the Property, payment shall be subject to the priority of distribution of resale proceeds as set forth in Article 7.03 of the Certificate and Agreement of Limited Partnership of the Maker. . . . In the event such resale proceeds are insufficient to pay the amounts due hereunder or any portion thereof, Payee shall be without recourse against the Maker or any General Partner thereof and this Note shall be cancelled.

*Id.* at Bates P0000478. At trial, Larsen testified that it was her understanding that whether something is an conditional or unconditional promise to pay has no bearing on whether it is an asset.

The next item is the amount of $2,000,000 listed for "Notes Receivable—Biltmore Tower Associates, Ltd." *Id.* at Bates P0000463. Larsen's handwritten note concerning this item provides:

Atlanta Biltmore Assoc. Ltd. had sold Executive Wing Bldg to Biltmore Tower Assoc. Ltd in exchange for a wrap around mtge and deed, both dated 12/31/84 for

$5,000,000. $3,000,000 of this is owed to C & S Bank. On 1/5/85, Atlanta Biltmore Assoc. Ltd assigned its rights to the balance of the note (i.e., $5,000,000 less $3,000,000 payable to C & S) to Renaissance ... for indebtedness arising in connection with the ownership and management of Atlanta Biltmore Hotel Property. No discrepancy.

*Id.* at Bates P0000466. The note evidencing the $5,000,000 obligation owed by BTA to ABA and the assignment to Renaissance of ABA's right to the $2,000,000 indebtedness owed by BTA were both included in the balance sheet work papers. *See id.* at Bates P0000490–95. Notably, the $5,000,000 note and corresponding wraparound deed to secure debt and security agreement, executed between BTA and ABA, provide that the indebtedness and conveyance are subject and subordinate to five other deeds to secure debt. *Id.* at Bates P0000490, P0000503. The note provides for monthly interests payments, beginning February 1, 1985, of $54,116.67 and further provides that the note will mature on December 31, 1996. *Id.* at Bates P0000490.

Humphries also testified at trial regarding the $935,350 and $2,000,000 notes receivable for BTA. With respect to the $935,350 note, he testified that he did not consider this figure to be materially misleading because the work performed showed that the note was due and payable. With respect to the $2,000,000 note, Humphries testified that the note speaks for itself. In addition, he testified that whether the note was a conditional or unconditional promise to pay is irrelevant because it would not affect its nature as an asset.

As to all items listed on the balance sheet as assets that resulted from the Executive Wing syndication, it could be argued that Peat Marwick should have known that escrow had broken by the time it performed its work on the balance sheet. Furthermore, it could be argued that Peat Marwick should have checked to see if the funds had been paid to Renaissance from escrow, as originally contemplated, instead of simply accepting verbal explanations from Renaissance staff members such as Shirley. However, in performing the balance sheet work, Peat Marwick was concerned only with determining whether Renaissance had "substantial assets" for tax purposes; it was not concerned with determining whether the balance sheet was stale or whether a more updated balance sheet should be assembled. Questions regarding stale or inaccurate information regarding the financial condition of Renaissance were properly within the purview of securities counsel's responsibilities. Accordingly, the balance sheet work papers, which include documentation and written notes of verbal explanations to support the assets relating to the Executive Wing syndication, reflect that an adequate investigation was made of these assets.

The next group of items is for "Real and Personal Property—Net of Depreciation," which totals $290,067. *Id.* at Bates P0000463. No supporting documentation is provided; only brief written descriptions of the property were made on the balance sheet. *See id.*

Next is the amount of $500, which is described as "Interest in Biltmore Hotels International." *Id.* A handwritten note explains that Renaissance owns a stock certificate in the Biltmore Hotels International, which was issued at its incorporation. *Id.* at Bates P0000468.

No other items are listed under "assets." According to the balance sheet, Renaissance had assets of $10,442,631 as of June 30, 1985.

Two items are listed under the "liabilities" section of the balance sheet. First, the amount of $325,000 is listed for "accounts payable." *Id.* at Bates P0000463. The only support provided for this figure is Larsen's handwritten explanation: "Trade payables estimated." *Id.* at P0000468. Second, the amount of $2,650,500 is listed for "Accrued Expenses and Taxes." *Id.* at Bates P0000463. As with the accounts payable, the only support provided is Larsen's handwritten explanation: "C. Shirley says this is an accrual for real estate taxes, federal and state payroll taxes, insurance, etc." *Id.* at Bates P0000469. These two figures indicate a total of $2,975,500 in liabilities. Accordingly, the stockholders' equity is shown on the

balance sheet to be $7,467,131. *Id.* at Bates P0000463.

At trial, Larsen testified as to her understanding of various omissions from the balance sheet. As to Renaissance's liability as a general partner in several limited partnerships, Larsen testified that it was not typical for a general partner to include its role in a limited partnership as an asset. In 1985, Larsen testified, she had no knowledge of a $1,000,000 note and a corresponding deed to secure debt that encumbered the 696 Peachtree. She had been instructed to read only the tax portions of the 696 Peachtree PPM, not the whole PPM, to determine whether the projections were consistent with the tax considerations set forth in the 696 Peachtree PPM. When questioned about a guarantee given by Renaissance for the $4,700,000 TCF loan on the St. Andrews project, *see* Exh. 250, Larsen testified that this guarantee did not need to be included on the balance sheet because of its contingent nature.

With respect to the $10,000,000 lawsuit brought by OPDI against ABA and Renaissance, Larsen testified that she received a document showing that the lawsuit had been dismissed "without prejudice." Larsen first testified that she told Humphries that she did not understand the meaning of the legal term "without prejudice"; Humphries then told her to call Shirley, which she did. According to Larsen, Shirley's explanation is reflected in her handwritten notes on a copy of the dismissal, which was included in her balance sheet work papers. These notes provide: "This was the $10,000,000 law suit. Biltmore main bldg[;] amount of purchase price[;] pseudo foreclosure[;] Actual amount paid to settle claim was $756,666.66 plus taxes of $55,000 for a grand total of $811,-666.66." Exh. 1761 at Bates P0000574. Larsen later testified at trial that she did not ask anyone for the definition of "without prejudice" but instead brought the dismissal to Humphries. She further testified that she did not ask (1) where the money came from to settle the lawsuit, (2) whether the amount was outstanding before June 20, 1985, or (3) whether OPDI could sue ABA and Renaissance again.

### f. Peat Marwick's Treatment of the Balance Sheet Work

At trial, Larsen testified that when she was finished with the balance sheet work, she was satisfied with the information she had received. She admitted that she had not sought verification of items on the balance sheet from third parties, but she testified that it did not occur to her to do so since she was not conducting an audit. She further testified that she did not have the impression that the client was withholding information from her, that anything was missing from the balance sheet, or that the balance sheet was misleading. However, she admitted that it was not reasonable to assume that the balance sheet would survive a review. She further admitted that she did not know in 1985 whether the balance sheet was false or misleading.

At trial, Humphries testified that after he completed the work on the balance sheet, he decided that he could proceed with the 696 Peachtree engagement. As he testified at trial, his goal in performing the balance sheet work was not to determine whether the items were misleading, but rather to determine whether they were legitimate and could therefore be included on the balance sheet. Humphries admitted that he did not check for undisclosed liabilities. He further admitted that he did not know whether the balance sheet could have survived a review. After he completed the balance sheet work, Humphries testified, he did not discuss his conclusions with Shirley, Schwartz, or any other third parties. However, he and Larsen discussed the work on the balance sheet. According to Humphries, although Larsen did not express an opinion regarding the accuracy of the balance sheet, she appeared to be satisfied with the back-up work done. Humphries also discussed the balance sheet work with Dickson, who similarly did not express an opinion regarding the accuracy of the balance sheet. After discussing individual items, they concluded that there was adequate information to support the figures.

As Humphries recalled at trial, no second partner review work was performed on the balance sheet work papers. Although he was aware that Larsen was in charge of deliver-

ing work papers to Moody and Cook, he did not instruct Larsen as to whether to submit the balance sheet work papers for second partner review. In Humphries's opinion, such work was not necessary. According to Humphries, he did not perform the balance sheet work to determine whether the projections were affected by it; rather, he did the work because his curiosity was piqued regarding the balance sheet.

At trial, Nadeau testified that Peat Marwick decided to bill Renaissance for cost overruns incurred in connection with the 696 Peachtree engagement. When Nadeau called Shirley and asked him for an additional $15,000, Nadeau testified, Shirley asked him for an analysis of cost overruns. The result was Exhibit 382, which is a letter from Nadeau to Shirley dated January 8, 1985, attaching a memorandum in which additional work performed and the allocation of work among Peat Marwick accountants is described. *See* Exh. 382. Nadeau testified that although he was not involved with the balance sheet work, he obtained this information from time reports, tax department records, Humphries, and other accountants who were involved with the work.

Nadeau described the work performed on the balance sheet as follows:

General Partner's Balance Sheet: Additional procedures included a detailed analytical review of assets and liabilities; meeting with and various phone discussions with Findley [sic], Kumball [sic]; review of effect of contingent liabilities upon net worth and discussions with Hurt Richardson re same.

Exh. 382 at Bates SC072944. At trial, Nadeau testified that "detailed analytical review" is a very general term used for work performed on financial data. He further testified that he did not recall that Humphries used this term, but he did recall that Humphries informed him as to' the extent and type of balance sheet work.

In addition, Nadeau allocated the work among accountants as follows: (1) Humphries—twelve hours; (2) Nadeau—four hours; (3) Dickson—sixteen hours; and (4) Berlin—eight hours. *Id.* He did not allocate any time to Larsen's work on the bal-

ance sheet. At trial, Nadeau testified that he did not necessarily have a rational basis for this time allocation; he just knew the total amount of work performed on the 696 Peachtree engagement. Accordingly, Nadeau, who did not perform any work on the balance sheet, was not trying to be "tricky" when he allocated four hours of work to himself. Instead, he allocated four hours of his time spent on the 696 Peachtree engagement to this category. He further testified that when he wrote this memorandum, he was not aware that Larsen had performed any work on the balance sheet.

Humphries also testified at trial regarding Nadeau's cost overrun memorandum. Contrary to the language used in Nadeau's letter to Shirley, *see id.* at Bates SC072941, Humphries testified, the balance sheet work was not done in connection with the 696 Peachtree engagement. According to Humphries, Shirley "knew what we were doing." When questioned about the descriptions contained in Nadeau's memorandum, Humphries answered that he was not sure of their accuracy, but he was sure he reviewed them before the memorandum was sent to Shirley. As to the description of phone calls with Finley Kumble, *see id.* at Bates SC072944, he thought that he might have told Nadeau of his phone calls with Schwartz. As to the language "review of effect of contingent liabilities," *see id.*, Humphries testified that he did not have these discussions and he did not know where Nadeau would have obtained this information.

It is evident that Nadeau's memorandum regarding the cost overruns was inaccurate in some respects. However, it is also evident that his descriptions were not intended to be a representation of the actual work performed, but rather a general summary for Shirley's benefit only. Accordingly, although the inaccurate descriptions of work performed (e.g., the omission of time billed for Larsen's work on the balance sheet and the inclusion of time billed for Nadeau, who did not work on the balance sheet) are somewhat troublesome, they do not contribute in any material fashion to the determination of what Peat Marwick did with respect to the balance sheet.

In addition, despite Humphries's testimony to the contrary, it is clear that the balance sheet work was done in connection with Peat Marwick's 696 Peachtree engagement. Humphries testified that he was concerned that the balance sheet, which was included in the 696 Peachtree PPM, might somehow affect their report on the projections and assumptions. Furthermore, Peat Marwick did not enter into a separate engagement for the balance sheet work, nor did the Peat Marwick accountants carry out the work without billing Renaissance for it. Notably, the Peat Marwick accountants carried out the balance sheet work just prior to the issuance of the review report for the 696 Peachtree.

### 2. Expert Testimony Regarding the Balance Sheet Work

At trial, plaintiffs expended a considerable amount of time and effort linking Peat Marwick's work on the balance sheet to their allegations that Peat Marwick was negligent and knew or should have known of Renaissance's fraud. Plaintiffs contend that the circumstances surrounding the performance of the balance sheet work support a finding that Peat Marwick possessed the requisite scienter to satisfy plaintiffs' section 10(b) and common law fraud claims. In addition, plaintiffs contend that Peat Marwick's knowledge of Renaissance's poor financial condition, as revealed by its balance sheet work, should have raised doubts as to Renaissance's integrity. These doubts, in turn, should have led Peat Marwick to an awareness of the fraud being perpetrated by Renaissance as well as the realization that the financial projections contained in the St. Andrews and 696 Peachtree PPMs, as a consequence of Renaissance's integrity problems, were unreasonable. Accordingly, plaintiffs argue, Peat Marwick's failure to investigate Renaissance further, after completing its balance sheet work, amounted to knowledge of the fraud and breach of its legal duty.

Peat Marwick, on the other hand, contends that the circumstances surrounding the decision to perform the balance sheet work do not support findings either of scienter or negligence. In addition, Peat Marwick contends that it did not negligently perform the balance sheet work. Last, Peat Marwick contends that it neither was nor should have been alerted to any fraud as a result of the balance sheet work. Accordingly, Peat Marwick argues, evidence of the balance sheet work does not support a finding of scienter or negligence.

#### a. Peat Marwick's Decision to Perform the Balance Sheet Work

The great mystery surrounding Peat Marwick's balance sheet work is the question of why the balance sheet work was performed. According to Taylor, the purpose of the balance sheet work was "to look at these assets [listed] to see what was here and how that impacted the financial condition of Renaissance." TR at 78 (Mar. 18, 1992). This explanation does not show why the balance sheet work was done; consequently, it cannot support any inference of scienter arising from the mere fact that Peat Marwick undertook work on the balance sheet. According to Pallais's understanding, the balance sheet work was performed because issues of integrity had been raised, which may have affected Peat Marwick's review report. *See id.* at 126–28 (Apr. 6, 1992). Although integrity may not properly be characterized as an implicit assumption, Pallais testified, it is a condition of performing accounting services and was therefore relevant.

On cross-examination by plaintiffs' counsel, Pallais recognized that the St. Andrews and 696 Peachtree projections assumed that the limited partnerships would be treated as partnerships for federal income tax purposes. He further recognized that the general partner's financial condition is important in determining the availability of tax benefits because it affects whether the limited partnership will be treated as an association taxable as a corporation. Although Pallais disputed whether Circular 230 was applicable to Peat Marwick's work, he testified that, in 1985, an accountant could rely on an attorney's tax opinion regarding the taxation of a partnership as a partnership so long as there is no indication that the tax opinion is wrong on its face. Pallais testified, however, that he did not think that Schwartz's phone call raised any questions as to whether Peat Marwick could rely on the tax opinion contained in the

696 Peachtree PPM; in fact, he adamantly insisted that the balance sheet work was not performed because of concerns regarding the tax treatment of the partnership. *See* TR at 104–08 (Apr. 6, 1992).

The court rejects both Pallais's and Taylor's opinions regarding the reason why the balance sheet work was performed. Instead, as discussed *supra,* the court finds that the balance sheet work was performed because of Humphries's concerns regarding the federal tax treatment of the 696 Peachtree limited partnership. In so finding, the court relies on Humphries's sworn testimony at trial as the explanation that, more than six and a half years after the balance sheet work was performed, bears the closest resemblance to the truth. At trial, Humphries testified that he was concerned, as a result of his awareness of previously undisclosed liens and lawsuits and Schwartz's request for "comfort," that Renaissance did not have "substantial assets." If this were true, then the assumption in the 696 Peachtree PPM regarding the tax treatment of the partnership as a partnership would be unreasonable. Accordingly, Humphries directed that certain work be carried out on the balance sheet to verify, for Peat Marwick's own internal uses, that Renaissance appeared to have "substantial assets." Based on the foregoing, the court finds that evidence regarding Humphries's decision to perform the balance sheet work fails to support a finding of scienter.

### b. Peat Marwick's Performance of the Balance Sheet Work

At trial, Taylor testified that several problems existed with Peat Marwick's work on the balance sheet. Based on his review of Exhibit 1761, Taylor concluded that the balance sheet was false and misleading in several aspects, including the following: (1) many assets contained insufficient support; (2) some assets were contingent, nonrecourse, and had little hope of being realized; and (3) Renaissance's liabilities were understated. For example, the balance sheet included assets relating to the Executive Wing, for which escrow had not yet broken as of the date of the balance sheet but had broken when Peat Marwick completed its work for the St. Andrews and 696 Peachtree review

reports. Because of the release of escrow, these listed assets were no longer contingent; accordingly, Taylor testified, Peat Marwick should have investigated whether Renaissance received the money it was reportedly due.

On direct examination, Pallais testified that nothing in Exhibit 1761 suggested that the balance sheet was misleading or that Renaissance was insolvent. On cross-examination by plaintiffs' counsel, however, he admitted that it was obvious that the balance sheet would not have survived a review without substantial modification. In addition, he testified that he did not know, at the time of trial, whether the balance sheet was false and misleading. He also testified that the balance sheet showed that Renaissance was illiquid.

The court has determined that Humphries directed that certain work be carried out on the balance sheet to verify, for Peat Marwick's own internal uses, that Renaissance appeared to have "substantial assets." This explanation justifies many aspects of Peat Marwick's work. First, it shows why the scope of the work performed on the balance sheet was somewhat narrow. As Larsen testified, she was instructed by Humphries to obtain documentation and explanations in support of items listed on the balance sheet. Humphries did not intend to perform an audit; rather, he wanted to verify the existence of "substantial assets." Accordingly, more detailed instructions to Larsen were not necessary. Second, because the balance sheet work was not performed out of concerns relating to Renaissance's integrity, it was appropriate for Peat Marwick to expect that Renaissance would supply all documents requested by Peat Marwick and would give verbal explanations that were not misleading. Third, the failure to submit the balance sheet work papers for second partner review does not show any negligence or recklessness because it was not necessary under the applicable AICPA and Peat Marwick guidelines. Fourth, Humphries's refusal to give "comfort" to Schwartz is clarified by this explanation. Neither Schwartz's request nor the resulting balance sheet work indicated to Humphries that the financial projections

were unreasonable or that the 696 Peachtree offering was tainted by any fraud. In addition, the work performed on the balance sheet was insufficient for Humphries to offer any formal opinion thereon. Accordingly, Humphries acted appropriately in refusing to give "comfort" to Schwartz. Last, this explanation demonstrates that no revision or updating of the St. Andrews reports was necessary. The balance sheet work showed that the assumption concerning the tax treatment of the partnership was reasonable.

Based on the foregoing, the court finds that the somewhat limited nature of Peat Marwick's investigation of the balance sheet was appropriate under the circumstances. The court further finds that the amount of work performed by Peat Marwick was sufficient to show that Renaissance did in fact have "substantial assets." Because no other facet of Peat Marwick's work on the St. Andrews or the 696 Peachtree engagements mandated that work be performed on the balance sheet, no further investigation of the assets and liabilities listed on the balance sheet was necessary. Accordingly, the court finds that the evidence of Peat Marwick's investigation of the balance sheet fails to show that Peat Marwick carried out its accounting services with actual knowledge of fraud, severely recklessness with respect to the existence of any fraud, or negligently.

c. Humphries's Refusal to Give "Comfort"

As stated *supra*, Peat Marwick presented the expert testimony at trial of Bernard L. Greer, an attorney with extensive experience in the private placements of real estate limited partnerships, who testified as to his opinion of the relationship between securities counsel and accountants as well as their respective responsibilities. The court finds that Greer's testimony was quite credible. Accordingly, the court relies on his testimony in finding that the evidence regarding the balance sheet work defeats plaintiffs' allegations of scienter or negligence.

It is appropriate to note, as the court and all the parties are aware, that securities counsel in the St. Andrews offering were not sued by the plaintiffs, and securities counsel in the 696 Peachtree settled after suit was brought against them. No close scrutiny of their culpability or negligence has thus been made. Accordingly, the court must be careful not to impose liability on the accountants for responsibilities within the securities lawyers' domain; as a corollary, the court should be mindful not to use securities counsel as a scapegoat and thereby excuse Peat Marwick from its duties owed to plaintiffs.

At trial, Greer testified that, in 1985, it was the role of securities counsel retained for the private placement of limited partnership interests to advise the general partner on the nature of disclosures required. In his experience, it was not typical for accountants who reviewed projections to advise securities counsel regarding disclosure issues. Based on his experience, Greer further testified that securities counsel would "quarterback" the deal, that is, perform the real estate acquisition work and carry out the due diligence necessary to determine what needed to be disclosed.

Greer testified that the scope of due diligence included examining the financial condition of the general partner. If a new client were involved, Greer testified, then he would ask for an audited financial statement as well as information regarding contingent liabilities of the general partner. In a situation in which the general partner did not have an audited financial statement, it was not typical in 1985 for securities counsel to question the accountants about the general partner's financial condition. In his experience, he generally did not include an unaudited financial statement of the general partner because he knew he was unqualified to audit the statement. Instead, he relied on the due diligence process and information from the general partner to determine the financial condition of the general partner. Information regarding the general partner's financial condition would need to be disclosed only if its financial condition would affect the limited partnership, which in turn required a determination of materiality. On cross-examination by plaintiffs' counsel, Greer agreed that the net worth of the general partner would be an issue in determining whether the partnership would be taxed as a partnership and not as an association taxable as a corpora-

tion. In his opinion, this issue was securities counsel's responsibility.

With a view toward the facts of Peat Marwick's involvement in the *Renaissance* litigation, Greer testified that if securities counsel found out information that cast doubt on the general partner's integrity, then securities counsel had a duty of inquiry at that point. Greer could not recall any situation in which securities counsel requested information from the accountants regarding the general partner. Nor, in Greer's experience, was it common for securities counsel to request any type of representation letter from accountants who reviewed financial projections. According to Greer, securities counsel relied on the review report issued by the accountants, but they did not rely on the accountants in any other respect.

On cross-examination by plaintiffs' counsel, Greer testified that although he was not familiar with the duties owed by accountants, he would want to know if the assumptions, on which the accountants were reporting, were unreasonable. When questioned about the process of assembling PPMs and the respective responsibilities of the client, accountants who issued a review report, and securities counsel, Greer testified that at the time when the projections were submitted to securities counsel, it was his belief that the accountants thought the assumptions were reasonable.

Greer testified further on cross-examination that if he were to ask accountants for information regarding the general partner, he would expect the response to be accurate. Greer was next presented with a hypothetical similar to Schwartz's request for comfort, namely, whether he would expect an accountant, who prepared a review report and, after performing additional work on an unaudited balance sheet included in the PPM, had knowledge that the balance sheet would not withstand a review without substantial modification, to disclose this knowledge to a securities lawyer who had asked the accountant about the balance sheet. In response, Greer testified that he would not expect such disclosure by the accountant to the securities lawyer unless the accountant had undertaken a formal engagement for the purpose of performing the balance sheet work.

Pallais similarly testified that Peat Marwick did not breach any duty by failing to give "comfort" to Schwartz because Peat Marwick was neither engaged nor required to perform the balance sheet work. In Pallais's opinion, while Peat Marwick may have had an interest, for whatever reason, in determining whether the balance sheet was *misstated,* the responsibility remained with securities counsel to determine whether the balance sheet was *misleading* to potential investors and therefore should have been revised. Thus, although Peat Marwick could have made recommendations to Renaissance or Finley Kumble regarding portions of the PPMs, on which it was not reporting, that needed some additional disclosures or revisions, it was not required to do so.

In addition, Pallais was not concerned by Humphries's unwillingness to give "comfort" to Schwartz for two reasons. First, Finley Kumble was not entitled to the balance sheet work papers because it was a third party to Peat Marwick. Second, insufficient work had been performed on the balance sheet upon which Humphries could have offered an opinion to Schwartz. Pallais further noted that Finley Kumble's issuance of its tax opinion letter at the closing should have indicated that its concerns were resolved favorably.

On cross-examination by plaintiffs' counsel, Pallais admitted that Peat Marwick was required to read the PPMs in their entirety to check for inconsistencies and to determine whether the projections should consequently be adjusted. Pallais further admitted that if the Peat Marwick accountants had found any misleading statements, then they should have communicated this information to someone such as a Renaissance staff member or securities counsel.

■■■■ The court accepts Greer's and Pallais's testimony concerning Humphries's refusal to give "comfort" to Schwartz. As Greer testified, because securities counsel had an independent obligation to investigate Renaissance's financial condition, as well as its integrity, they could not have relied on the accountants for such information. Indeed, as Greer testified in response to the hypothetical recited above, Humphries

should not have made any disclosures regarding his work on the balance sheet because no formal engagement existed. Schwartz's request for "comfort" should definitely have notified Humphries that he could not rely on Finley Kumble with respect to the balance sheet and, consequently, with respect to Renaissance's financial condition. Humphries acted appropriately, under the circumstances, by refusing to discuss the balance sheet work with Schwartz and by carrying out his own investigation of whether Renaissance appeared to have "substantial assets" for federal tax purposes. Based on the foregoing, the court finds that Humphries did not breach any duty when he refused to give "comfort" to Schwartz. In addition, the court finds that Schwartz's request for "comfort" did not and should not have alerted Humphries to the Renaissance's serious integrity problems. Accordingly, the court finds that Humphries's refusal to give "comfort" to Schwartz does not support findings of scienter or negligence.

### H. Peat Marwick's Awareness of Previously Undisclosed Information

■ At trial, the evidence showed that three items concerning Renaissance were sent to Peat Marwick in mid-December, just prior to the release of Peat Marwick's review report on the 696 Peachtree: (1) the order of prohibition regarding Dobbs; (2) a letter dated December 17, 1985 from Hansen to Shirley disclosing the existence of six lawsuits and liens; and (3) a letter dated December 17, 1985 from Hansen to Larsen enclosing the dismissal of the OPDI lawsuit dated December 12, 1985 and filed December 16, 1985. Plaintiffs and Peat Marwick disagree as to whether these items, in addition to other information revealed during Peat Marwick's work on the St. Andrews and the 696 Peachtree engagements, should have alerted the Peat Marwick accountants to the fraud being perpetrated by Renaissance in connection with the St. Andrews and 696 Peachtree syndications.

Evidence regarding Peat Marwick's receipt of the order of prohibition and the letter enclosing the OPDI dismissal is not in substantial dispute. Evidence regarding the circumstances of the December 17, 1985 letter from Hansen to Shirley, however, is conflicting.

### 1. The Order of Prohibition

The order of prohibition was included in a Peat Marwick balance sheet work paper dated December 18, 1985. *See* Exh. 1761 at Bates P0000577–79. This order of prohibition, which is dated May 31, 1978, states that Dobbs sold unregistered securities involving a real estate syndication in violation of the Georgia Securities Act. *Id.* at Bates P0000578. In this order of prohibition, Dobbs agreed to "cease and desist" from selling securities in violation of the Georgia Securities Act. *Id.* at Bates P000579.

At trial, Humphries testified that the order of prohibition was sent to him by Hansen. In addition, Shirley testified that Humphries asked him on December 16th or 17th of 1985 about the order of prohibition, to which he responded that he had to talk to Dobbs about it. According to Shirley, he told Dobbs about Humphries's request; Dobbs then told him that he would take care of sending a copy of the order of prohibition to Humphries. No other evidence was submitted regarding the circumstances of Peat Marwick's receipt of this information.

### 2. The OPDI Dismissal

As stated *supra*, the OPDI dismissal concerned a lawsuit that was filed by OPDI against ABA and Renaissance in connection with the Executive Wing project. At trial, several witnesses testified that Richard Ellenberg, the attorney representing OPDI in the lawsuit, filed notices of default so frequently that no one took them seriously. Ellenberg did not testify at trial. At trial, Shirley testified as to his understanding:

> It seemed that Mr. Richard Ellenberg ... had a dislike for Reed [sic] Dobbs, and any time there was ... the slightest default on the Biltmore mortgage for whatever reason, Mr. Ellenberg sent demand letters, and it was clear to me that Mr. Ellenberg, with ... the pretense of protecting [ODPI's] interest in the Biltmore, just for some reason loved to antagonize Reed [sic] Dobbs and Renaissance.

TR at 165 (Feb. 25, 1992). The evidence shows that E. Lewis Hansen, an attorney with defendant Hurt Richardson represented ABA and Renaissance in connection with the ODPI dispute. In his testimony, Hansen stated that two lawsuits were brought by OPDI against ABA and Renaissance. The first suit was filed on April 24, 1985 and was dismissed on May 2, 1985 without prejudice. *See* Exhs. 2101; 41776; 45839A.1–2. The second suit was filed on September 16, 1985 and was dismissed on December 16, 1985. *See* Exhs. 1761 at Bates P000574; 2100.[19]

At trial, Shirley was unsure whether he was aware of the OPDI dismissal in December of 1985. In response to a question from the court concerning the OPDI lawsuit, Shirley testified:

> I knew there was a dispute, your honor, but I didn't think it was a lawsuit. I know I was seeing—a demand letter would come in or a registered letter, and those were being handled by Stephanie Chisholm and Reed [sic] Dobbs, but I wasn't aware that there was [a] lawsuit. I knew there was a dispute with ODPI.

TR at 174 (Feb. 25, 1992).

Although the following testimony by Humphries was elicited in response to a question regarding the order of prohibition, it appears to concern Humphries's treatment of the OPDI dismissal:

> ... I talked with Brian Godwin, who was in charge of the tax department, told him this had come to our attention and asked what we should do, and he said we should follow up with our counsel and executive. So, I called them, and ... I read to them over the phone what the situation was. They asked me how securities counsel regarded this and said that we should talk with securities counsel ... about it and see what they thought, but our in-house counsel at that time said that it had been dismissed and paid and settled and they didn't really see where this would affect the 696 placement because this settlement

was against the Biltmore Associates, which of course isn't what we were looking into or reporting on at this point in time.

> So, I did discuss this with Schwartz, and Schwartz said it was settled and he didn't see any reason to mention it in the memorandum. To him it wasn't considered material to what we were doing. So, that was it. Our in-house counsel looked at it and said it was okay, the securities counsel that was working on the P.P.M. said it was okay, to me it appeared okay, so we went on.

TR at 117 (Feb. 10, 1992). Humphries further testified that he had little reason to investigate the source of settlement amount because, since ABA was the primary debtor, he assumed that payment of the settlement money would come from ABA. He further thought that this obligation properly belonged on ABA's balance sheet.

### 3. The December 17, 1985 Letter from Hansen to Shirley

At trial, evidence was submitted showing that numerous liens and lawsuits were pending against Renaissance and its affiliates in December 1985. These liens and lawsuits were not disclosed in the St. Andrews or 696 Peachtree PPMs. Hansen, who did not perform any legal services directly in connection with the issuance of the PPMs, represented Renaissance and its affiliates in nearly all of these disputes. The evidence at trial showed that Peat Marwick had no knowledge of any pending litigation or creditors' disputes involving Renaissance during its work on the St. Andrews and 696 Peachtree engagements, aside from some rumors that Peat Marwick had heard and the liens and lawsuits disclosed in a December 17, 1985 letter from Hansen to Shirley.

At trial, Humphries testified that he asked Shirley during a meeting in December of 1985 if there were any outstanding lawsuits and liens that had not been disclosed. In

---

**19.** At trial, counsel for plaintiffs and Peat Marwick stipulated that the December 16, 1985 dismissal erroneously contained the civil action number for the first suit. Ellenberg intended to dismiss the second suit when he filed the December 16, 1985 dismissal. Accordingly, for all

practical purposes, no OPDI lawsuit was pending either when Peat Marwick conducted its pre-engagement client evaluation of Renaissance or when Humphries was questioning Shirley about undisclosed lawsuits.

response, he and Larsen received a letter dated December 17, 1985 from Hansen enclosing the OPDI dismissal, which became part of the balance sheet work papers, *see* Exh. 1761 at P0000573–76. Humphries further testified that, during the meeting, Shirley gave him permission to talk to Hansen regarding lawsuits involving Renaissance. Humphries then testified:

> ... I called while [Shirley] was there the first day to try to catch [Hansen] and we didn't catch him then. I talked to him later and I told him I wanted to know— that [Shirley] had given us permission to get any liens and lawsuits on Renaissance, and if there were such animals out there, to please give us a description, the amount, and some sort of little summary of what it was, where it was, et cetera. So he did so, and this is the synopsis of what he gave us.

TR at 110 (Feb. 10, 1992). According to Humphries, a letter dated December 17, 1985 from Hansen to Shirley was then hand-delivered by Nelson. This letter supplied descriptions of six lawsuits, two involving bonded liens, and was included in Peat Marwick's balance sheet work papers. *See* Exh. 1761 at Bates P0000580–83. Humphries later testified at trial that he talked to Hansen after he received the letter and asked if there were any more lawsuits. According to Humphries, Hansen replied that there were more suits but they would be settled shortly.

Humphries testified at trial that the disclosure of the lawsuit and lien information did not trouble him because such disputes are common in the construction industry. In addition, this disclosure did not cause him to question Renaissance's integrity for three reasons: (1) although Renaissance was named as a defendant in each suit, the suits had nothing to do with the 696 Peachtree limited partnership; (2) the letter mentions that sufficient monies were in a trust fund to cover the amounts owed; and (3) in response to his request for lawsuits involving Renaissance, Hansen told him that these comprised the lawsuits against Renaissance.

According to Shirley, when Humphries asked for information regarding the order of prohibition against Dobbs, discussed *supra,* Humphries also asked him for information about liens and lawsuits. In response, as with the order of prohibition, Shirley told Humphries that he needed to talk to Dobbs about these matters, which Shirley subsequently did. According to Shirley, Dobbs told Shirley that he would ask Nelson to contact Hansen and direct Hansen to supply information to Humphries. Accordingly, Shirley testified, he did nothing further with regard to this matter.[20] In fact, Shirley did not recall supplying any information or documentation regarding previously undisclosed lawsuits and liens to Humphries.

Shirley also testified that the day after the phone call, Wednesday, December 18, 1985, he, Humphries, and Larsen met in Humphries's office. As discussed previously, Humphries raised his voice and asked Shirley "is this everything," to which Shirley replied that he had supplied everything that had been requested. Shirley testified at trial that, in the fall of 1985, he did not know about the numerous liens and lawsuits involving Renaissance or the OPDI lawsuit. In addition, although the December 17, 1985 letter from Hansen to Larsen enclosing the OPDI dismissal reflected that a copy was sent to Shirley, and although Hansen's December 17, 1985 letter listing the six lawsuits and liens was addressed to Shirley, Shirley did not recall seeing these documents in December of 1985.[21] Shirley further testified

---

**20.** At trial, the following exchange occurred between plaintiffs' counsel and Shirley:

> Q: ... [P]rior to or on December 17, 1985, did you request E. Lewis Hansen to submit a list of pending suits filed naming Renaissance Investment Corporation as a defendant?
>
> . . . . .
>
> A: No.

TR at 46 (Feb. 24, 1992).

**21.** At trial, the following exchange took place between plaintiffs' counsel and Shirley:

> Q: Now, do you see the date of the 17th on Mr. Hansen's letter that is 994 and the 17th on Oliver Reid Dobbs' letter that is 289 and the 17th on plaintiff's [sic] exhibit 338 that is the letter addressed to you from Mr. Hansen?
> A: Yes.
> Q: Do you recall all of those letters being— well, with respect to the first two, do you recall seeing those letters on or shortly after December 17?
> A: Again, I'm a little bit vague on that. I don't think I did. During this time period I

that there was a "concerted effort" by other Renaissance corporate officers to keep information from him. TR 16 at 27 (Feb. 24, 1992). Chisholm testified similarly that she and Dobbs hid much information, including information regarding liens and lawsuits, from Shirley.

Hansen's version of the events surrounding his December 17, 1985 letter contradicts Shirley's and Humphries's testimony substantially. According to Hansen, Shirley called and left a message for him on Monday, December 16, 1985. When Hansen returned Shirley's telephone call on Tuesday, December 17, 1985, Shirley told Hansen that he was trying to get Renaissance's books in order and needed some information regarding lawsuits. Specifically, Shirley needed a list of pending lawsuits that involved disputed amounts of more than ten thousand dollars. According to Hansen, he did not know that the letter would be delivered to any accountants. On cross-examination by counsel for Peat Marwick, Hansen did not recall receiving any phone call from Humphries. After he was shown two telephone messages from Humphries, one of which appears to have been made on December 16, 1985 and the other on December 17, 1985, *see* Exh. 90006B at Bates RH001396, RH001413, Hansen's recollection was not refreshed.

At trial, Nelson testified that he recalled attending a meeting at which he explained the lawsuits and liens listed in Hansen's December 17, 1985 letter to Shirley. According to Nelson, Dobbs asked him to attend the meeting and told him that there were a number of suits that required explanation from him. Since Nelson had been involved with negotiations regarding the suits, Dobbs told him with "some anxiety" in his voice that he wanted Nelson to attend the meeting. At the meeting, which included himself, Humphries, and Larsen, Nelson discussed only the contents of the letter. Although he knew of other undisclosed lawsuits involving Renaissance and its affiliates, he did not discuss these with Humphries and Larsen; neither

Humphries nor Larsen asked him if there were any other undisclosed suits. Instead, Humphries and Larsen asked him about the details of the lawsuits and liens, such as the nature of the suit, the nature of the dispute, and how they would be settled.

On cross-examination by plaintiffs' counsel, Dobbs testified that he had very little contact with anyone from Peat Marwick. However, he recalled a conference call with Shirley, Nelson, and Humphries in which he participated for a brief time. Dobbs further testified that Shirley told him that Peat Marwick had heard rumors of undisclosed lawsuits during their work on the 696 Peachtree engagement and that "Humphries wanted to discuss some of the things that he had heard and have a clarification and have an explanation of what was going on." TR at 16 (Mar. 10, 1992). According to Dobbs, Shirley asked him if Nelson could sit in on a conference to explain the various contractor and construction disputes. Dobbs then sat in on a portion of the conference call between Shirley, Humphries, and Nelson. As Dobbs recalled, Nelson was explaining some subcontractor litigation and how Renaissance was solving problems. No further testimony was elicited from Dobbs at trial regarding the genesis of Hansen's December 17, 1985 letter.

After consideration of the foregoing recitation of evidence regarding Hansen's December 17, 1985 letter to Shirley, it is quite obvious that the various versions of the circumstances under which Hansen wrote the letter are contradictory. Upon careful reflection, the court finds that the following facts have been proved by a preponderance of the evidence. During a meeting between Humphries and Shirley in mid-December of 1985, Humphries asked Shirley if there were any liens and lawsuits involving Renaissance that had not been disclosed to Peat Marwick. At some subsequent point, after consulting with Dobbs, Shirley gave permission to Humphries to contact Hansen, who was handling

---

was heavily involved in the selling effort of the 696 project. These things, they may have crossed my desk. Again, when Mr. Humphries requested that we provide this information, I trans—I sent—I talked to Mr.—talked to Reid

Dobbs about his request, and Reid, knowing that I was heavily involved in the selling effort, said, "I'll get Tommy Nelson to handle this or I'll take care of this for you."
TR at 89–90 (Feb. 24, 1992).

a substantial amount of litigation on behalf of Renaissance and its affiliates, regarding the matter of liens and lawsuits. At this point, Shirley was aware of Renaissance's severe financial difficulties but was not aware of the numerous liens and lawsuits, including the OPDI lawsuits, because such information had been concealed from him. When Humphries got in touch with Hansen by phone, after one unsuccessful attempt, Humphries told him that Renaissance had given its permission for Hansen to disclose information regarding liens and lawsuits to Humphries. The December 17, 1985 letter from Hansen to Shirley was the result. After Humphries received the letter and asked Shirley if all liens and lawsuits had been disclosed, Shirley replied honestly, if somewhat recklessly (considering his responsibilities as a corporate officer and agent of Renaissance), that everything had been disclosed.

In finding the facts as set forth above, the court rejects Hansen's version of the events surrounding his letter as not credible. Specifically, the court rejects Hansen's testimony that Shirley called him regarding the need for a list of lawsuits, that Shirley asked only for liens and lawsuits involving amounts in dispute of more than ten thousand dollars, and that Hansen did not know that the information would be conveyed to accountants. It is a mystery to the court why Hansen addressed the letter to Shirley. In light of Shirley's testimony that Dobbs told Shirley he would talk to Hansen, the conclusion may be drawn that this was the result of a discussion between Hansen and Dobbs.

### 4. Expert Testimony

At trial, Taylor testified that the disclosure of previously undisclosed information should have caused Peat Marwick to question Renaissance's integrity. First, Taylor testified, Peat Marwick's awareness of the OPDI dismissal should have resulted in an investigation regarding the circumstances of the dismissal and the source of payment. Second, Peat Marwick's awareness of the other previously undisclosed lawsuits detailed in Hansen's December 17, 1985 letter to Shirley, along with their knowledge of the OPDI dis-

missal, should also have raised concerns regarding Renaissance's integrity.

Pallais, on the other hand, testified that the six lawsuits and liens listed in the December 17, 1985 letter from Hansen to Shirley had no material effect on the numbers contained in the projections and did not suggest that Peat Marwick should have withdrawn from the 696 Peachtree engagement. He testified similarly in regard to the OPDI dismissal. When questioned about the language contained in the "illustrative review procedures" section of the '80 Guide that an accountant "consider obtaining a letter from the client's legal counsel, as of the report date, covering [l]itigation, claims, and assessments," *see* Exh. 45,584 at 19, Pallais responded that this is only an AICPA suggestion, and not a requirement, for conducting a review. He was not troubled by the fact that Peat Marwick did not investigate the existence of lawsuits with the client; in fact, he testified that the suggested investigation of lawsuits and other claims is rarely done by accountants.

In examining Peat Marwick's conduct in regard to the previously undisclosed information, the court rejects Taylor's testimony and accepts Pallais's testimony. It could be argued that the information revealed by the client evaluation and Peat Marwick's knowledge of previously undisclosed liens, lawsuits, and the order of prohibition regarding Reid Dobbs constituted sufficient "red flags" to warrant closer scrutiny of all information provided by Renaissance in connection with the balance sheet work. In other words, Peat Marwick should have been alerted to integrity problems with Renaissance and, consequently, should have conducted a more in-depth investigation of the balance sheet and of Renaissance. The court rejects this argument, however. Although a few "red flags" may have existed regarding Renaissance's integrity, they were not serious enough to warrant an exhaustive investigation of Renaissance's integrity or a distrust of Renaissance's representations to Peat Marwick. Based on the foregoing, the court finds that the evidence of previously undisclosed information regarding Dobbs' order of prohibition, the OPDI dismissal, and the six

lawsuits and liens does not support a finding that Peat Marwick was negligent for failing to investigate Renaissance's integrity or that Peat Marwick was or should have been alerted to the fraud. Correspondingly, the court finds that Peat Marwick's reliance on Renaissance to provide documents and verbal explanations in support of the balance sheet was neither reckless nor negligent.

### I. Peat Marwick's Work in 1986

■ Peat Marwick's professional relationship with Renaissance continued after its work on the St. Andrews and 696 Peachtree engagements. Although the evidence in this area was not developed fully at trial, Peat Marwick performed some work on the Georgian Terrace, a property that Renaissance tried unsuccessfully to syndicate in 1986. Peat Marwick also performed some tax return work for some limited partnerships of which Renaissance acted as general partner. In addition, at Shirley's request, Humphries agreed to send out some letters to other Peat Marwick accountants to introduce them to investment opportunities in the Georgian Terrace limited partnership interests. At trial, Humphries testified that he first learned in April of 1986 that the Renaissance projects were in serious financial trouble.

In a memorandum dated August 15, 1986, Nadeau reported to Humphries that, according to Shirley, Renaissance was in "dire financial straits." Exh. 869 at Bates P0001160. After detailing several severe problems with ABA, the St. Andrews, and the 696 Peachtree, as well as the status of past due bills owed to Peat Marwick, Nadeau concluded:

> ... I feel we should review our current situation with regards to the Georgian Terrace Private Placement Memo currently on the streets. Due to lateness in the year, it appears that it is not possible for the construction to be completed and the Hotel opened by the end of the year as the projections assume. Given the financial difficulty of the General Partner, certain of the assumptions indicated in the financial forecast may need to be reviewed.

*Id.* at Bates P0001161. Apparently, at the time this memorandum was written, Peat Marwick's work on the Georgian Terrace had been completed but the Georgian Terrace syndication had not yet closed. *See id.* at Bates P0001160. At trial, Nadeau testified that the purpose of this memorandum was to inform the Peat Marwick partners fully so that they could decide what Peat Marwick's obligations were with respect to their work on Renaissance projects.

This memorandum supports a finding that Peat Marwick was careful in its work on the Georgian Terrace because it demonstrates that Peat Marwick was concerned that some of the projections and assumptions on which it reported were in error. However, as the court stated on several occasions during the trial, the Georgian Terrace syndication is not at issue in this litigation. What Peat Marwick did in connection with the Georgian Terrace, in August of 1986, is therefore irrelevant.

In addition, this memorandum does not indicate that any of the events detailed therein occurred prior to the dates of Peat Marwick's reports on the St. Andrews and 696 Peachtree offerings. In both engagements, Peat Marwick expressly limited its responsibility to update information:

> The terms of our engagement are such that we have no obligation to update this report or to revise the projected financial results because of events and transactions occurring subsequent to the date of this report.

Exh. 925 at Bates SC50630 (St. Andrews supplement—review report); Exh. 5006 at Bates P0011936 (St. Andrews compilation report); Exh. 5016 at Bates P0001513 (696 Peachtree review report). The evidence at trial did not show that any of the projections or assumptions on which Peat Marwick reported, in connection with the St. Andrews and 696 Peachtree engagements, were unreasonable as of the dates of the reports. Accordingly, this memorandum, or any other evidence submitted at trial, does not support a finding that Peat Marwick breached its obligation to update its St. Andrews and 696 Peachtree reports.

## CONCLUSION

The court concludes that plaintiffs have not proved by a preponderance of the evidence that Peat Marwick had actual knowledge of the fraud perpetrated by Renaissance. The evidence as to what Peat Marwick knew, in carrying out its St. Andrews and 696 Peachtree engagements, simply does not amount to actual knowledge of fraud. The court concludes similarly that plaintiffs have not proved by a preponderance of the evidence that Peat Marwick had a general awareness of any fraud and accordingly was severely reckless with respect to its engagements. Last, the court concludes that Peat Marwick did not breach any duties owed to the *Abrams & Wofsy, Pignatelli,* and *Pendleton* plaintiffs and therefore was not negligent.

Based on the foregoing findings of fact and conclusions of law, the court finds that Peat Marwick did not have the requisite scienter to satisfy the *Abrams & Wofsy, Pignatelli,* and *Pendleton* plaintiffs' claims under section 10(b) and common law fraud claims. Consequently, the court finds that claims against Peat Marwick for section 10(b) violations (as-suming that at least one plaintiff's section 10(b) claim is not time-barred), common law fraud, and violations of federal and Georgia RICO statutes fail. In addition, the court finds that the professional negligence claims against Peat Marwick fail on the ground that Peat Marwick did not breach any duty owed to plaintiffs. Accordingly, the court finds in favor of defendants Peat Marwick and Jerry F. Humphries and against the *Abrams & Wofsy, Pignatelli,* and *Pendleton* plaintiffs as to all remaining counts of their complaints. The court hereby grants Peat Marwick's Rule 52(c) motion, Fed.R.Civ.P.,[22] and denies the *Abrams & Wofsy, Pignatelli,* and *Pendleton* plaintiffs' Rule 52(c) in part.[23] The court further denies Peat Marwick's motion to file an additional memorandum as moot.[24]

IT IS SO ORDERED.

---

**22.** Case No. 1:87–cv–1931–WCO, Docket No. 438; Case No. 1:87–cv–1962–WCO, Docket No. 521; Case No. 1:87–cv–2454–WCO, Docket No. 430.

**23.** Case No. 1:87–cv–1931–WCO, Docket No. 425; Case No. 1:87–cv–1962–WCO, Docket No. 509; Case No. 1:87–cv–2454–WCO, Docket No. 418.

**24.** Case No. 1:87–cv–1931–WCO, Docket No. 457; Case No. 1:87–cv–1962–WCO, Docket No. 542; Case No. 1:87–cv–2074–WCO, Docket No. 470; Case No. 1:87–cv–2454–WCO, Docket No. 452.